# UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT
## MOTION INFORMATION STATEMENT

Caption [use short title]

**Docket Number(s):** 13-3123

**Jaenean Ligon, et al.,**

**Motion for:** Expedited appeal

Plaintiffs-Appellees,

-against-

**Set forth below precise, complete statement of relief sought:**

**City of New York, et al.**

An order (1) expediting briefing and consideration of the appeal; and (2) directing that this appeal be heard in tandem with *Floyd v. City of New* York (Docket No. 13-3088).

Defendants-Appellants.

**MOVING PARTY:** City of New York et al.

**OPPOSING PARTY:** Plaintiffs-Appellees

☐ Plaintiff  ☒ Defendant

**Jaenean Ligon, et al.**

☒ Appellant/Petitioner  ☐ Appellee/Respondent

**MOVING ATTORNEY:** Michael A. Cardozo,
Corporation Counsel, City of N.Y.

**OPPOSING ATTORNEY:**

[name of attorney, with firm, address, phone number, and email]

[name of attorney, with firm, address, phone number, and email]

**New York City Law Department**
**Office of the Corporation Counsel**
**100 Church St.**
**New York, NY 10007**

**Christopher Dunn**
**125 Broad Street, 19th Floor**
**New York, NY 10004**
**(212) 607-3300**
**CDunn@nyclu.org**

**By: Deborah A. Brenner**
**212-356-0826 or -0827**
**dbrenner@law.nyc.gov**

Court-Judge/Agency appealed from: **United States District Court for the Southern District of New York (Scheindlin, D.J.)**

Please check appropriate boxes:

**FOR EMERGENCY MOTIONS, MOTIONS FOR STAYS: AND INJUNCTIONS PENDING APPEAL:**

Has **consent** of opposing counsel:
    A.  been sought?  ☒ Yes  ☐ No

Has request for relief been made **below**?  ☐ Yes  ☐ No

    B.  been obtained  ☐ Yes  ☒ No

Has this relief been previously sought in

**Counsel only consents to an order directing that the two appeals be heard in tandem, and has requested until September 17, 2013 to file opposing papers on the issue of expedition.**

this Court?  ☐ Yes  ☐ No

Is **oral argument** requested?  ☐ Yes  ☒ No
(requests for oral argument will not necessarily be granted)

Requested returned date and explanation of emergency:

Has **argument** date of appeal been **set**:  ☐ Yes  ☒ No

If yes, enter date

**Signature of Moving Attorney:**

**Date:** 9/11/2013  Has **service** been effected? ☒ Yes ☐ No
[Attach proof of service]

## ORDER

Leave this space blank.
**IT IS HEREBY ORDERED that the motion is:**  ☐ **granted**  ☐ **denied.**

**FOR THE COURT:**

CATHERINE O'HAGAN WOLFE, Clerk

Date: _____

By: _____

**Form T-1080** (Revised 12/12/01)

**RULES OF THE UNITED STATES COURT OF APPEALS FOR THE 2ND CIRCUIT**

**supplementing**
**Federal Rules of Appellate Procedure**

**INSTRUCTIONS**

**INTERIM LOCAL RULE 27.**

(a)  **Form of Motion and Supporting Papers for Motion and Opposition Statement.**

    1.    Form of Motion.  A motion must be in writing, unless the court otherwise directs, and must conform to paragraphs (A) through (C) below.

        (A)    The front page of the motion must follow the form of the Motion Information Statement approved by the Court (T-1080 revised as of 12/12/01 and printed on the reverse side) and contain all information required by the form.

        (B)    The body of the motion, following the Motion Information Statement, must set forth the information and legal argument necessary to support the motion, and, if emergency relief is sought, an explanation of the emergency.

        (C)    Formal requirements.

            (i)    8-½ x 11 inch paper;

            (ii)    Text  double spaced, except for quotations, headings and footnotes;

            (iii)    Margins of one inch on all sides;

            (iv)    Pages sequentially numbered (page numbers may be placed in the margins);

            (v)    Bound or stapled in a secure manner that does not obscure text;

            (vi)    Length: no more than 20 pages, not including attachments and the Motion Information Statement;

            (vii)    Number of copies: original plus four copies;

            (viii)    Required attachments to motion:

                a.    An affidavit (containing only statements of fact, not legal argument);
                b.    If the motion seeks substantive relief, a copy of lower court opinion or agency decision;
                c.    Any exhibits necessary to determine the motion;
                d.    Affidavit of service.

    2.    Non-Compliance Sanctions.  If the moving party has not complied with this rule, the motion may be dismissed by the clerk without prejudice to renew upon proper papers. If application is promptly made, the action of the clerk may be reviewed by a single judge.  The court may impose costs and an appropriate fine against either party for failure to comply with this rule.

---

## MOTION INFORMATION FORM

---

### UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

| **Ligon v. City of New York, et al.** | **DOCKET NO.  13-3123** |
| --- | --- |

**Michael A. Cardozo**
**Attorney for Defendants-Appellants**

**Office & Post Office Address & Telephone Number:**    **New York City Law Department**
    **Office of the Corporation Counsel**
    **100 Church St., New York, NY 10007**
    **212-356-0826 or -0827**

**Form T-1080** (Revised 12/12/01)

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT
— — — — — — — — — — — — — — — — — — — — — — — — — — X
JAENEAN LIGON, et al.,

                         **Docket No.  13-3123**

                    Plaintiffs-Appellees,

           -against-               **DECLARATION    IN
SUPPORT**

THE CITY OF NEW YORK, et al.,

                  Defendants-Appellants.

— — — — — — — — — — — — — — — — — — — — — — — — — X

      **DEBORAH A. BRENNER**, declares under penalty of perjury, pursuant to

28 U.S.C. §1746, that the following is true and correct:

      1.     I am a Senior Counsel in the office of Michael A. Cardozo,

Corporation Counsel of the City of New York, attorney for defendants-appellants

the City of New York, et al. ("the City"), in the above-captioned appeal.

      2.     This declaration is submitted in support of the City's motion for an

order (1) granting an expedited briefing schedule; (2) granting expedited

consideration of this appeal; and (3) directing that this appeal be heard in tandem

with *Floyd v. City of New York* (Docket No. 13-3088).

      3.     This is a class action filed pursuant to 42 U.S.C. § 1983 and the

Fourth Amendment.  Plaintiffs-appellees are a class of persons who allege that

defendants-appellants the City of New York ("the City") and its Police Department

("NYPD"), have engaged in a pattern or practice of stopping, questioning, and/or

frisking them without reasonable suspicion outside of certain privately owned

buildings.  The owners of these buildings are participants in the Trespass Affidavit

Program, or "TAP," who enlisted the help of the NYPD in addressing drug dealing and other offenses by taking an aggressive stand against trespassers.

4.     After a hearing, the District Court for the Southern District of New York (Schiendlin, U.S.D.J.) found that plaintiffs were likely to succeed on the merits of their claims concerning TAP buildings in Bronx County, and had otherwise demonstrated an entitlement to preliminary injunctive relief.

5.     The City appeals from the District Court's Remedial Order, entered August 12, 2013, annexed hereto as Exhibit A (the "Injunction" or "Remedial Order"). The appeal also brings up for review the District Court's decision and order, as amended February 14, 2013, which ruled in plaintiffs' favor on the motion for preliminary injunctive relief (the "February 14 order," annexed hereto as Exhibit B).[1]

6.     In the Remedial Order, the Court directed the City to take three specific measures to address the unconstitutionality of NYPD policies and practices in connection with the Bronx TAP program identified in its February 14, 2013 decision. First, the NYPD must adopt a new formal policy specifying the

---

[1]    This Court has jurisdiction over this interlocutory appeal from the Injunction under 28 U.S.C. § 1292(a)(1).  The February 14 order, which purports to provide the legal basis for the Injunction, is also properly before this Court, because it is "necessary to ensure meaningful review of" and "inextricably intertwined with" the appealable order. *Lamar Adver. of Penn., LLC v. Town of Orchard Park*, 356 F.3d 365, 371 (2d Cir. 2004); *Merritt v. Shuttle, Inc.*, 187 F.3d 263, 268-269 (2d Cir. 1999).  The February 14 order was later stayed by the District Court pending "final decision as to the appropriate scope of the relief to be ordered" (ECF # 99, at 15). The stay was dissolved with entry of the Injunction.  Exh. A, at 32 (imposing a "final order of preliminary injunctive relief in Ligon").  By letter dated August 27, 2013, the City sought an order staying the remedial order in the District Court (ECF #120).  The District Court has not yet decided the motion.  Plaintiffs submitted an opposition dated September 6, 2013 (ECF #130). The City's reply is due September 12, 2013.

limited circumstances in which the District Court deemed it legally permissible to "stop" or "approach" a person outside a TAP building on a suspicion of trespass. The content of the revised policy is set forth verbatim in the Injunction. Exh. A, at 34. Second, the NYPD must transmit a FINEST message explaining the limits of that new policy. Third, the NYPD must revise its training and supervision regarding stop-and-frisk outside Bronx TAP buildings to accord with the District Court's interpretation of federal and state law. Exh. A, at 33-36. The Court appointed Peter L. Zimroth as Court Monitor to finalize the content of the FINEST message, and to oversee reforms as to training and supervision. Exh. A, at 33.

7. Appended hereto as Exhibit C is the Memorandum of Law submitted on the City's motion to expedite the appeal in *Floyd v. City of New York* (Docket No. 13-3088).

8. While plaintiffs do not consent to an order expediting the due date for their appellees' brief, or to expedited argument or consideration of the appeal, they agree that these two interrelated appeals should be heard in tandem. The NYPD's stop-and-frisk policies are directly at issue in both cases, and the Injunction was issued under both captions. The grant of this relief will best serve the interests of judicial economy, and avoid the possibility of inconsistent decisions.

9. Accordingly, and for all the reasons set forth in Exhibit C, the City respectfully submits that this appeal should be expedited to the same extent as the *Floyd* appeal. The City stands ready to perfect its appeal by November 12, 2013,

and seeks an order directing appellees to file their answering briefs by January 13, 2014, with the City's reply submission to be due on January 28, 2014.

10.    Plaintiffs intend to submit a response to the portions of this motion they oppose by September 17, 2013.

## CONCLUSION

For the reasons set forth herein and in Exhibit C, the Court should grant the relief requested.

_____
DEBORAH BRENNER
Corporation Counsel of the City of
  New York

Exhibit "A"

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------ X

DAVID FLOYD, *et al.*,

          Plaintiffs,

    - against -

CITY OF NEW YORK,

          Defendant.

          **OPINION AND ORDER**

          **08 Civ. 1034 (SAS)**

------------------------------------------------------------ X

JAENEAN LIGON, *et al.*,

          Plaintiffs,

    - against -

CITY OF NEW YORK, *et al.*,

          Defendants.

          **12 Civ. 2274 (SAS)**

------------------------------------------------------------ X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 8/12/13

SHIRA A. SCHEINDLIN, U.S.D.J.:

I.    INTRODUCTION

        In an Opinion issued today I found the City of New York liable in the *Floyd* case for violating the Fourth and Fourteenth Amendment rights of the plaintiff class because of the way the New York City Police Department ("NYPD") has conducted stops and frisks over the past decade (the "Liability Opinion"). In an Opinion issued in January 2013, I found that the *Ligon* plaintiffs, representing a putative class of people stopped outside buildings participating in

1

the Trespass Affidavit Program ("TAP") in the Bronx, were entitled to preliminary injunctive relief based on violations of their Fourth Amendment rights.

The purpose of this Opinion (the "Remedies Opinion") is to determine what remedies are appropriate in these cases. I address both cases in one Opinion because the remedies necessarily overlap. Each requires that the NYPD reform practices and policies related to stop and frisk to conform with the requirements of the United States Constitution. I stress, at the outset, that the remedies imposed in this Opinion are as narrow and targeted as possible. To be very clear: I am *not* ordering an end to the practice of stop and frisk. The purpose of the remedies addressed in this Opinion is to ensure that the practice is carried out in a manner that protects the rights and liberties of all New Yorkers, while still providing much needed police protection.

## II.   REMEDIES IN *FLOYD*

### A.   The Court Has the Power to Order Broad Equitable Relief

#### 1.   Plaintiffs Satisfied the Requirements for a Permanent Injunction

Plaintiffs seeking a permanent injunction must demonstrate: (1) that they have suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiffs and the defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.[1] Plaintiffs may satisfy the first two factors by demonstrating that they are likely to be deprived of their constitutional rights in the future by the

---

[1]      *See World Wide Polymers, Inc. v. Shinkong Synthetic Fibers Corp.*, 694 F.3d 155, 160–61 (2d Cir. 2012) (citing *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006)).

acts they seek to have enjoined.[2]  The evidence discussed in the Liability Opinion shows that plaintiffs have suffered violations of their Fourth and Fourteenth Amendment rights, and that the prevalence of the practices leading to those violations creates a likelihood of future injury.[3] Thus, plaintiffs have satisfied the first two requirements for obtaining permanent injunctive relief.

The balance of hardships tilts strongly in favor of granting a permanent injunction in *Floyd*.  That is, the burden on the plaintiff class of continued unconstitutional stops and frisks far outweighs the administrative hardships that the NYPD will face in correcting its unconstitutional practices.[4]

> The right to physical liberty has long been at the core of our nation's commitment to respecting the autonomy and dignity of each person:  "No right is held more sacred, or is more carefully guarded, by the common law, than the right of every individual to the possession and control of his own person, free from all restraint or interference of others, unless by clear and unquestionable authority of law."[5]

---

[2]     *See New York State Nat'l Org. for Women v. Terry*, 886 F.2d 1339, 1362 (2d Cir. 1989) (deprivation of constitutional rights "cannot be compensated by money damages"); *New York Magazine v. Metropolitan Transp. Auth.*, 136 F.3d 123, 127 (2d Cir. 1998) (the "'loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury'" (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976))).

[3]     *See* Liability Opinion at Part V (conclusions of law); *Floyd v. City of New York*, 283 F.R.D. 153, 170 (S.D.N.Y. 2012) (citing *National Cong. for Puerto Rican Rights, by Perez v. City of New York*, 75 F. Supp. 2d 154, 161 (S.D.N.Y. 1999) (later renamed *Daniels*)).  *See also Floyd*, 283 F.R.D. at 160, 178 (certifying plaintiffs' class).

[4]     *See Association of Surrogates & Supreme Court Reporters Within City of New York v. State of New York*, 966 F.2d 75, 79, *modified on reh'g*, 969 F.2d 1416 (2d Cir. 1992) (noting that "state budgetary processes may not trump court-ordered measures necessary to undo a federal constitutional violation," provided that the equitable relief is proportional to the constitutional infraction).

[5]     *Floyd*, 283 F.R.D. at 158–59 (quoting *Union Pac. R. Co. v. Botsford*, 141 U.S. 250, 251 (1891)).

3

Ensuring that people are not seized and searched by the police on the streets of New York City without a legal basis is an important interest meriting judicial protection.

Eliminating the threat that blacks and Hispanics will be targeted for stops and frisks is also an important interest. In addition to the significant intrusion on liberty that results from any stop, increased contact with the police leads to increased opportunities for arrest, even when the reason for the arrest was not the reason for the stop. As a result, targeting racially defined groups for stops — even when there is reasonable suspicion — perpetuates the stubborn racial disparities in our criminal justice system.[6] Although the costs of complying with the permanent injunction in *Floyd* will be significant, they are clearly outweighed by the urgent need to curb the constitutional abuses described in the Liability Opinion.

With regard to the public interest, the City has expressed concern that interference in the NYPD's stop and frisk practices may have a detrimental effect on crime control.[7] However, as previously noted, I am *not* ordering an end to stop and frisk. Moreover, it has been widely reported that as the number of recorded stops has decreased over the past year, the crime

---

[6]     *See, e.g.*, MICHELLE ALEXANDER, THE NEW JIM CROW 6–7 (2010) ("No other country in the world imprisons so many of its racial or ethnic minorities. . . . In Washington, D.C., . . . it is estimated that three out of four young black men (and nearly all those in the poorest neighborhoods) can expect to serve time in prison."). Another collateral consequence of stops was highlighted in the recently settled case of *Lino v. City of New York*, No. 106579/10, 2011 WL 2610501 (Sup. Ct. N.Y. Co. June 24, 2011), in which the NYPD agreed to purge personal information from its stop database. Plaintiffs — including named plaintiff Clive Lino — had alleged that the NYPD was using personal information from the stop database to conduct criminal investigations. *See* John Caher, *NYPD Agrees to Purge Stop-Frisk Databank*, N.Y. L.J., August 8, 2013.

[7]     *See* 4/11/13 Defendant['s] Memorandum of Law in Opposition to Plaintiffs' Requested Injunctive Relief ("Def. Inj. Mem.") at 17–18.

4

rate has continued to fall.[8]  The United States Department of Justice ("DOJ") has pointed out that "there is significant evidence that unlawfully aggressive police tactics are not only unnecessary for effective policing, but are in fact detrimental to the mission of crime reduction."[9]  By strictly adhering to the rule of law, the NYPD will achieve greater cooperation between police officers and the communities they serve.  Fostering trust in the police will "promote, rather than hinder, [the] NYPD's mission of safely and effectively fighting crime."[10]

Furthermore, as in *Ligon*, it is "'clear and plain'" that the public interest in liberty and dignity under the Fourth Amendment, and the public interest in equality under the Fourteenth Amendment, trumps whatever modicum of added safety might theoretically be gained by the NYPD making *unconstitutional* stops and frisks.[11]  This Opinion does not call for the NYPD to abandon proactive policing and return to an earlier era of less effective police practices.  Rather, the relief ordered below requires the NYPD to be *even more* proactive:

---

[8]     *See, e.g.*, Tamer El-Ghobashy & Michael Howard Saul, *New York Police Use of Stop-and-Frisk Drops: Plummet in Disputed Tactic Tracks Overall Decrease in Crime*, WALL ST. J., May 6, 2013 (noting that UF-250s fell 51% in the first three months of 2013 compared to 2012, while crime fell 2.7% and murders fell 30% through April 28 compared to 2012).  I note, however, that the number of *unrecorded* stops may have increased over the same period as a result of misleading training at the NYPD's new stop and frisk refresher course at Rodman's Neck.  *See* Liability Opinion at Part IV.C.5 (citing, *inter alia*, 4/25 Trial Transcript ("Tr.") at 5119–5124 (Shea)); *Ligon v. City of New York*, No. 12 Civ. 2274, 2013 WL 628534, at *38 (S.D.N.Y. Feb. 14, 2013).

[9]     6/12/13 Statement of Interest of the United States ("DOJ Inj. Mem.") at 10.  *See id.* at 10–11 (collecting sources).

[10]    *Id.* at 10.  Even NYPD Commissioner Raymond Kelly has recognized that the misuse of stop and frisk can contribute to community mistrust.  In 2000, he criticized "dubious stop-and-frisk tactics" instituted after his first period as Police Commissioner that had "sowed new seeds of community mistrust."  Kevin Flynn, *Ex-Police Head Criticizes Strategies*, N.Y. TIMES, Apr. 5, 2000.

[11]    *Cf. Ligon*, 2013 WL 628534, at *40–41.

proactive not only about crime control and prevention, but also about protecting the constitutional rights of the people the NYPD serves.  The public interest will not be harmed by a permanent injunction requiring the NYPD to conform its practices to the Constitution.

### 2.    The Court's Broad Authority to Enter Injunctive Relief

"[T]he scope of a district court's equitable powers to remedy past wrongs is broad, for breadth and flexibility are inherent in equitable remedies."[12]  At the same time, it is "'the essence of equity jurisdiction' that a court is only empowered 'to grant relief no broader than necessary to cure the effects of the harm caused by the violation.'"[13]  "Discretion to frame equitable relief is limited by considerations of federalism, and remedies that intrude unnecessarily on a state's governance of its own affairs should be avoided."[14]

Nevertheless, as the DOJ notes, "courts have long recognized — across a wide range of institutional settings — that equity often requires the implementation of injunctive relief to correct unconstitutional conduct, even where that relief relates to a state's administrative practices."[15]  "Courts . . . must not shrink from their obligation to enforce the constitutional

---

[12]    *Swann v. Charlotte-Mecklenburg Bd. of Ed.*, 402 U.S. 1, 15 (1971).  *Accord Association of Surrogates*, 966 F.2d at 79 ("[F]ederal courts have broad discretion in fashioning equitable remedies for . . . constitutional violations.").

[13]    *City of New York v. Mickalis Pawn Shop, LLC*, 645 F.3d 114, 144 (2d Cir. 2011) (quoting *Forschner Grp., Inc. v. Arrow Trading Co.*, 124 F.3d 402, 406 (2d Cir. 1997)).

[14]    *Association of Surrogates*, 966 F.2d at 79.

[15]    DOJ Inj. Mem. at 7 (citing *Brown v. Plata*, 131 S. Ct. 1910 (2011); *Brown v. Board of Educ.*, 349 U.S. 294 (1955)).  *See also id.* at 7 n.3 (criticizing the City's citation of inapposite cases "for the proposition that federal courts should decline to enter injunctive relief that requires operational changes to a State's institutions").

6

rights of all persons."[16]  This duty is not curtailed when constitutional violations arise in the context of law enforcement.  Rather, where "there is a persistent pattern of police misconduct, injunctive relief is appropriate."[17]

I have always recognized the need for caution in ordering remedies that affect the internal operations of the NYPD,[18] the nation's largest municipal police force and an organization with over 35,000 members.[19]  I would have preferred that the City cooperate in a joint undertaking to develop some of the remedies ordered in this Opinion.[20]  Instead, the City declined to participate, and argued that "the NYPD systems already in place" — perhaps with unspecified "minor adjustments" — would suffice to address any constitutional wrongs that

---

[16]     *Plata*, 131 S. Ct. at 1928 (citing *Cruz v. Beto*, 405 U.S. 319, 321 (1972) (*per curiam*)) (quotation marks omitted).  *Accord Todaro v. Ward*, 565 F.2d 48, 53–54 (2d Cir. 1977) ("'[A] policy of judicial restraint cannot encompass any failure to take cognizance of valid constitutional claims whether arising in a federal or state institution.'" (quoting *Procunier v. Martinez*, 416 U.S. 396, 405 (1974))).

[17]     *Allee v. Medrano*, 416 U.S. 802, 815 (1974).  *Accord* DOJ Inj. Mem. at 8–9 (collecting cases and noting that pursuant to statutory authorities "the United States has itself sought and secured the implementation of remedial measures to reform police misconduct in dozens of law enforcement agencies," including measures that "directly address systemic deficiencies in the way officers conduct stops and searches").

[18]     *See, e.g.*, *Patrolmen's Benevolent Ass'n of City of New York, Inc. v. City of New York*, No. 97 Civ. 7895 (SAS), 2000 WL 1538608, at *3–4 (S.D.N.Y. Oct. 18, 2000) (declining to impose injunction on the NYPD where doing so would have been "an undue intrusion into a matter of state sovereignty").

[19]     *See* Def. Inj. Mem. at 1.

[20]     *See* 1/31 Tr. at 101; 1/28/13 Letter from Jonathan C. Moore et al., Counsel for Plaintiffs, to the Court (proposing collaborative procedure involving all the parties in *Floyd*, *Ligon*, and *Davis*, a court-appointed facilitator, and the views of major stakeholders).  The City rejected this proposal.  *See* 1/31 Tr. at 9–10.

might be found.[21]  I note that the City's refusal to engage in a joint attempt to craft remedies contrasts with the many municipalities that have reached settlement agreements or consent decrees when confronted with evidence of police misconduct.[22]

## B.    Equitable Relief

Federal Rule of Civil Procedure 65(d) requires that "[e]very order granting an injunction . . . must: (A) state the reasons why it issued; (B) state its terms specifically; and (C) describe in reasonable detail — and not by referring to the complaint or other document — the act or acts restrained or required."[23]  These specificity provisions are "'no mere technical requirements,'" but were "'designed to prevent uncertainty and confusion on the part of those faced with injunctive orders, and to avoid the possible founding of a contempt citation on a

---

[21]     6/12/13 Defendant's Post-Trial Memorandum of Law ("Def. Mem.") at 24–25. *Accord* Def. Inj. Mem. at 7–18.  The City also argues that no remedy is required because improper stops can be addressed by individual suits for damages. *See* Def. Inj. Mem. at 6.  The DOJ counters that if individual suits were an effective remedy for police misconduct, courts would not have found it necessary to impose injunctive relief in so many police misconduct cases. *See* DOJ Inj. Mem. at 9 & n.5 (also citing arguments from Daryl J. Levinson, *Making Government Pay: Markets, Politics, and the Allocation of Constitutional Costs*, 67 U. CHI. L. REV. 345, 354–57 (2000)).  I note that individual suits for damages are particularly ineffective as a remedy for unconstitutional stops, where individuals often do not know what the basis for their stop was, and thus cannot know whether the stop lacked a legal basis or was influenced improperly by race.  In addition, while the indignity of an unconstitutional stop is a serious harm, few of those stopped will be motivated to dedicate their time and resources to filing a lawsuit — especially where the standard for recovery may require proof of *Monell* liability.

[22]     *See, e.g.*, *Bailey v. City of Philadelphia*, No. 10 Civ. 5952 (E.D. Pa. June 21, 2011) (consent decree in class action alleging unconstitutional stops and frisks of black and Hispanic men); DOJ Inj. Mem. at 9 (noting DOJ settlement agreements and consent decrees with dozens of law enforcement agencies nationwide).  The City's resistance to reform in this case may reflect a more general skepticism toward judicial interpretation of the Constitution and the limits it imposes on municipalities. *See, e.g.*, Jill Colvin, *Bloomberg Says Interpretation of Constitution Will "Have to Change" After Boston Bombing*, POLITICKER (Apr. 22, 2013).

[23]     Fed. R. Civ. P. 65(d)(1).

decree too vague to be understood.'"[24]  The specificity provisions also ensure "'that the appellate court knows precisely what it is reviewing.'"[25]

Compliance with the prohibition on the incorporation of extrinsic documents is "'essential,' unless the enjoined party acquiesces to the extrinsic reference."[26]  The City has not acquiesced to any extrinsic reference.  Thus, while the sections below refer to NYPD documents that must be revised, the ordered relief is contained entirely within the four corners of this Opinion.[27]

### 1.    Appointment of a Monitor to Oversee Reforms

Because of the complexity of the reforms that will be required to bring the NYPD's stop and frisk practices into compliance with the Constitution, it would be impractical for this Court to engage in direct oversight of the reforms.  As a more effective and flexible alternative, I am appointing an independent monitor (the "Monitor") to oversee the reform process.  I have chosen Peter L. Zimroth to serve as Monitor.

Mr. Zimroth, a partner in the New York office of Arnold & Porter, LLP, is a

---

[24]     *Mickalis Pawn Shop*, 645 F.3d at 143 (quoting *Schmidt v. Lessard*, 414 U.S. 473, 476 (1974)).

[25]     *Id.* at 144 (quoting *S.C. Johnson & Son, Inc. v. Clorox Co.*, 241 F.3d 232, 241 (2d Cir. 2001)).

[26]     *Eyewonder, Inc. v. Abraham*, 293 Fed. App'x 818, 820 (2d Cir. 2008) (quoting *Lau v. Meddaugh*, 229 F.3d 121, 123 (2d Cir. 2000), and citing *Perfect Fit Indus., Inc. v. Acme Quilting Co.*, 646 F.2d 800, 809 (2d Cir. 1981)).  *Accord Petrello v. White*, 533 F.3d 110, 114 (2d Cir. 2008) ("Rule 65(d) 'is satisfied only if the enjoined party can ascertain from the four corners of the order precisely what acts are forbidden' or required." (quoting *Fonar Corp. v. Deccaid Servs., Inc.*, 983 F.2d 427, 430 (2d Cir. 1993))).

[27]     The remedies ordered below are largely drawn from submissions by plaintiffs and the DOJ.

former Corporation Counsel of the City of New York, and the former Chief Assistant District

Attorney of New York County.  In both of these roles, Mr. Zimroth worked closely with the

NYPD.  A graduate of Columbia University and Yale Law School — where he served as Editor

in Chief of the Yale Law Journal — he also served as a law clerk on the Supreme Court of the

United States and a federal prosecutor.  He taught criminal law and criminal procedure as a

tenured professor at the New York University School of Law.

   Mr. Zimroth has also been appointed to many positions in public service.  The

Chief Judge of the New York Court of Appeals appointed him as one of three directors of New

York's Capital Defender Office.  He has also served on the Mayor's Committee on the Judiciary,

and on the boards of two schools for children with special needs.  He has been a member of the

House of Delegates of the American Bar Association, the Executive Committee of the New York

City Bar Association, and the Board of Directors of the Legal Aid Society.

   It is within the power of a district court to order the appointment of a monitor to

oversee judicially ordered reforms.[28]  The DOJ recommended the appointment of a monitor in

this case, in the event that the Court found the City liable.  Based on "decades of police reform

efforts across the country," the DOJ concluded that "the appointment of a monitor to guide

implementation of . . . injunctive relief may provide substantial assistance to the Court and the

parties and can reduce unnecessary delays and litigation over disputes regarding compliance."[29]

In addition, the DOJ noted:

---

  [28]  *See, e.g.*, *United States v. City of New York*, 717 F.3d 72, 97 (2d Cir. 2013).

  [29]  DOJ Inj. Mem. at 11.  *Accord* 5/15 Tr. at 7435 (plaintiffs' remedies expert
Professor Samuel Walker testifying that if liability is found, the appointment of an independent
monitor is "necessary").

> [T]he experience of the United States in enforcing police reform injunctions teaches that the appointment of an independent monitor is a critically important asset to the court, the parties, and the community in cases involving patterns or practices of unlawful conduct by law enforcement officials.  A court-appointed monitor in this case would help the Court ensure that . . . any pattern or practice . . . is effectively and sustainably remedied.[30]

The appointment of a monitor will serve the interests of all stakeholders, including the City, by facilitating the early and unbiased detection of non-compliance or barriers to compliance.  By identifying problems promptly, the Monitor will save the City time and resources.[31]

I also note that the Monitor will have a distinct function from the other oversight entities identified by the City, such as the NYPD's Internal Affairs Bureau, federal prosecutors, the Civilian Complaint Review Board, and "the public electorate."[32]  The Monitor will be specifically and narrowly focused on the City's compliance with reforming the NYPD's use of stop and frisk — although this will inevitably touch on issues of training, supervision, monitoring, and discipline.  Finally, the Monitor will operate in close coordination with this

---

[30]    DOJ Inj. Mem. at 5.

[31]    *See id.* at 16 ("Without an independent monitor, the Court will be forced to depend on motions practice between the parties to assess progress; a costly, contentious, inefficient, and time-consuming process.").

[32]    *Id.* at 18 (citing Def. Inj. Mem. at 13).  In particular, as the DOJ notes, "it is not realistic to ask 'the public electorate' to monitor the police department to ensure that the department's stop-and-frisk practices are consistent with the Constitution."  *Id.* at 20 (citing *United States v. Carolene Prods. Co.*, 304 U.S. 144, 152 n.4 (1938)).  If it is true that 76% percent of black voters in New York City disapprove of stop and frisk, as found in a recent Quinnipiac University poll, then the persistence of this policy in heavily black communities might indicate the failure "of those political processes ordinarily to be relied upon to protect minorities," and thus might justify "more searching judicial inquiry."  *Carolene Prods.*, 304 U.S. at 152 n.4; Quinnipiac University, *New Yorkers Back Ban on Take-Out Foam More Than 2-1*, at 8 (Feb. 28, 2013), http://www.quinnipiac.edu/images/polling/nyc/nyc02282013.pdf/ (19% of blacks approve and 76% disapprove of "a police practice known as stop and frisk, where police stop and question a person they suspect of wrongdoing and, if necessary, search that person").

Court, which retains jurisdiction to issue orders as necessary to remedy the constitutional violations described in the Liability Opinion.[33]

        I now specify the Monitor's role and functions:

1.      The Monitor will be subject to the supervision and orders of the Court.

2.      The Monitor will not, and is not intended to, replace or assume the role or duties of any City or NYPD staff or officials, including the Commissioner.  The Monitor's duties, responsibilities, and authority will be no broader than necessary to end the constitutional violations in the NYPD's stop and frisk practices described in the Liability Opinion.

3.      The Monitor's initial responsibility will be to develop, based on consultation with the parties, a set of reforms of the NYPD's policies, training, supervision, monitoring, and discipline regarding stop and frisk.  These reforms (the "Immediate Reforms") are outlined below in Part II.A.2.  They will be developed as soon as practicable and implemented when they are approved by the Court.

4.      After the completion of the Joint Remedial Process, described below in Part II.A.4, the Monitor will work with the Facilitator and the parties to develop any further reforms necessary to ending the constitutional violations described in the Liability Opinion. These reforms ("Joint Process Reforms") will be implemented upon approval by the Court.

5.      The Monitor will inform the City of the milestones the City must achieve in order to demonstrate compliance and bring the monitoring process to an end.

6.      The Monitor will regularly conduct compliance and progress reviews to assess the extent

---

[33]     The Monitor's role will also be distinct from the broad advisory role of the NYPD Inspector General envisioned in N.Y. City Council Introductory No. 1079 of 2013.

to which the NYPD has implemented and complied with the Immediate and Joint Process Reforms.

7.    The Monitor will issue public reports every six months detailing the NYPD's compliance with the Immediate and Joint Process Reforms.  The Monitor will also file these reports with the Court.

8.    The Monitor will work with the parties to address any barriers to compliance.  To the extent possible, the Monitor should strive to develop a collaborative rather than adversarial relationship with the City.

9.    The Monitor may request the Court to modify the Immediate and Joint Process Reforms, if evidence shows that such modifications are warranted.

10.   The Monitor may request technical assistance from outside experts.  He may also employ staff assistance as he finds reasonable and necessary.

11.   The City will be responsible for the reasonable costs and fees of the Monitor, his staff, and any experts he retains.

12.   The Monitor's position will come to an end when the City has achieved compliance with the Immediate and Joint Process Reforms.

### 2.    Immediate Reforms Regarding Stop and Frisk

Ending the constitutional violations inherent in the NYPD's current use of stop and frisk will require reforms to a number of NYPD policies and practices.  It would be unwise and impractical for this Court to impose such reforms at this time, prior to input from the Monitor and the participants in the Joint Remedial Process ordered below.[34]  Instead, as noted

---

[34]    In particular, the City has not yet provided input regarding specific reforms.  *See* Def. Inj. Mem. at 18 (declining to offer a remedy "other than to respectfully direct the Court to

above, the development of reforms will take place in two stages.  *First*, the Monitor will develop, in consultation with the parties, an initial set of reforms to the NYPD's policies, training, supervision, monitoring, and discipline regarding stop and frisk (the "Immediate Reforms").  These reforms will be developed and submitted to the Court as soon as practicable, and implemented when they are approved.  *Second*, the Facilitator will work with the parties and other stakeholders to develop, through the Joint Remedial Process, a more thorough set of reforms (the "Joint Process Reforms") to supplement, as necessary, the Immediate Reforms. The development of the Joint Process Reforms is discussed below in Part II.A.4.

If the parties, together with the Monitor, are unable to develop agreed-upon Immediate Reforms, the Court will order the parties to draft proposed revisions to specific policies and training materials, as the parties have already done quite effectively in *Ligon*.[35] Indeed, the remedies proposed in *Ligon* may provide a useful model for some aspects of the Immediate Reforms.[36]

Based on the liability and remedies evidence presented at trial, the Immediate Reforms must include the following elements:

**a.    Revisions to Policies and Training Materials Relating to Stop and Frisk and to Racial Profiling**

*First*, the NYPD should revise its policies and training regarding stop and frisk to adhere to constitutional standards as well as New York state law.  The constitutional standards

---

the trial record for an assessment of the remedies evidence"); 6/12/13 Defendant's Post-Trial Memorandum of Law at 24–25 (declining to propose remedies).

[35]    *See* 7/8/13 Defendants' Proposed Remedial Relief ("*Ligon* Def. Rem.").

[36]    *See Ligon,* 2013 WL 628534, at *41–44.

include the standards for: what constitutes a stop, when a stop may be conducted, when a frisk may be conducted, and when a search into clothing or into any object found during a search may be conducted.[37]  Although the standards may sometimes require the informed use of discretion, they are not complicated and should be stated in policies and training as clearly and simply as possible.

To summarize: an encounter between a police officer and a civilian constitutes a stop whenever a reasonable person would *not feel free to disregard the officer and walk away*. The threat or use of force is not a necessary or even typical element of stops.  Encounters involving nothing more than commands or accusatory questions can and routinely do rise to the level of stops, provided that the commands and questions would lead a reasonable person to conclude that he was not free to terminate the encounter.[38]

In order to conduct a stop, an officer must have *individualized*, reasonable suspicion that the person stopped has committed, is committing, or is about to commit a crime. The officer must be able to articulate facts establishing a minimal level of *objective* justification

---

[37]     *See* Liability Opinion at Part III.B; *Ligon*, 2013 WL 628534, at *41–42.

[38]     There could be a simple way to ensure that officers do not unintentionally violate the Fourth Amendment rights of pedestrians by approaching them without reasonable suspicion and then inadvertently treating them in such a way that a reasonable person would not feel free to leave.  Officers could, for example, begin *De Bour* Level 1 and 2 encounters by informing the person that he or she is free to leave.  There is no constitutional requirement for officers to inform people that they are free to leave.  *Cf. Ohio v. Robinette*, 519 U.S. 33, 35 (1996) (holding that the Fourth Amendment does not require "that a lawfully seized defendant must be advised that he is 'free to go' before his consent to search will be recognized as voluntary"); *Schneckloth v. Bustamonte*, 412 U.S. 218, 227 (1973) ("While knowledge of the right to refuse consent is one factor to be taken into account, the government need not establish such knowledge as the sine qua non of an effective consent.").  Nevertheless, the Constitution does not prohibit a police department from adopting this policy or a court from ordering it as a *means* of avoiding unconstitutional stops, where — as here — officers have been incorrectly trained on the definition of a stop.

for making the stop, which means more than an inchoate and unparticularized suspicion or hunch.  "Furtive movements" are an insufficient basis for a stop or frisk if the officer cannot articulate anything more specific about the suspicious nature of the movement.  The same is true of merely being present in a "high crime area."  Moreover, no person may be stopped solely because he matches a vague or generalized description — such as young black male 18 to 24 — without further detail or indicia of reliability.

To proceed from a stop to a frisk, the police officer must reasonably suspect that the person stopped is *armed and dangerous*.  The purpose of a frisk is not to discover evidence of crime, but to allow the officer to pursue his investigation without fear of violence.  Thus, the frisk must be strictly limited to whatever is necessary to uncover weapons that could harm the officer or others nearby.  When an officer lawfully pats down a suspect's outer clothing and feels an object whose contour or mass makes its identity as contraband *immediately apparent*, the officer may seize the contraband.  If an officer reasonably suspects that a felt object in the clothing of a suspect is a weapon, then the officer may take whatever action is necessary to examine the object and protect himself, including removing the object from the clothing of the stopped person.

The erroneous or misleading training materials identified in the Liability Opinion must be corrected, including the Police Student Guide's overbroad definition of "furtive behavior;" the misleading training on "unusual firearms" implying that the presence of a wallet, cell phone, or pen could justify a frisk, or search; the complete lack of training on the constitutional standard for a frisk — reasonable suspicion that a stopped person is "armed and dangerous;" and the failure to include self-initiated stops (which make up 78% of street stops) in

16

the role-playing at Rodman's Neck.[39]  These training reforms will be in addition to those discussed below in the section of this Opinion relating to *Ligon*.[40]

Second, the NYPD should revise its policies and training regarding racial profiling to make clear that targeting "the right people" for stops, as described in the Liability Opinion, is a form of racial profiling and violates the Constitution.[41]  Racially defined groups may not be targeted for stops in general simply because they appear more frequently in local crime suspect data.  Race may only be considered where the stop is based on a specific and reliable suspect description.  When an officer carries out a stop based on reasonable suspicion that a person fits such a description, the officer may consider the race of the suspect, just as the officer may consider the suspect's height or hair color.  When a stop is not based on a specific suspect description, however, race may not be either a motivation or a justification for the stop. In particular, officers must cease the targeting of young black and Hispanic males for stops based on the appearance of these groups in crime complaints.  It may also be appropriate to conduct training for officers on the effect of unconscious racial bias.

Third, it is unclear at this stage whether Operations Order 52 ("OO 52"), which describes the use of performance objectives to motivate officers, requires revision in order to bring the NYPD's use of stop and frisk into compliance with the Fourth and Fourteenth Amendments.  The evidence at trial showed that OO 52's use of "performance goals" created pressure to carry out stops, without any system for monitoring the constitutionality of those

---

[39]     *See* Liability Opinion at Part IV.C.5.

[40]     *See infra* Part III.

[41]     *See* Liability Opinion at Parts IV.C.3, V.B.1.

17

stops.  However, the use of performance goals in relation to stops may be appropriate, once an effective system for ensuring constitutionality is in place.[42]  Because the perspective of police officers and police organizations will be particularly valuable to clarifying the role of performance goals in the reform of stop and frisk, these issues should be addressed as part of the Joint Remedial Process rather than the Immediate Reforms.

Finally, I note that where legitimate uncertainty exists regarding the most efficient means of reform, and the parties have differing views, it may be feasible for the Monitor to test the alternatives by applying them in different precincts and studying the results. In some contexts, the size of the NYPD makes it possible, and desirable, to resolve practical disagreements through the rigorous testing and analysis of alternatives at the precinct level before applying these reforms to the department as a whole.

### b.  Changes to Stop and Frisk Documentation

Both the trial record and the Liability Opinion document, in detail, the inadequacy of the NYPD's methods of recording *Terry* stops.  The UF-250, used by officers in the field to

---

[42]     Plaintiffs' policing expert Lou Reiter testified that "there are circumstances where productivity goals are consistent with generally accepted [police] practices."  4/24 Tr. at 4917. The City's policing expert, James K. Stewart, testified that performance goals are a necessary part of monitoring and supervision:

> In policing, there are disincentives to engaging in some activities, because they are dangerous, they are in unsterile conditions and chaotic conditions, and the officers may not engage in that but yet spend their time on random patrol.  They are not out there doing what the department wants them to do, but they do show up and they show up in uniform.  The reason that . . . you have to count the activities is to ensure that those officers do respond . . . to the calls for assistance of help, they do address the community issues . . . .

5/17 Tr. at 7756.

record the basis for stops, is flawed and must be revised.[43]  Officers are also required to record

stop and frisk activity in memo books, otherwise known as activity logs.  Quarterly audits of

these memo book entries have revealed significant deficiencies in record keeping practices in

virtually every precinct throughout the City.[44]  The proper use of activity logs to record stop and

frisk activity must be emphasized in training, as well as enforced through supervision and

discipline.  I first address the UF-250 and then the activity logs.

### i.    UF-250

As described in the Liability Opinion, the current UF-250 consists mainly of

checkboxes that officers can and often do check by rote,[45] thus facilitating post-hoc justifications

for stops where none may have existed at the time of the stop.  The UF-250 must be revised to

include a narrative section where the officer must record, in her own words, the basis for the

stop.  The narrative will enable meaningful supervisory oversight of the officer's decision to

conduct the stop, as well as create a record for a later review of constitutionality.

As an independent monitor of the New Orleans Police Department ("NOPD")

recently noted, "the overwhelming belief of experts [is] that a narrative field in which the

officers describe the circumstances for each stop would be the best way to gather information

that will be used to analyze reasonable suspicion" and, relatedly, "prevent[] racially biased

---

[43]    *See* 5/16 Tr. at 7457 (Walker).

[44]    *See* Pl. Findings ¶ 197 (citing Plaintiffs' Trial Exhibit ("PX") 450; Defendant's Trial Exhibit ("DX") G6).

[45]    *See, e.g.*, Liability Opinion at Part IV.B.2.

policing."[46]  The NOPD monitor noted that the City of Oakland recently revised its data

collection system to include "a narrative field in which officers are required to state, in their own

words, their basis for having reasonable suspicion for a stop."[47]  The Oakland Police Department

added this narrative field "because it was the best way to evaluate whether individual officers

possessed the requisite reasonable suspicion for a *Terry* stop."[48]  The Philadelphia Police

Department has also included a narrative field in its stop form.[49]  Similarly, Professor Walker, a

nationally recognized authority on police accountability, opined that a form for recording stops

must contain a sufficiently detailed narrative that a reviewer can determine from the narrative

alone whether the stop was based on reasonable suspicion.[50]

       The UF-250 should also be revised to require a separate explanation of why a pat-

down, frisk, or search was performed.  The evidence at trial revealed that people were routinely

subjected to these intrusions when no objective facts supported reasonable suspicion that they

were armed and dangerous.  It is apparent that some officers consider frisks to be a routine part

of a stop.  Because this misconception is contrary to law, the revised UF-250 should include a

separate section requiring officers to explain why the stopped person was suspected of being

---

[46]     SUSAN HUTSON, INDEPENDENT POLICE MONITOR, REVIEW OF THE NEW ORLEANS POLICE DEPARTMENT'S FIELD INTERVIEW POLICIES, PRACTICES, AND DATA: FINAL REPORT 45 (Mar. 12, 2013) (footnote omitted).

[47]     *Id.* at 46.

[48]     *Id.*

[49]     *See id.*

[50]     *See* 5/16 Tr. at 7456–7458 (Walker).  Professor Walker testified that a description of reasonable suspicion for a stop will generally require no more than three lines of text.  *See id.* at 7458.

armed and dangerous.

Furthermore, both the DOJ and plaintiffs recommend that the UF-250 contain a tear-off portion stating the reason for the stop, which can be given to each stopped person at the end of the encounter.[51] A 2007 RAND report, commissioned by the NYPD, similarly recommended that "[f]or a trial period in select precincts, the NYPD could require that officers give an information card to those stopped pedestrians who are neither arrested nor issued a summons."[52] Any form or card given to stopped persons should provide the stated reasons for the stop, the badge numbers of the stopping officers, and information on how to file a complaint.

Finally, the UF-250 should be revised to simplify and improve the checkbox system used to indicate common stop justifications.   It may also be necessary to reduce the number of "stop factor" boxes in order to permit easier analyses of patterns in the constitutionality of stops.[53]

In addition to changing the UF-250, officers should be further trained in its use. As discussed in the Liability Opinion, some officers check certain boxes (or combinations of boxes) reflexively as part of "scripts," including "Furtive Movements" and "Area Has High

---

[51]     *See* Pl. Rem. Br. at 19 (citing Deborah Ramirez, Jack McDevitt & Amy Farrell, *A Resource Guide on Racial Profiling Data Collection Systems: Promising Practices and Lessons Learned* 38 (United States Department of Justice 2000), and noting that a tear-off form has been used in Great Britain for more than a decade).

[52]     GREG RIDGEWAY, RAND, ANALYSIS OF RACIAL DISPARITIES IN THE NEW YORK POLICE DEPARTMENT'S STOP, QUESTION, AND FRISK PRACTICES 44 (2007), DX K6.

[53]     *See* Report of Jeffrey Fagan, Ph.D. (Oct. 15, 2010), PX 411 ("Fagan Rpt.") at 49 (describing the analytical difficulties created by the number of possible combinations of stop factors and suspected crimes).

Incidence of Reported Offense of Type Under Investigation."[54]  Officers must understand that if a stop is based on these factors, the officer must provide additional detail in the narrative field — for example, what was the specific nature of the furtive movement, and why was it suspicious? What was the geographic scope of the "high crime area," and what was the officer's specific basis for believing it has a high incidence of the suspected crime?

### ii.   Activity Logs

All uniformed officers are required to provide narrative descriptions of stops in their activity logs whenever a UF-250 is prepared.[55]  In practice, this does not take place. Evidence at trial showed that throughout the class period, officers consistently failed to record stops in their logs, or provided insufficient detail for a supervisor to meaningfully review the constitutionality of the stop.  This problem is best addressed through training, supervision, and monitoring.[56]

---

[54]   Suspicious Bulge is another factor — albeit less often used than Furtive Movements and High Crime Area — that should require greater specificity or a narrative description.

[55]   *See* Operations Order 44 (9/11/08), PX 96.  In addition, the Chief of Patrol recently directed all officers in the patrol borough to include nine categories of information in every activity log entry for a stop.  The categories include: the date, time and location of the stop; the name and pedigree of the person stopped; the suspected felony or penal law misdemeanor; an explanation of the suspicion that led to the stop (such as "*looking into windows,*" or "*pulling on doorknobs*"); whether the suspect was frisked; the sprint or job number, if applicable; and the disposition of the stop.  The Chief of Patrol's memo also requires officers to elaborate the basis for a stop in the "Additional Circumstances/Factors" section of the UF-250, to photocopy every activity log entry for a stop, and to attach the photocopy to the UF-250 before submitting it to a supervisor.  *See* DX J13.

[56]   *See infra* Part II.B.2.c.  I recognize the risk of inefficiency if officers record the same information on UF-250s and in their activity logs.  Professor Walker argued in favor of requiring both, but also expressed concerns regarding inefficiencies.  *See* 5/16 Tr. at 7458, 7480. If the parties can agree upon an improved procedure during the Joint Remedial Process described below, those improvements can be included in the Joint Process Reforms.

### iii.      Specific Relief Ordered

The NYPD, with the assistance of the Monitor, is directed to revise the UF-250 to address the criticisms expressed in the Liability Opinion and the direction given in this Opinion, and to provide training with respect to the new form.  The NYPD is further ordered, again with the assistance of the Monitor, to ensure that activity logs are completed with the required specificity, and to implement measures to adequately discipline officers who fail to comply with these requirements.

### c.      Changes to Supervision, Monitoring, and Discipline

An essential aspect of the Joint Process Reforms will be the development of an improved system for monitoring, supervision, and discipline.  Professor Walker testified that comprehensive reforms may be necessary to ensure the constitutionality of stops, including revisions to written policies and training materials, improved documentation of stops and frisks, direct supervision and review of stop documentation by sergeants, indirect supervision and review by more senior supervisors and managers, improved citizen complaint procedures, improved disciplinary procedures, department-wide audits, and perhaps even an early intervention system based on a centralized source of information regarding officer misconduct. According to Professor Walker, "[a] comprehensive approach is absolutely essential, because if any one of the components is absent or weak and ineffective, the entire accountability system begins to collapse."[57]

---

[57]      5/15 Tr. at 7440.  The National Institute of Justice, which the City's policing expert, James K. Stewart, directed from 1982 to 1990, notes that "the management and culture of a department are the most important factors influencing police behavior."  National Institute of Justice, *Police Integrity*, *available at* http://www.nij.gov/topics/law-enforcement/legitimacy/integrity.htm#note2. Ultimately, ending unconstitutionality in stop and frisk may require changing the culture of the NYPD so that officials and officers view their

In light of the complexity of the supervision, monitoring, and disciplinary reforms that will be required to bring the NYPD's use of stop and frisk into compliance with the Fourth and Fourteenth Amendments, it may be appropriate to incorporate these reforms into the Joint Remedial Process negotiations described below.  However, to the extent that the Monitor can work with the parties to develop reforms that can be implemented immediately, the Monitor is encouraged to include those reforms in the proposed Immediate Reforms.

For example, based on the findings in the Liability Opinion, there is an urgent need for the NYPD to institute policies specifically requiring sergeants who witness, review, or discuss stops to address not only the effectiveness but also the *constitutionality* of those stops, and to do so in a thorough and comprehensive manner.[58]  To the extent that Integrity Control Officers witness or review stops, they too must be instructed to review for constitutionality.[59]  The Department Advocate's Office must improve its procedures for imposing discipline in response to the Civilian Complaint Review Board's ("CCRB") findings of substantiated misconduct during stops.  This improvement must include increased deference to credibility determinations by the CCRB, an evidentiary standard that is neutral between the claims of complainants and officers, and no general requirement of corroborating physical evidence.  Finally, the Office of the Chief of Department must begin tracking and investigating complaints

---

purpose not only as policing effectively, but policing constitutionally as well.  If so, the NIJ's first recommendation for improving the integrity of a department is to "[a]ddress and discipline minor offenses so officers learn that major offenses will be disciplined too."  *Id.*

[58]     *See* Liability Opinion at Part IV.C.4.b.

[59]     *See id.*

it receives related to racial profiling.[60]

### d.    FINEST Message

As soon as practicable, the NYPD should transmit a FINEST message explaining the outcome of the *Floyd* litigation and the need for the reforms described above.[61]  The FINEST message should summarize in simple and clear terms the basic constitutional standards governing stop and frisk, the constitutional standard prohibiting racial profiling, and the relation between these standards and New York state law.  The message should order all NYPD personnel to comply immediately with those standards.

### 3.    Body-Worn Cameras

The subject of police officers wearing "body-worn cameras" was inadvertently raised during the testimony of the City's policing expert, James K. Stewart.  The following discussion took place:

> A. . . . But what happens is the departments a lot of times may not have . . . expertise and they may need some technical assistance like body worn cameras is an example and how much technology and where you store the information and stuff like that.  They may not have it.  And there may be other issues like psychological ideas about —
> THE COURT: What do you think of body worn cameras?
> THE WITNESS: I think it's a good idea.  We recommended it in Las Vegas. And we're doing it in Phoenix as well.
> THE COURT: Thank you.
> . . .
> A. But I have no opinion in this case with respect to body worn cameras.[62]

---

[60]     *See id.* at Part IV.C.6.

[61]     The NYPD's "FINEST" messaging system allows the transmission of legal directives to the NYPD's commands.  *See, e.g.*, 5/10/12 Finest Message Regarding Taxi/Livery Robbery Inspection Program, Ex. 1 to 7/24/13 Plaintiffs' Brief Concerning Defendants' Remedial Proposals ("*Ligon* Pl. Rem.").

[62]     5/17 Tr. at 7817–7818.

The use of body-worn cameras by NYPD officers would address a number of the issues raised in the Liability Opinion.  In evaluating the constitutionality of individual stops, I explained the difficulty of judging in hindsight what happened during an encounter between a civilian and the police.[63]  The only contemporaneous records of the stops in this case were UF-250s and short memo book entries — which were sometimes not prepared directly after a stop, and which are inherently one-sided.  Thus, I was forced to analyze the constitutionality of the stops based on testimony given years after the encounter, at a time when the participants' memories were likely colored by their interest in the outcome of the case and the passage of time.  The NYPD's duty to monitor stop and frisk activity is similarly hamstrung by supervisors' inability to review an objective representation of what occurred.[64]

Video recordings will serve a variety of useful functions.  *First*, they will provide a contemporaneous, objective record of stops and frisks, allowing for the review of officer conduct by supervisors and the courts.  The recordings may either confirm or refute the belief of some minorities that they have been stopped simply as a result of their race, or based on the clothes they wore, such as baggy pants or a hoodie.[65]  *Second*, the knowledge that an exchange is being recorded will encourage lawful and respectful interactions on the part of both parties.[66] *Third*, the recordings will diminish the sense on the part of those who file complaints that it is

---

[63]     *See* Liability Opinion at Part IV.D.

[64]     *See id.* at Part IV.C.4.

[65]     By creating an irrefutable record of what occurred during stops, video recordings may help lay to rest disagreements that would otherwise remain unresolved.

[66]     If, in fact, the police do, on occasion, use offensive language —  including racial slurs — or act with more force than necessary, the use of body-worn cameras will inevitably reduce such behavior.

their word against the police, and that the authorities are more likely to believe the police.[67]
Thus, the recordings should also alleviate some of the mistrust that has developed between the
police and the black and Hispanic communities, based on the belief that stops and frisks are
overwhelmingly and unjustifiably directed at members of these communities. Video recordings
will be equally helpful to members of the NYPD who are wrongly accused of inappropriate
behavior.

       Because body-worn cameras are uniquely suited to addressing the constitutional
harms at issue in this case, I am ordering the NYPD to institute a pilot project in which body-
worn cameras will be worn for a one-year period by officers on patrol in one precinct per
borough — specifically the precinct with the highest number of stops during 2012. The Monitor
will establish procedures for the review of stop recordings by supervisors and, as appropriate,
more senior managers. The Monitor will also establish procedures for the preservation of stop
recordings for use in verifying complaints in a manner that protects the privacy of those stopped.
Finally, the Monitor will establish procedures for measuring the effectiveness of body-worn
cameras in reducing unconstitutional stops and frisks. At the end of the year, the Monitor will
work with the parties to determine whether the benefits of the cameras outweigh their financial,
administrative, and other costs, and whether the program should be terminated or expanded. The
City will be responsible for the costs of the pilot project.

       It would have been preferable for this remedy to have originated with the NYPD,
which has been a leader and innovator in the application of technology to policing, as Compstat
illustrates. Nevertheless, there is reason to hope that not only civilians but also officers will

---

[67]    *See* Liability Opinion at Part IV.C.6.

27

benefit from the use of cameras.  When a small police department in Rialto, California introduced body-worn cameras, "[t]he results from the first 12 months [were] striking.  Even with only half of the 54 uniformed patrol officers wearing cameras at any given time, the department over all had an 88 percent decline in the number of complaints filed against officers, compared with the 12 months before the study."[68]  While the logistical difficulties of using body-worn cameras will be greater in a larger police force, the potential for avoiding constitutional violations will be greater as well.

### 4.    Joint Remedial Process for Developing Supplemental Reforms

A community input component is increasingly common in consent decrees and settlements directed at police reform.[69]  The DOJ has recognized the importance of community input in its recent consent decrees and other agreements with police departments.[70]  The landmark Collaborative Agreement approved in 2002 by Judge Susan J. Dlott of the Southern District of Ohio as the settlement of class claims against the Cincinnati Police Department has been widely recognized as a successful model for other police reform.[71]

Although the remedies in this Opinion are not issued on consent and do not arise

---

[68]    Randall Stross, *Wearing a Badge, and a Video Camera*, N.Y. TIMES, Apr. 7, 2013, at BU4.

[69]    *See* 5/16 Tr. at 7521 (Walker).

[70]    *See* Memorandum of Law in Support of Plaintiffs' Request for Injunctive Relief ("Pl. Inj. Mem.") at 15 (collecting agreements).

[71]    *See In re Cincinnati Policing*, 209 F.R.D. 395, 397 (S.D. Ohio 2002) (discussing development of Collaborative Agreement through a collaborative procedure); *Tyehimba v. City of Cincinnati*, No. C-1-99-317, 2001 WL 1842470 (S.D. Ohio May 3, 2001) ("Order Establishing Collaborative Procedure"); Pl. Inj. Mem. at 14; GREG RIDGEWAY ET AL., POLICE-COMMUNITY RELATIONS IN CINCINNATI (2009).

from a settlement, community input is perhaps an even more vital part of a sustainable remedy in this case.  The communities most affected by the NYPD's use of stop and frisk have a distinct perspective that is highly relevant to crafting effective reforms.  No amount of legal or policing expertise can replace a community's understanding of the likely practical consequences of reforms in terms of both liberty and safety.

It is important that a wide array of stakeholders be offered the opportunity to be heard in the reform process: members of the communities where stops most often take place; representatives of religious, advocacy, and grassroots organizations; NYPD personnel and representatives of police organizations; the District Attorneys' offices; the CCRB; representatives of groups concerned with public schooling, public housing, and other local institutions; local elected officials and community leaders; representatives of the parties, such as the Mayor's office, the NYPD, and the lawyers in this case; and the non-parties that submitted briefs: the Civil Rights Division of the DOJ, Communities United for Police Reform, and the Black, Latino, and Asian Caucus of the New York City Council.

If the reforms to stop and frisk are not perceived as legitimate by those most affected, the reforms are unlikely to be successful.[72]  Neither an independent Monitor, nor a municipal administration, nor this Court can speak for those who have been and will be most affected by the NYPD's use of stop and frisk.[73]  The 2007 RAND report, relied on by the City at

---

[72]     *Cf.* 5/16 Tr. at 7522 (Professor Walker discussing the legitimacy of reforms).  As a general matter, police departments "depend upon public confidence, public trust, and public cooperation."  *Id.* at 7520.  This principle applies no less in the context of stop and frisk.

[73]     *Cf. United States v. City of Los Angeles*, 288 F.3d 391, 404 (9th Cir. 2002) (remanding to the district court for a hearing on the permissive intervention of community groups in a DOJ lawsuit against the Los Angeles Police Department, and emphasizing the importance of not "marginalizing those . . . who have some of the strongest interests in the

trial, recognized the importance of "ongoing communication and negotiation with the community about [stop and frisk] activities" to "maintaining good police-community relations."[74]  It is surely in everyone's interest to prevent another round of protests, litigation, and divisive public conflicts over stop and frisk.

Drawing on this Court's broad equitable powers to remedy the wrongs in this case,[75] I am ordering that all parties participate in a joint remedial process, under the guidance of a Facilitator to be named by the Court.  I hereby order the following specific relief:

1.  All parties shall participate in the Joint Remedial Process for a period of six to nine months to develop proposed remedial measures (the "Joint Process Reforms") that will supplement the Immediate Reforms discussed above.  The Joint Process Reforms must be no broader than necessary to bring the NYPD's use of stop and frisk into compliance with the Fourth and Fourteenth Amendments.

2.  The Joint Remedial Process will be guided by the Facilitator, with such assistance as the Facilitator deems necessary and in consultation with the Monitor.

3.  The initial responsibility of the Facilitator will be to work with the parties to develop a time line, ground rules, and concrete milestones for the Joint Remedial Process.  The Cincinnati Collaborative Procedure and subsequent DOJ consent decrees and letters of

---

outcome").

[74]  RAND Report at 44.

[75]  The equitable power of district courts to order processes involving community input is well-established.  *See, e.g.*, *United States v. Yonkers Bd. of Educ.*, 635 F. Supp. 1538, 1545 (S.D.N.Y. 1986), *aff'd*, 837 F.2d 1181 (2d Cir. 1987) (ordering the Yonkers public school system to organize "community meetings with minority groups and organizations to solicit support and assistance in the dissemination of magnet program availability"); Pl. Inj. Mem. at 11–13 (collecting cases and scholarship).

intent may be used as models.[76]

4.      At the center of the Joint Remedial Process will be input from those who are most

affected by the NYPD's use of stop and frisk, including but not limited to the people and

organizations noted above.  Input from academic and other experts in police practices

may also be requested.

5.      The Facilitator will convene "town hall" type meetings in each of the five boroughs in

order to provide a forum in which all stakeholders may be heard.  It may be necessary to

hold multiple meetings in the larger boroughs in order to ensure that everyone will have

an opportunity to participate.  The Facilitator will endeavor to prepare an agenda for such

meetings, through consultation with the various interested groups prior to the meeting.

The Monitor will also attend these meetings to the extent possible.

6.      The NYPD will appoint a representative or representatives to serve as a liaison to the

Facilitator during the Joint Remedial Process.

7.      The Facilitator may receive anonymous information from NYPD officers or officials,

subject to procedures to be determined by the parties.

8.      When the parties and the Facilitator have finished drafting the Joint Process Reforms,

they will be submitted to the Court and the Monitor.  The Monitor will recommend that

the Court consider those Reforms he deems appropriate, and will then oversee their

implementation once approved by the Court.

---

[76]      *See Tyehimba*, 2001 WL 1842470; Pl. Inj. Mem. at 15.  In the interests of
conserving resources and speeding the development of the Joint Process Reforms, the Joint
Remedial Process will not involve the development of an independent analysis by a panel of paid
experts, as proposed by plaintiffs in Pl. Inj. Mem. at 10.  The participants in the Joint Remedial
Process may rely on any sources of facts deemed useful by the Facilitator, including this Court's
findings in the Liability Opinion.

9.     In the event that the parties are unable to agree on Joint Process Reforms, the Facilitator will prepare a report stating the Facilitator's findings and recommendations based on the Joint Remedial Process, to be submitted to the parties, the Monitor, and the Court. The parties will have the opportunity to comment on the report and recommendations.

10.    The City will be responsible for the reasonable costs and fees of the Facilitator and the Joint Remedial Process.

## III.    REMEDIES IN *LIGON*

In a January 8, 2013 Opinion and Order, amended on February 14, 2013, I granted the *Ligon* plaintiffs' motion for a preliminary injunction, and proposed entering several forms of preliminary relief.[77]  I postponed ordering that relief until after a consolidated remedies hearing could be held in *Ligon* and *Floyd*.[78]  That hearing has now concluded.  The defendants in *Ligon* have submitted drafts of the documents discussed in the proposed relief section of the February 14 Opinion, the *Ligon* plaintiffs have proposed revisions to those drafts, and the defendants have responded to the proposed revisions.[79]

Having reviewed the parties' submissions, I am now imposing the final order of preliminary injunctive relief in *Ligon*.  The reasons for the ordered relief, which must be stated pursuant to Federal Rule of Civil Procedure 65(d)(1)(A), are the reasons stated in the February

---

[77]     *See Ligon*, 2013 WL 628534, at *41–44; *Ligon v. City of New York*, No. 12 Civ. 2274, 2013 WL 227654 (S.D.N.Y. Jan. 22, 2013) (staying the sole immediate relief ordered in the January 8 Opinion).

[78]     *See Ligon*, 2013 WL 628534, at *42.

[79]     *See* 7/8/13 Defendants' Proposed Remedial Relief ("*Ligon* Def. Rem."); *Ligon* Pl. Rem.; 8/2/13 Defendants' Reply Memorandum of Proposed Remedial Relief ("*Ligon* Def. Reply").

14 Opinion.

As set forth in the February 14 Opinion, the relief falls into four categories: policies and procedures; supervision; training; and attorney's fees. Attorney's fees and costs will be rewarded as appropriate on application. With regard to policies and procedures, I am ordering the proposed relief from the February 14 Opinion as elaborated below.

With regard to the remaining two categories of relief — supervision and training — I am ordering the proposed relief from the February 14 Opinion, as restated below, and I am also appointing the Monitor from *Floyd*, Mr. Zimroth, to oversee the detailed implementation of these orders. I am delegating the oversight of the *Ligon* remedies regarding supervision and training to the Monitor because there is substantial overlap between these remedies and the injunctive relief concerning supervision and training in *Floyd*. For example, both sets of remedies will require alterations to supervisory procedures for reviewing stops, as well as the revision of the NYPD Legal Bureau's slide show at Rodman's Neck.

The purpose of consolidating the remedies hearings in *Ligon* and *Floyd* was to avoid inefficiencies, redundancies, and inconsistencies in the remedies process.[80] This purpose can best be fulfilled by placing both the preliminary injunctive relief in *Ligon* and the permanent injunctive relief in *Floyd* under the direction and supervision of the Monitor.

For the foregoing reasons, the Monitor is directed to oversee the City's compliance with the following orders.

A.     **Policies and Procedures**

*First*, as proposed in the February 14 Opinion, the NYPD is ordered to adopt a

---

[80]     *Ligon*, 2013 WL 227654, at *4.

formal written policy specifying the limited circumstances in which it is legally permissible to stop a person outside a TAP building on a suspicion of trespass. Specifically, the NYPD is ordered to amend Interim Order 22 of 2012 ("IO 22") by deleting the paragraph labeled "NOTE" on page 2 of IO 22,[81] and inserting the following paragraphs in its place:

> A uniformed member of the service may approach and ask questions of a person (that is, conduct a Level 1 request for information under *DeBour*) if the uniformed member has an objective credible reason to do so. However, mere presence in or outside a building enrolled in the Trespass Affidavit Program is not an "objective credible reason" to approach. A uniformed member of the service may *not* approach a person merely because the person has entered or exited or is present near a building enrolled in the Trespass Affidavit Program.

> Under the Fourth Amendment to the United States Constitution, a person is *stopped* (temporarily detained) if under the circumstances a reasonable person would not feel free to disregard the police and walk away. A uniformed member of the service may not stop a person on suspicion of trespass unless the uniformed member *reasonably suspects* that the person was in or is in the building without authorization.

> Mere presence near, entry into, or exit out of a building enrolled in the Trespass Affidavit Program, without more, is *not* sufficient to establish reasonable suspicion for a stop on suspicion of trespass.

The NYPD is ordered to draft a FINEST message explaining the revisions to IO 22 and the need for those revisions. The FINEST message attached as Exhibit 1 to the *Ligon* Plaintiffs' Brief Concerning Defendants' Remedial Proposals will serve as a model. The draft will be provided to the Monitor and then to the Court for approval prior to transmission, with a copy to plaintiffs' counsel.

### B.   Remaining Relief

The Monitor is directed to oversee the City's compliance with the remaining

---

[81]   *See* Exhibit A to *Ligon* Def. Rem.

orders discussed below.  Plaintiffs do not object to many of the draft revisions submitted by the City in response to the proposed orders.[82]  Where the parties disagree, the Monitor is authorized to resolve the dispute by submitting a proposed order for the Court's approval.

As a model for resolving the parties' disputes, the Monitor may use this Court's revision of IO 22, as presented above.[83]  In arriving at a compromise between the parties' proposed language, I aimed to articulate the relevant legal standards as *simply* and *clearly* as possible.  The goal must be to communicate the law to officers in a way that will be understood, remembered, and followed.  In general, plaintiffs' proposed revisions to the City's draft materials make the achievement of this goal more likely.[84]  I note that the Monitor may depart from the City's draft materials even when they do not contain legally erroneous language, if doing so would decrease the likelihood of constitutional violations.

### 1.    Supervision

*First*, the City is ordered to develop procedures for ensuring that UF-250s are completed for *every* trespass stop outside a TAP building in the Bronx.  A "stop" is defined as any police encounter in which a reasonable person would not feel free to terminate the encounter.

*Second*, the City is ordered to develop and implement a system for reviewing the constitutionality of stops outside TAP buildings in the Bronx.  Needless to say, any system

---

[82]    *See Ligon* Def. Rem. at Exs. B–F; *Ligon* Pl. Rem. at 4–16.

[83]    For the materials used in drafting the Court's revision, see *Ligon* Def. Rem. at Ex. A; *Ligon* Pl. Rem. at 1–4; *Ligon* Def. Reply at 2–4.

[84]    *See, e.g.*, *Ligon* Pl. Rem. at 7–8 (proposing revisions to the City's draft slide show for officer training at Rodman's Neck to emphasize the "free to leave" standard, where confusion might otherwise arise).

developed must not conflict with the supervisory reforms ordered in *Floyd*.  To the extent that supervisory review reveals that a stop has not conformed with the revised version of IO 22 described above, the supervisor will ensure that the officer has a proper understanding of what constitutes a stop and when it is legitimate to make a stop. Copies of all reviewed UF-250s shall be provided to plaintiffs' counsel.

## 2.    Training

The City is ordered to revise the NYPD's training materials and training programs to conform with the law as set forth in the February 14 Opinion.  The instruction must be sufficient to uproot the longstanding misconceptions that have affected stops outside of TAP buildings in the Bronx.  It must include, but need not be limited to, the following reforms: (1) The revised version of IO 22 described above must be distributed to each Bronx NYPD member, and then redistributed two additional times at six-month intervals.  (2) The stop and frisk refresher course at Rodman's Neck must be altered to incorporate instruction specifically targeting the problem of unconstitutional trespass stops *outside* TAP buildings.  Training regarding stops outside TAP buildings must also be provided to new recruits, as well as any officers who have already attended the Rodman's Neck refresher course and are not scheduled to do so again.  (3) Chapter 16 of the Chief of Patrol Field Training Guide must be revised to reflect the formal written policy governing trespass stops outside TAP buildings described above.  (4) SQF Training Video No. 5 must be revised to conform with the law set forth in the February 14 Opinion and must be coordinated with the relief ordered in *Floyd*.  The revised video must state that the information contained in the earlier video was incorrect and explain why it was incorrect.

36

**IV.    CONCLUSION**

        The defendant in *Floyd* and the defendants in *Ligon* are ordered to comply with the remedial orders described above.  The Clerk of the Court is directed to close the *Ligon* defendants' motion regarding proposed remedies. [No. 12 Civ. 2274, Dkt. No. 112]


SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:       August 12, 2013
             New York, New York

37

**- Appearances -**

**For *Ligon* Plaintiffs:**

Christopher Dunn, Esq.
Alexis Karteron, Esq.
Taylor Pendergrass, Esq.
Daniel Mullkoff, Esq.
New York Civil Liberties Union
125 Broad Street, 19th floor
New York, NY 10004
(212) 607-3300

Mariana Kovel, Esq.
The Bronx Defenders
860 Courtlandt Avenue
Bronx, NY 10451
(718) 508-3421

Juan Cartagena, Esq.
Foster Maer, Esq.
Roberto Concepcion, Jr., Esq.
LatinoJustice PRLDEF
99 Hudson Street, 14th Floor
New York, NY 10013
(212) 219-3360

John A. Nathanson, Esq.
Tiana Peterson, Esq.
Mayer Grashin, Esq.
Shearman & Sterling LLP
599 Lexington Avenue
New York, NY 10022
(212) 848-5222

**For *Floyd* Plaintiffs:**

Darius Charney, Esq.
Sunita Patel, Esq.
Baher Azmy, Esq.
Rachel Lopez, Esq.
Ghita Schwarz, Esq.
Chauniqua Young, Esq.
Center for Constitutional Rights
666 Broadway, 7th Floor
New York, NY 10012
(212) 614-6439

Philip I. Irwin, Esq.
Eric Hellerman, Esq.
Gretchen Hoff Varner, Esq.
Kasey Martini, Esq.
Bruce Corey, Jr., Esq.
Covington & Burling LLP
620 Eighth Avenue
New York, NY 10018
(212) 841-1000

Jonathan Moore, Esq.
Jenn Rolnick Borchetta, Esq.
Beldock Levine & Hoffman LLP
99 Park Avenue, Suite 1600
New York, NY 10016
(212) 490-0900

38

**For *Ligon* and *Floyd* Defendants:**

Brenda Cooke
Linda Donahue
Heidi Grossman
Morgan Kunz
Joseph Marutollo
Suzanna Publicker
Lisa Richardson
Cecilia Silver
Judson Vickers
Richard Weingarten
Mark Zuckerman
Assistant Corporation Counsel
New York City Law Department
100 Church Street
New York, NY 10007
(212) 788-1300

# Exhibit B

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————————— X

JAENEAN LIGON, individually and on
behalf of her minor son, J.G.; FAWN
BRACY, individually and on behalf of her
minor son, W.B.; JACQUELINE YATES;
LETITIA LEDAN; ROSHEA JOHNSON;
KIERON JOHNSON; JOVAN JEFFERSON;
A.O., by his parent DINAH ADAMES;
ABDULLAH TURNER; FERNANDO
MORONTA; and CHARLES BRADLEY,
individually and on behalf of a class of all
others similarly situated,

                    Plaintiffs,

               - against -

CITY OF NEW YORK; RAYMOND W.
KELLY, COMMISSIONER OF THE NEW
YORK CITY POLICE DEPARTMENT;
POLICE OFFICER JOHNNY BLASINI;
POLICE OFFICER GREGORY
LOMANGINO; POLICE OFFICER
JOSEPH KOCH; POLICE OFFICER
KIERON RAMDEEN; POLICE OFFICER
JOSEPH BERMUDEZ; POLICE OFFICER
MIGUEL SANTIAGO; and POLICE
OFFICERS JOHN DOE 1–12,

                  Defendants.

———————————————————————— X



**AMENDED
OPINION & ORDER**

12 Civ. 2274 (SAS)

1

I.      INTRODUCTION................................................. 4

II.     LEGAL STANDARD FOR PRELIMINARY INJUNCTION........... 10

III.    APPLICABLE LAW............................................. 12

        A.     Sources of Liability................................. 12
        B.     The Fourth Amendment, Stops, and Reasonable Suspicion........ 16
        C.     Criminal Trespass under New York State Law................. 20
        D.     *De Bour*........................................... 21

IV.     FINDINGS OF FACT........................................... 23

        A.     Evidence of an Unconstitutional Practice or Custom of the NYPD. . 23

               1.     Findings of Fact Regarding Testimony of ADA Rucker and
                      Decline to Prosecute Forms. ........................ 24
               2.     Findings of Fact Regarding Plaintiffs' Stops. ............. 32
                      a.     Charles Bradley's Stop........................ 35
                      b.     Abdullah Turner's Stops........................ 41
                      c.     J.G.'s Stop. ............................... 49
                      d.     Jerome Grant's Stop........................... 52
                      e.     Roshea Johnson's Stop......................... 54
                      f.     Letitia Ledan's Stops.......................... 57
                      g.     Fernando Moronta's Stop....................... 61
                      h.     Kieron Johnson's Stop. ....................... 62
                      i.     Jovan Jefferson's Stop. ....................... 64
               3.     Expert Testimony Regarding UF-250 Forms. ............. 67

        B.     Steps Taken by the NYPD in 2012......................... 82

               1.     NYPD Recognition of a Problem in TAP................. 84
               2.     Interim Orders 22 and 23 of 2012..................... 85
               3.     Absence of Steps Meaningfully Addressing Outdoor TAP
                      Stops.................................... 90

V.      DISCUSSION................................................. 94

A.      Standing. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 92

B.      Preliminary Injunctive Relief. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 96

        1.      Clear or Substantial Likelihood of Success on the Merits. . . . 97
                a.      Deliberate Indifference. . . . . . . . . . . . . . . . . . . . . . . . 98
                        i.      ADA Rucker's Testimony. . . . . . . . . . . . . . . . . 98
                        ii.     Plaintiffs' Stops. . . . . . . . . . . . . . . . . . . . . . . . . 99
                        iii.    Decline to Prosecute Forms. . . . . . . . . . . . . . 104
                        iv.     Dr. Fagan's Analysis. . . . . . . . . . . . . . . . . . . 107
                        v.      Notice to Defendants. . . . . . . . . . . . . . . . . . . 117
                        vi.     Legal Analysis. . . . . . . . . . . . . . . . . . . . . . . . 118
                b.      Failure to Rebut Deliberate Indifference Claim Based on
                        Steps Taken by NYPD in 2012. . . . . . . . . . . . . . . . . . 121
        2.      Irreparable Harm. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 134
        3.      Balance of Equities. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 136
        4.      Public Interest. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 139

C.      Appropriate Scope of Injunctive Relief. . . . . . . . . . . . . . . . . . . . . 141

        1.      Immediate Relief. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 142
        2.      Proposed Additional Relief. . . . . . . . . . . . . . . . . . . . . . . . . . 144
                a.      Policies and Procedures. . . . . . . . . . . . . . . . . . . . . 146
                b.      Supervision. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 147
                c.      Training. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 147
                d.      Attorneys' Fees. . . . . . . . . . . . . . . . . . . . . . . . . . . 149

VI.     CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 150

APPENDIX A. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 151

APPENDIX B. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 157

**SHIRA A. SCHEINDLIN, U.S.D.J.:**

## I.    INTRODUCTION

This case, filed in 2012, is one of three cases currently before this Court challenging aspects of the New York City Police Department's "stop and frisk" practices.[1]  Of the three cases, this case is the most narrow.  It deals only with stops made by the police on suspicion of trespass outside of certain privately-owned buildings in the Bronx.  But the legal issues raised by this case have roots that stretch back decades.

In 1964, New York adopted the first version of its stop and frisk law, which has since been amended several times.  The essence of the law is that a police officer may stop a person in a public place when he reasonably suspects that such person is committing, has committed, or is about to commit a crime, and the

---

[1]    *Floyd v. City of New York*, filed in 2008, challenges the NYPD's stop and frisk practices in general, arguing among other things that the NYPD is systematically violating the rights of New York City's residents and visitors under the Fourth Amendment to be free from unreasonable searches, and under the Fourteenth Amendment to be free from discrimination on the basis of race.  *See Floyd v. City of New York*, 283 F.R.D. 153, 159 (S.D.N.Y. 2012) (granting class certification).  *Davis v. City of New York*, filed in 2010, focuses on stop and frisk practices at public housing properties run by the New York City Housing Authority ("NYCHA").  Plaintiffs in *Davis* argue that the NYPD uses unlawful stops, searches, and arrests to enforce the prohibitions against trespassing on public housing property.  *See Davis v. City of New York*, — F. Supp. 2d —, 2012 WL 4813837, at *1 (S.D.N.Y. Oct. 9, 2012) (granting in part and denying in part defendants' motions for summary judgment regarding individual plaintiffs' arrests and tenancies).

officer may demand of him his name, his address, and an explanation of his conduct.  Upon stopping a person, if the police officer reasonably suspects that he is in danger of physical injury, he may search the person for a deadly weapon.[2]

This law and the policing practices associated with it have raised a host of difficult questions, including:  (1) what is reasonable suspicion; (2) what constitutes a stop; (3) what is a public place; (4) when is a stopped person free to walk away from the police; and (5) when does an officer have grounds to reasonably suspect that he is danger of physical injury.  None of these questions are easily answered.

In 1968, the United States Supreme Court heard a challenge to New York's stop and frisk statute in the context of two criminal convictions, and made some important points that bear repeating today.[3]  *First*, the Court held that although states may develop their own laws on stop and frisk, they may not "authorize police conduct which trenches upon Fourth Amendment rights, regardless of the labels which it attaches to such conduct."[4]  The Court stated, in no

---

[2]        *See generally* New York Criminal Procedure Law ("CPL") § 140.50.

[3]        *See generally Sibron v. State of New York*, 392 U.S. 40 (1968) (reversing conviction for failure to suppress evidence seized in an unlawful stop, and affirming conviction in a related appeal, finding that the seizure in latter case was reasonable under the Fourth Amendment).

[4]        *Id.* at 61.

uncertain terms, that the question is not whether a particular search was authorized by state law but "'whether the search was reasonable under the Fourth Amendment.'"[5] *Second*, the Court held that it would not judge the constitutionality of the New York statute on its face, but rather as applied to the particular facts of the two cases it was reviewing.[6] *Third*, the Court stressed that a police officer must have reasonable grounds before he seizes a person. In that regard the Court stated: "The police officer is not entitled to seize and search every person whom he sees on the street or of whom he makes inquiries."[7]

In confronting the issues addressed in this Opinion, I am keenly aware that this Court does not stand in the shoes of the Police Department and is in no way qualified or empowered to engage in policy determinations. The sole role of the Court is to interpret and apply the law — in this case the Fourth Amendment of the United States Constitution as interpreted by the Supreme Court of the United States and the United States Court of Appeals for the Second Circuit — to the

---

[5]      *Id.* (quoting *Cooper v. State of California*, 386 U.S. 58, 61 (1967)).

[6]      *See id.* ("Our constitutional inquiry would not be furthered here by an attempt to pronounce judgment on the words of the statute. We must confine our review instead to the reasonableness of the searches and seizures which underlie these two convictions.").

[7]      *Id.* The Court continued: "Before he places a hand on the person of a citizen in search of anything, he must have constitutionally adequate, reasonable grounds for doing so." *Id.*

specific facts before it.  I have endeavored faithfully to carry out that limited role.

My object here is only to clarify what the law permits — and does not permit — an

officer to do when initiating and conducting a stop or stop and frisk of people in

the public areas outside of certain privately owned buildings in the Bronx.

Plaintiffs, all of whom are African-American or Latino residents of

New York,[8] argue that the Police Department has a widespread practice of making

unlawful stops on suspicion of trespass outside buildings in the Bronx that are

enrolled in the Trespass Affidavit Program ("TAP"), which was formerly known in

the Bronx as Operation Clean Halls.[9]  This program allows "police officers to

patrol inside and around thousands of private residential apartment buildings

throughout New York City."[10]  Plaintiffs argue that the NYPD's trespass stops

outside TAP buildings are often made without reasonable suspicion, and thus

---

[8]        *See* Complaint ¶¶ 11–23.

[9]        *See Ligon v. City of New York*, No. 12 Civ. 2274, 2012 WL 3597066,
at *1 (S.D.N.Y. Aug. 21, 2012) (allowing preliminary injunction hearing to
proceed).  For the history of TAP, see *infra* Part IV.B.  Plaintiffs' Complaint
concerns stops in and around TAP buildings throughout New York City, but
plaintiffs' motion for preliminary injunction focuses solely on outside stops in the
Bronx.  *See Ligon*, 2012 WL 3597066, at *3–4; Memorandum of Law in Support
of Plaintiffs' Motion for Class Certification ("Class Mem.") at 1 n.1.

[10]       *See Ligon*, 2012 WL 3597066, at *1.

violate the Fourth Amendment.[11]  Plaintiffs stated that such stops have caused them to feel "violated,"[12] "disrespected,"[13] "angry,"[14] and "defenseless."[15]  As the Supreme Court noted in *Terry v. Ohio*, even limited stops and searches represent "an annoying, frightening, and perhaps humiliating experience,"[16] and thus must be based on reasonable suspicion.

On September 24, 2012, plaintiffs filed a motion for a preliminary injunction, seeking an order requiring the NYPD to create and implement new policies, training programs, and monitoring and supervisory procedures that specifically address the problem of unconstitutional trespass stops outside TAP buildings.[17]  The preliminary injunction hearing took place between October 15 and November 7, 2012.[18]  This Opinion addresses plaintiffs' motion.

---

[11]     *See* Plaintiffs' Revised Proposed Findings of Fact and Conclusions of Law ("Pl. Findings") ¶¶ 64–67, 69–70.

[12]     Transcript of Preliminary Injunction Hearing ("Tr.") 10/16 at 275:8.

[13]     *Id.* at 349:1.

[14]     Tr. 10/17 at 444:2.

[15]     *Id.* at 486:1.

[16]     392 U.S. 1, 25 (1968).

[17]     *See* Memorandum of Law in Support of Plaintiffs' Motion for Preliminary Injunction at 21; Pl. Findings ¶¶ 72–75.

[18]     *See* Tr. 10/15 at 1; Tr. 11/7 at 1282.

I begin by summarizing the relevant legal standards, then state my findings of fact and conclusions of law.  Based on all the evidence presented at the hearing, I conclude that plaintiffs have shown a clear likelihood of proving that defendants have displayed deliberate indifference toward a widespread practice of unconstitutional trespass stops by the NYPD outside TAP buildings in the Bronx. This conclusion is based on five categories of evidence, briefly summarized here and fully explored below:  (1) the testimony of Bronx Assistant District Attorney Jeannette Rucker ("ADA Rucker"), who concluded that the NYPD frequently made trespass stops outside TAP buildings in the Bronx for no reason other than that the officer had seen someone enter and exit or exit the building; (2) a sample of "decline to prosecute" forms prepared by the Bronx District Attorneys' Office, which revealed the alarming frequency of unlawful trespass stops in the vicinity of TAP buildings in the Bronx; (3) the testimony of eight plaintiffs and a non-party witness, who described remarkably similar encounters with the police when stopped in the vicinity of TAP buildings in the Bronx; (4) the analysis by Dr. Jeffrey Fagan, plaintiffs' expert, of an NYPD database of recorded stops, which provided further evidence of the frequency of apparently unlawful trespass stops outside TAP buildings in the Bronx; and (5) NYPD training materials that continue to misstate the minimal constitutional standards for making stops.

In sum, while it may be difficult to say where, precisely, to draw the line between constitutional and unconstitutional police encounters, such a line exists, and the NYPD has systematically crossed it when making trespass stops outside TAP buildings in the Bronx.  For those of us who do not fear being stopped as we approach or leave our own homes or those of our friends and families, it is difficult to believe that residents of one of our boroughs live under such a threat.[19] In light of the evidence presented at the hearing, however, I am compelled to conclude that this is the case.

As a result, plaintiffs are entitled to a preliminary injunction. However, with one exception, I am not yet ordering relief pending a further hearing on the appropriate scope of such relief.

## II.    LEGAL STANDARD FOR PRELIMINARY INJUNCTION

"'A preliminary injunction is an extraordinary remedy never awarded as of right.'"[20]  In general, to obtain a preliminary injunction, the moving party

---

[19]     To echo language quoted by Justice Thurgood Marshall, the evidence in this case "has evoked images of other days, under other flags, when no man traveled . . . without fear of unwarranted interruption." *Florida v. Bostick*, 501 U.S. 429, 443 (1991) (Marshall, J., dissenting) (quotation marks and citation omitted).

[20]     *UBS Fin. Servs., Inc. v. West Virginia Univ. Hosps., Inc.*, 660 F.3d 643, 648 (2d Cir. 2011) (quoting *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008)).

must establish:  (1) "that [it] is likely to succeed on the merits," (2) "that [it] is

likely to suffer irreparable harm in the absence of preliminary relief," (3) "that the

balance of equities tips in [its] favor," and (4) "that an injunction is in the public

interest."[21]  The Second Circuit has held that the moving party may be entitled to a

preliminary injunction even if the party is unable to establish a likelihood of

success on the merits, provided that the party demonstrates "'a serious question

going to the merits to make them a fair ground for trial, with a balance of hardships

tipping decidedly in the plaintiff's favor.'"[22]  In addition, when the moving party

seeks a "mandatory" injunction, that is, an injunction that commands action rather

than merely prohibiting it, the standard is higher:  "[W]here 'the injunction sought

will alter rather than maintain the status quo,' the movant must show [a] 'clear' or

---

[21]     *Winter*, 555 U.S. at 20 (citing *Munaf v. Geren*, 553 U.S. 674, 689–90
(2008); *Amoco Production Co. v. Gambell*, 480 U.S. 531, 542 (1987); *Weinberger
v. Romero–Barcelo*, 456 U.S. 305, 311–12 (1982)).  *See also* Fed. R. Civ. P. 65(a)
(preliminary injunctions).

[22]     *Red Earth LLC v. United States*, 657 F.3d 138, 143 (2d Cir. 2011)
(quoting *Metropolitan Taxicab Bd. of Trade v. City of New York*, 615 F.3d 152,
156 (2d Cir. 2010)).  *Accord Pamlab, L.L.C. v. Macoven Pharm., L.L.C.*, — F.
Supp. 2d —, 2012 WL 2540234, at *3 (S.D.N.Y. June 29, 2012) (recognizing that
the Supreme Court in *Winter* "cast some doubt on the continuing viability" of the
Second Circuit's "serious questions" prong, but noting that "the Second Circuit has
since held that 'our venerable standard for assessing a movant's probability of
success on the merits remains valid'" (quoting *Citigroup Global Mkts., Inc. v. VCG
Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 38 (2d Cir. 2010))).

'substantial' likelihood of success."[23]

Because plaintiffs seek mandatory injunctive relief including the drafting and distribution of new policies, the development and implementation of new training programs, and the implementation of new monitoring and supervision procedures,[24] they must establish a clear or substantial likelihood that they will succeed at trial.

## III.   APPLICABLE LAW

### A.   Sources of Liability

Plaintiffs bring a claim under 42 U.S.C. § 1983 alleging violations of their Fourth Amendment rights by the City of New York and several of its employees.[25]  As the Supreme Court established in *Monell v. New York City*

---

[23]     *Rodriguez v. DeBuono*, 175 F.3d 227, 233 (2d Cir. 1999) (quoting *Jolly v. Coughlin*, 76 F.3d 468, 473–74 (2d Cir. 1996)).  The Second Circuit has recognized that "[t]he distinction between mandatory and prohibitory injunctions is not without ambiguities or critics, and that in a close case an injunction can be framed in mandatory or prohibitory terms."  *Jolly*, 76 F.3d at 474 (quotation marks and citations omitted).

[24]     *See* Pl. Findings ¶¶ 72–75.

[25]     *See* Compl. ¶¶ 1, 203.  42 U.S.C. § 1983 provides:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws,

*Department of Social Services*,[26] in order to have recourse against a municipality or other local government under section 1983, plaintiffs "must prove that 'action pursuant to official municipal policy' caused the alleged constitutional injury."[27] In general, "[o]fficial municipal policy includes the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law."[28]

One way to establish an official policy is through a showing of "deliberate indifference" by high-level officials. "'[W]here a policymaking official exhibits deliberate indifference to constitutional deprivations caused by subordinates, such that the official's inaction constitutes a deliberate choice, that

---

shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

[26]     436 U.S. 658 (1978).  Interpreting the language of section 1983 and the legislative history surrounding its passage in the Civil Rights Act of 1871, the Court in *Monell* held that local governing bodies could be held liable either on the basis of formally approved policy or on the basis of "'customs'" or "'usages.'"  *Id.* at 690–91 (quoting *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 167–68 (1970)).  Later cases have "considerably broadened the concept of official municipal action."  *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 125 (2d Cir. 2004).

[27]     *Cash v. County of Erie*, 654 F.3d 324, 333 (2d Cir. 2011) (quoting *Connick v. Thompson*, 131 S.Ct. 1350, 1359 (2011), in turn quoting *Monell*, 436 U.S. at 691).

[28]     *Connick*, 131 S.Ct. at 1359 (citing *Monell*, 436 U.S. at 694; *Pembaur v. Cincinnati*, 475 U.S. 469, 479 (1986); *Adickes*, 398 U.S. at 167–68).

acquiescence may be properly thought of as a city policy or custom that is actionable under § 1983.'"[29]  "Deliberate indifference" requires "'proof that a municipal actor disregarded a known or obvious consequence of his action.'"[30]

Recognizing that "deliberate indifference" is "a stringent standard of fault," the Second Circuit requires "that the policymaker's inaction was the result of 'conscious choice' and not 'mere negligence.'"[31]  The Second Circuit has held that municipal liability can be established "by demonstrating that the actions of subordinate officers are sufficiently widespread to constitute the *constructive* acquiescence of senior policymakers."[32]

---

[29]     *Cash*, 654 F.3d at 334 (quoting *Amnesty*, 361 F.3d at 126).

[30]     *Connick*, 131 S.Ct. at 1359 (quoting *Board of Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 410 (1997)).

[31]     *Cash*, 654 F.3d at 334 (quoting *Connick*, 131 S.Ct at 1360; *Amnesty*, 361 F.3d at 128).

[32]     *Sorlucco v. City of New York*, 971 F.2d 864, 871 (2d Cir. 1992) (emphasis added), quoted with approval by *Amnesty*, 361 F.3d at 126; *Okin v. Village of Cornwall-on-Hudson Police Dep't*, 577 F.3d 415, 440 (2d Cir. 2009). Though the Second Circuit has not explicitly reaffirmed the "constructive acquiescence" theory of *Monell* liability articulated in *Sorlucco* since the Supreme Court decided *Connick*, the Second Circuit noted in *Jones v. Town of E. Haven*, 691 F.3d 72, 82 (2d Cir. 2012), that the plaintiff there could have established municipal liability by showing:

> a sufficiently widespread practice among police officers of abuse of the rights of black people to support reasonably the conclusion that such abuse was the custom of the officers of the Department

A municipality may incur *Monell* liability based on deliberate
indifference through its training practices.  Although "[a] municipality's
culpability for a deprivation of rights is at its most tenuous where a claim turns on
a failure to train,"[33] the Supreme Court has held that "[w]hen city policymakers are
on actual or constructive notice that a particular omission in their training program
causes city employees to violate citizens' constitutional rights, the city may be
deemed deliberately indifferent if the policymakers choose to retain that
program."[34]  "[D]eliberate indifference may be inferred where 'the need for more
or better supervision to protect against constitutional violations was obvious,' but
the policymaker 'fail[ed] to make meaningful efforts to address the risk of harm to
plaintiffs[.]'"[35]

---

and that supervisory personnel must have been aware of it but
took no adequate corrective or preventive measures (or some
combination of the two).

*Jones*, 691 F.3d at 82.  The Second Circuit thus continues to hold that if a practice
of misconduct is sufficiently widespread, the municipality may be assumed to have
acquiesced in it, even in the absence of direct evidence of such acquiescence.

[33]   *Connick*, 131 S.Ct. at 1359 (citing *Oklahoma City v. Tuttle*, 471 U.S.
808, 822–23 (1985) (plurality opinion)).

[34]   *Id.* (citing *Bryan Cty.*, 520 U.S. at 407).

[35]   *Cash*, 654 F.3d at 334 (quoting *Reynolds v. Giuliani*, 506 F.3d 183,
192 (2d Cir. 2007); *Vann v. City of New York*, 72 F.3d 1040, 1049 (2d Cir. 1995)).
*Cash* reaffirmed the validity of the three-part framing of the failure-to-train inquiry

**B.     The Fourth Amendment, Stops, and Reasonable Suspicion**

The Fourth Amendment, made applicable to the States by the Fourteenth Amendment,[36] states:  "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause . . . ."[37] As interpreted by the courts, the Fourth Amendment prohibits arrest without probable cause, but allows the police to "'stop and briefly detain a person for investigative purposes if the officer has a reasonable suspicion supported by

---

in *Walker v. City of New York*, 974 F.2d 293, 297–98 (2d Cir. 1992), summarized as:

> (1) policymaker knows "to a moral certainty" that its employees will confront a given situation; (2) either situation presents employees with difficult choice that will be made less so by training or supervision, or there is a record of employees mishandling situation; and (3) wrong choice by employees will frequently cause deprivation of constitutional rights.

*Cash*, 654 F.3d at 334.  "Where the plaintiff establishes all three elements, then . . . the policymaker should have known that inadequate training or supervision was 'so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need.'" *Walker*, 974 F.2d at 298 (quoting *City of Canton v. Harris*, 489 U.S. 378, 390 (1989)).

[36]     *See Maryland v. Pringle*, 540 U.S. 366, 369 (2003) (citing *Mapp v. Ohio*, 367 U.S. 643 (1961)).

[37]     U.S. CONST. amend. IV.

16

articulable facts that criminal activity "may be afoot," even if the officer lacks

probable cause."[38]  "This form of investigative detention is now known as a *Terry*

stop."[39]

      "While 'reasonable suspicion' is a less demanding standard than

probable cause and requires a showing considerably less than preponderance of the

evidence, the Fourth Amendment requires at least a minimal level of objective

justification for making the stop."[40]  "'The officer [making a *Terry* stop] . . . must

be able to articulate something more than an inchoate and unparticularized

suspicion or hunch.'"[41]  "Reasonable suspicion is an objective standard; hence, the

subjective intentions or motives of the officer making the stop are irrelevant."[42]

---

[38]    *United States v. Swindle*, 407 F.3d 562, 566 (2d Cir. 2005) (quoting *United States v. Sokolow*, 490 U.S. 1, 7 (1989)).  Under New York law, the justifications required for different levels of police intrusion were established in *People v. De Bour*, 40 N.Y.2d 210 (1976).  *See infra* Part III.D.  States may impose greater restrictions on police conduct than those established by the Fourth Amendment, but "may not . . . authorize police conduct which trenches upon Fourth Amendment rights."  *Sibron*, 392 U.S. at 61.

[39]    *Davis*, 2012 WL 4813837, at *2 (citing *Terry*, 392 U.S. at 88).

[40]    *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000).

[41]    *Alabama v. White*, 496 U.S. 325, 329 (1990) (quoting *Sokolow*, 490 U.S. at 7) (certain quotation marks omitted).  Courts are divided over whether reasonable suspicion must be of a particular crime, or may be of criminality in general.  *See* 4 WAYNE R. LAFAVE, SEARCH & SEIZURE § 9.5(c) (5th ed. 2012).

[42]    *United States v. Bayless*, 201 F.3d 116, 133 (2d Cir. 2000).

It is sometimes the case that a police officer may observe "a series of acts, each of them perhaps innocent in itself, but which taken together warrant[] further investigation."[43]  "An individual's presence in an area of expected criminal activity, standing alone, is not enough to support a reasonable, particularized suspicion that the person is committing a crime."[44]  However, "the fact that the stop occurred in a 'high crime area' [may be] among the relevant contextual considerations in a *Terry* analysis."[45]

Courts reviewing stops for reasonable suspicion "must look at 'the totality of the circumstances' of each case to see whether the detaining officer has a 'particularized and objective basis' for suspecting legal wrongdoing."[46]  "[T]he proper inquiry is not whether each fact considered in isolation denotes unlawful behavior, but whether all the facts taken together support a reasonable suspicion of wrongdoing."[47]

The test for whether a *Terry* stop has taken place outdoors is whether

---

[43]     *Terry*, 392 U.S. at 22.

[44]     *Wardlow*, 528 U.S. at 124 (citing *Brown v. Texas*, 443 U.S. 47 (1979)).

[45]     *Id.* (quoting *Adams v. Williams*, 407 U.S. 143, 144 (1972)).

[46]     *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (quoting *United States v. Cortez*, 449 U.S. 411, 417–18 (1981)).

[47]     *United States v. Lee*, 916 F.2d 814, 819 (2d Cir. 1990).

"a reasonable person would feel free 'to disregard the police and go about his business.'"[48]  "'[W]henever a police officer accosts an individual and restrains his freedom to walk away, he has 'seized' that person.'"[49]  "[P]olice questioning, by itself, is unlikely to result in a Fourth Amendment violation . . . [u]nless the circumstances of the encounter are so intimidating as to demonstrate that a reasonable person would have believed he was not free to leave if he had not responded."[50]  The Second Circuit has held that "[a] seizure occurs when (1) a person obeys a police officer's order to stop or (2) a person that does not submit to an officer's show of authority is physically restrained."[51]  Both *Terry* stops and

---

[48]      *Bostick*, 501 U.S. at 434 (quoting *California v. Hodari D.*, 499 U.S. 621, 628 (1991)).  *Accord United States v. Mendenhall*, 446 U.S. 544, 554 (1980) ("[A] person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.").  In an enclosed space, such as a bus, this test may be rephrased as "'whether a reasonable person would feel free to decline the officers' requests or otherwise terminate the encounter.'"  *United States v. Drayton*, 536 U.S. 194, 202 (2002) (quoting *Bostick*, 501 U.S. at 436).  *Bostick* also notes that "the 'reasonable person' test presupposes an *innocent* person."  *Bostick*, 501 U.S. at 438.  For a comprehensive summary of the "free to leave" test as it has been interpreted and applied, see LAFAVE, SEARCH & SEIZURE § 9.4(a).

[49]      *Brown*, 443 U.S. at 50 (quoting *Terry*, 392 U.S. at 16).

[50]      *INS v. Delgado*, 466 U.S. 210, 216 (1984).

[51]      *United States v. Simmons*, 560 F.3d 98, 105 (2d Cir. 2009) (citing *Swindle*, 407 F.3d at 572).

arrests constitute "seizures" under the Fourth Amendment.[52]

### C.   Criminal Trespass under New York State Law

Criminal trespass is defined under section 140 of the New York Penal Law.  As the Appellate Division, First Department, of the Supreme Court of New York recently stated in a case concerning alleged trespass in a Clean Halls building:

> A person is guilty of criminal trespass in the second degree when, in pertinent part, he "knowingly enters or remains unlawfully in a dwelling" (Penal Law § 140.15[1]).  A person "enters or remains unlawfully" in or upon premises "when he is not licensed or privileged to do so" (Penal Law § 140.00[5]).  "In general, a person is 'licensed or privileged' to enter private premises when he has obtained the consent of the owner or another whose relationship to the premises gives him authority to issue such consent" (*People v. Graves*, 76 N.Y.2d 16, 20 . . . [1990]).  The prosecution bears the burden of proving the absence of such license or privilege (*People v. Brown*, 25 N.Y.2d 374, 377 . . . [1969]).[53]

The trespass law also states:

> A person who, regardless of his intent, enters or remains in or upon premises which are at the time open to the public does so with license and privilege unless he defies a lawful order not to enter or remain, personally communicated to him by the owner of such premises or other authorized person. A license or privilege to enter or remain in a building which is only partly open to the public is not a license or privilege to enter or remain in that part

---

[52]   *See Terry*, 392 U.S. at 16–20.

[53]   *In re Lonique M.*, 939 N.Y.S.2d 341, 343 (1st Dep't 2012).

of the building which is not open to the public.[54]

### D.   *De Bour*

In *People v. De Bour*, the New York Court of Appeals established a four-level test for determining the legality of encounters between police officers and civilians under New York state law.  The more intrusive the encounter, the more justification required:

- Level 1:  Approach to Request Information:  "If a police officer seeks simply to request information from an individual, that request must be supported by an objective, credible reason, not necessarily indicative of criminality."[55]

- Level 2:  The Common-Law Right of Inquiry:  "Once the officer asks more pointed questions that would lead the person approached reasonably to believe that he or she is suspected of some wrongdoing and is the focus of the officer's investigation, the officer is [engaged in] a common-law inquiry that must be supported by a *founded suspicion that criminality is afoot.*"[56]

- Level 3:  Forcible Stop:  "Where a police officer has *reasonable suspicion that a particular person was involved in a felony or misdemeanor*, the officer is authorized to forcibly stop and detain that person."[57]   A Level 3 stop is legally equivalent to a *Terry*

---

[54]   N.Y. Penal Law § 140.00.

[55]   *People v. Hollman*, 79 N.Y.2d 181, 184 (1992) (reaffirming *De Bour* despite case law suggesting that the Fourth Amendment does not protect against police-initiated encounters falling short of seizures).

[56]   *Id.* at 184–85 (emphasis added).

[57]   *Id.* at 185 (emphasis added).

stop, and New York state court opinions generally refer to Level 3 *De Bour* stops and *Terry* stops interchangeably.[58]

- Level 4: Arrest: "Finally, where the officer has probable cause to believe that a person has committed a crime, an arrest is authorized."[59]

At least in the context of police encounters *inside* TAP and NYCHA buildings, New York courts have often identified requests for name and purpose in the building as Level 1 questions.[60] Mere presence in a drug-prone NYCHA building with a history of trespassing has been identified as an objective, credible reason justifying Level 1 questioning.[61] Level 1 questioning of someone *exiting* a

---

[58] *See, e.g.*, *People v. Reyes*, 651 N.Y.S.2d 431, 432–33 (1st Dep't 1996); *People v. Francis*, 847 N.Y.S.2d 398, 401 (Sup. Ct. Bronx Co. 2007).

[59] *Hollman*, 79 N.Y.2d at 185.

[60] *See, e.g.*, *People v. Hendricks*, 841 N.Y.S.2d 94, 94 (1st Dep't 2007) (holding that NYCHA building's "history of drug activity and trespassing" provided "objective, credible reason" for Level 1 inquiry "to determine if defendant was legitimately in the building"); *People v. Anderson*, 759 N.Y.S.2d 676, 676 (1st Dep't 2003) (holding that group of nine or ten people descending staircase in drug-prone TAP building provided objective credible reason to ask defendant whether he lived there, "'which constituted a level one request for information and not a common-law inquiry'" (quoting *People v. Tinort*, 709 N.Y.S.2d 511, 511 (1st Dep't 2000))).

[61] *See Hendricks*, 841 N.Y.S.2d at 94. Level 1 questioning of a person in a NYCHA building requires "[a]t a minimum, . . . evidence of prior criminality" in the building. *People v. Ventura*, 913 N.Y.S.2d 543, 546–47 (Sup. Ct. N.Y. Co. 2010). "To the extent that . . . in public housing the police routinely engage in random, unjustified questioning — and there is evidence that they do — the practice would amount to a systematic violation of *De Bour*." *Id.* at 547 (citing

22

TAP building, on the other hand, appears to require more than a history of drug activity in the building.[62]

## IV.   FINDINGS OF FACT

### A.   Evidence of an Unconstitutional Practice or Custom of the NYPD

At the hearing, plaintiffs offered three categories of evidence in support of their contention that the NYPD has a practice of making unconstitutional trespass stops outside Clean Halls buildings in the Bronx. *First*, plaintiffs offered the testimony of ADA Rucker regarding her concerns about trespass stops and arrests at Clean Halls buildings, corroborated by "decline to prosecute" forms from the Bronx District Attorney's office. *Second*, plaintiffs offered testimony regarding their personal experiences of having been stopped outside Clean Halls buildings.[63] *Third*, plaintiffs offered the expert testimony of

_____

Adam Carlis, *The Illegality of Vertical Patrols*, 109 COLUM. L. REV. 2002 (2009)).

[62]      *See, e.g.*, *People v. Kojac*, 671 N.Y.S.2d 949, 953–54 (Sup. Ct. N.Y. Co. 1998) ("The police are not justified in approaching an individual merely because he exits [a TAP building] known for its high incidence of drug activity."). *See also People v. Almonte*, No. 0209/2009, 2011 WL 864940, at *2 (Sup. Ct. Bronx Co. Mar. 8, 2011) (suggesting that decisions upholding Level 1 questioning of individuals exiting TAP buildings have "noted some additional factor" other than location, such as defendant's conduct not being innocuous).

[63]      Plaintiffs introduced testimony regarding eleven stops. *See infra* Part IV.A.2.  All of the stops were of named plaintiffs except the July 2011 stop of non-party witness Jerome Grant, a relative of two named plaintiffs.  *See infra* Part IV.A.2.d.  For convenience, when making general statements about the personal

Dr. Jeffrey Fagan regarding the number and nature of trespass stops outside Clean Halls buildings.

I address each of these categories of evidence in turn.

### 1.   Findings of Fact Regarding Testimony of ADA Rucker and Decline to Prosecute Forms

Since 2007, ADA Rucker has been chief of the complaint and arraignments bureau at the Bronx DA.  In this position, she oversees the arrest to arraignment process, ensuring "that we evaluate all cases that are coming through and making sure we are doing the right thing."  ADA Rucker testified that around 2007 she started to become concerned about cases in which people were being stopped and then arrested based solely on their having entered or exited a Clean Halls building.  Especially in 2009, judges began dismissing these cases frequently, sometimes saying that the police had no right to approach the arrested person in the first place.[64]

ADA Rucker also started to receive a steady stream of complaints about trespass arrests from the defense bar, the Legal Aid Society, and the Bronx

---

testimony of stops offered at the hearing, I will often refer to named plaintiffs and non-party witness Jerome Grant collectively as "plaintiffs."

[64]   *See* Tr. 10/15 at 168–75.

Defenders.[65]  At first, she ignored the complaints.  But in 2010, her staff began

telling her that judges were not only dismissing trespass cases, but were finding

evidence that the defendant lived in the building where the trespass was said to

have occurred.[66]

Finally, in 2011, ADA Rucker investigated the law governing trespass

stops based on entry to and exit from a Clean Halls building, and she determined

that the office's position on the prerequisites for a legal stop had been wrong.[67]

She sent memos to a number of commanders and other police officials clarifying

that, contrary to previous statements, observing someone exiting a Clean Halls

building is not by itself a sufficient justification for a stop.[68]  ADA Rucker testified

that she sent the memos in her official capacity, and that the memos expressed the

views of the Bronx DA's office.[69]

---

[65]     *See id.* at 175:20–22.  The Bronx Defenders are co-counsel for plaintiffs in this case.

[66]     *See id.* at 175:21–25, 176:2–8.

[67]     *See id.* at 176:9–23.

[68]     *See id.* at 176:14–177:22, 180:19–181:21; 7/7/11 Letter from ADA Rucker to Deputy Inspector William McSorley ("7/7/11 Rucker Letter"), Plaintiffs' Exhibit ("Pl. Ex.") 6.  *See also* Tr. 10/15 at 184:7–185:17; 7/13/11 Memo from ADA Rucker to ADAs, Pl. Ex. 7 at 2 (explaining that Bronx DA would decline to prosecute trespass cases where stop was based on nothing more than entry and exit from Clean Halls building).

[69]     *See* Tr. 10/15 at 182:11–183:8.

I find ADA Rucker's testimony credible.  It is no small matter when an ADA publicly suggests that the NYPD has been engaged in a recurring pattern of unlawful stops.  Such testimony is entitled to significant weight.  A prosecutor has professional and institutional incentives to be skeptical of allegations that the police are making stops and arrests without a legal basis.   That ADA Rucker overcame her skepticism says a great deal about the severity of the problem she came to recognize.  I also note that the NYPD itself found ADA Rucker sufficiently trustworthy to allow her to train police officers regarding procedures in the complaint room.[70]

Yet defendants argue that ADA Rucker's impression that a problem existed regarding unlawful trespass stops at Clean Halls buildings was unfounded, and in fact rested only on the two specific cases she discussed in detail at the hearing.[71]  Defendants' argument is without merit.  ADA Rucker made clear that

---

[70]    *See id.* at 170:12–173:17.  Throughout this opinion, for convenience, I will refer to NYPD trainees as "officers," though in some cases the training involves "recruits."  *See* Tr. 10/19 at 839:18–24.

[71]    *See* Defendants' Proposed Findings of Fact and Conclusions of Law ("Def. Findings") ¶¶ 11–14.  One case involved an anonymous letter whose author claimed to have been arrested for trespass while leaving a friend's building with the friend.  *See* Tr. 10/15 at 190:17–20; Tr. 10/16 at 239:1–240:22; 3/13/12 Anonymous Letter to ADA Rucker, Pl. Ex. 11.  The other involved a stop inside a Clean Halls building, and was brought to ADA Rucker's attention by the Bronx Defenders.  *See* Tr. 10/15 at 196:13–198:15; Tr. 10/16 at 241:5–243:2.  In the latter case, according to ADA David Grigoryan, who performed an investigation at ADA

over the years she learned of "many" cases involving unlawful trespass stops at

Clean Halls buildings,[72] that "the judges kept dismissing" them,[73] that "[a]t least

five" judges had dismissed Clean Halls trespass cases based on lack of probable

cause,[74] and that her concerns were also based on complaints from other ADAs,

phone calls from the arraignment parts, and ADAs coming to her after leaving

court, or when sent to her by their supervisors.[75]   ADA Rucker explicitly stated on

cross-examination that her concerns were not based only on the anonymous letter

---

Rucker's request, the defendant was stopped and questioned for no specified
reason at his sister's building, where he was apparently staying, and then the
defendant was arrested because he failed to provide his sister's name or apartment
number.  *See* Tr. 10/18 at 609:7–614:19, 617:25–619:9.  ADA Grigoryan testified
that in his opinion this arrest was "absolutely valid."  *Id.* at 611:14.

[72]       Tr. 10/15 at 176:7–8.

[73]       *Id.* at 176:10–11.

[74]       Tr. 10/16 at 234:9.

[75]       *See id.* at 237:13–238:8, 239:11–24, 240:6–7, 243:13–18, 244:6–12.
Further support for ADA Rucker's criticisms can be found in the opinions of New
York state courts.  *See, e.g.*, *Almonte*, 2011 WL 864940, at *1 (criticizing police
officer who was apparently "operating under the assumption that he had the
authority to identify anyone leaving a trespass affidavit building").  Other cases
describe problems with stops and arrests inside TAP buildings.  *See, e.g.*, *People v.
Ruiz*, No. 056832C-2006, 2007 WL 1428689, at *3–4 (Sup. Ct. Bronx Co. May 15,
2007) (chastising NYPD after apparently unlawful trespass arrest inside Clean
Halls building, and concluding:  "One hopes the New York City Police Department
will better train its officers in the realm of Criminal Trespass so that only true
trespassers will be arrested, and innocents will be spared.").

27

and the indoor stop highlighted by defendants.[76]

To the extent that ADA Rucker's concerns were based partly on statements made by non-parties who did not testify at the hearing and whose statements do not fall under any hearsay exception, I give no weight to the truth of those statements. I do not accept, however, the insinuation that ADA Rucker invented the problem of unlawful Clean Halls trespass stops in order to lessen the Bronx DA's caseload,[77] or that she imagined the dismissed trespass cases under pressure from the Bronx Defenders.[78] ADA Rucker's concerns are independently corroborated by numerous "decline to prosecute" affidavit forms. As ADA Rucker explained, the Bronx DA's office produces these affidavits after a police officer or witness is interviewed and the office declines to prosecute the case.[79]

The decline to prosecute forms are an important source of information and I have reviewed each of them. Plaintiffs entered into evidence twenty-six

---

[76]   *See* Tr. 10/16 at 237:13–16. *Accord* Tr. 10/15 at 202:22–203:20 (ADA Rucker rejecting mischaracterization of her views in 9/6/12 Letter from Police Commissioner Raymond W. Kelly to Bronx County District Attorney Robert Johnson, Pl. Ex. 12); Tr. 10/16 at 235:3–7 (ADA Rucker explaining that she had orally conveyed details of other cases to the NYPD).

[77]   *See* Tr. 10/16 at 246:8–248:14.

[78]   *See id.* at 222:9–224:2.

[79]   *See id.* at 213:5–7.

28

forms generated by the Bronx DA's office in support of its decision not to

prosecute cases involving arrests for trespass outside TAP buildings in the Bronx

over three sample months in 2011.[80]   Without giving weight to the truth of any

hearsay statements attributed to arrestees in the decline to prosecute forms, the

forms persuasively show that ADA Rucker was not alone in the Bronx DA's office

in perceiving a recurring problem involving legally unjustified trespass stops and

arrests outside Clean Halls buildings.[81]   Defendants concede that the forms are, at

minimum, admissible "for the limited purpose of establishing that officers'

observations of entries/exits were the bases for the underlying stops," though

defendants question whether the forms can support this finding in the absence of

---

[80]      *See* Pl. Findings ¶ 16 n.1; Tr. 10/16 at 210:17–220:25; Tr. 10/17 at
508:11–509:20; Bronx DA Decline to Prosecute Affidavits ("Decline Prosecute
Affs."), Pl. Ex. 74.  Plaintiffs' Exhibit 74 contains thirty-one forms, but plaintiffs
later conceded that only twenty-eight forms expressly identify the building outside
of which the stop took place as a TAP building.  *See* Pl. Findings ¶ 16 n.2
(referring to Decline Prosecute Affs. at 4425, 5001, 5055).  In addition, two of the
forms are revisions of other forms.  *Compare* Decline Prosecute Affs. at 2996,
3088, *with id.* at 3174, 3086.

[81]      ADA Rucker confirmed that the types of cases described in the
decline to prosecute forms were, in part, what motivated the Bronx DA's office to
adopt a policy in July 2011 of declining to prosecute cases where the arresting
officer had only observed someone exiting or entering and exiting a Clean Halls
building.  *See* Tr. 10/16 at 218:16–219:8.  *Accord* Tr. 10/15 at 180:13–182:18;
7/7/11 Rucker Letter.

testimony from the assigned ADA and further paperwork.[82]  Defendants were free to elicit such testimony and introduce such paperwork.  They did not.[83]  I decline to draw inferences in defendants' favor based on the speculative possibility that further testimony would have revealed persuasive legal justifications for the stops described in the forms.

In an Appendix to this Opinion, I have collected excerpts from the twenty-six narratives of stops and arrests that appear in the decline to prosecute forms.[84]  One of the shorter and less redacted narratives reads:

> On January 5, 2011 the defendants were observed exiting a [C]lean [H]alls building.  The defendants stated they were there to visit a tenant in the building.  After being arrested[,] a tenant from the building did corroborate the defendant[s'] statements and the tenant stated that both defendants were in the building as his guests.
>
> Therefore, the People are declining to prosecute this case at this time [redacted].[85]

Based solely on a review of these forms, *none* of the stops leading to the arrests described in the forms were based on a reasonable suspicion of trespass.  All were

---

[82]    Def. Findings ¶ 13.

[83]    Neither party attempted to determine whether the stops described in the decline to prosecute forms were recorded in UF-250s.

[84]    *See infra* Appendix A ("App. A").

[85]    Decline Prosecute Affs. at 4407, excerpted at App. A ¶ 2.

based merely on exit or entry and exit from a Clean Halls building.[86]   Thus, over the course of three months in 2011, there were at least twenty-six arrests for trespass outside Clean Halls buildings in the Bronx that resulted from stops lacking reasonable suspicion.  As will be discussed in greater detail below, these arrests independently suggest a widespread practice of unlawful stops.[87]

In sum, ADA Rucker's testimony and the supporting exhibits, including the decline to prosecute forms, contained more than enough evidence to support the conclusion that there is a clear and substantial likelihood that plaintiffs will be able to prove at trial that NYPD officers in the Bronx repeatedly stopped and questioned people on suspicion of trespass simply because they were observed exiting or entering and exiting a Clean Halls building.  ADA Rucker's testimony and the supporting exhibits show that a nexus existed between the Clean Halls program and the kinds of unlawful trespass stops described by plaintiffs and quantified by Dr. Fagan, as discussed in the sections below.  That is, the stops of people exiting or entering and exiting Clean Halls buildings took place *because* the buildings were enrolled in Operation Clean Halls.

---

[86]     Some of the forms describe stops in which an officer eventually obtained probable cause for an arrest. *See, e.g.*, App. A ¶ 23.  But the instant case concerns the legal basis for stops, not arrests.

[87]     *See infra* Part V.B.1.a.

## 2.     Findings of Fact Regarding Plaintiffs' Stops

Plaintiffs offered testimony at the preliminary injunction hearing regarding their experiences in having been stopped on suspicion of trespass outside Clean Halls buildings in the Bronx.  Sometimes plaintiffs' accounts were corroborated by other plaintiffs and witnesses.  In a few cases, the parties were able to identify officers who took part in the stops, and these officers testified.  In other cases, neither plaintiffs nor defendants were able to identify the officers.

Defendants argue that plaintiffs failed to provide sufficient information to identify the John Doe officers in the case, and that as a result this Court should not credit plaintiffs' testimony.[88]  Defendants go so far as to suggest that the stops about which plaintiffs testified "may not have occurred at all."[89]  Based on the testimony described below, I reject this contention.  Perhaps the strongest sign of the credibility of plaintiffs' testimony is the striking similarities among plaintiffs' stops.  A person approaches or exits a Clean Halls building in the Bronx; the police suddenly materialize, stop the person, demand identification, and question the person about where he or she is coming from and what he or she is doing; attempts at explanation are met with hostility; especially if the person is a

---

[88]     *See* Tr. 11/7 at 1298:19–22 (defendants' summation).

[89]     Def. Findings ¶ 15.

32

young black man, he is frisked, which often involves an invasive search of his pockets; in some cases the officers then detain the person in a police van in order to carry out an extended interrogation about the person's knowledge of drugs and weapons; and in some cases the stop escalates into an arrest for trespass, with all of the indignities, inconveniences, and serious risks that follow from an arrest even when the charges are quickly dropped.

Nevertheless, while I found plaintiffs' testimony credible, it would obviously have been valuable to hear from the unnamed officers involved in plaintiffs' stops. The officers were never identified. I find that this was due in part to the lack of specificity in some of plaintiffs' memories of their encounters. At the same time, I also find that defendants made inadequate efforts to identify officers based on the information plaintiffs did provide.

Defendants claim that Sgt. Robert Musick of the NYPD's Special Litigation Support Unit "conducted an *exhaustive* search to determine the officers involved in the purported incidents presented by plaintiffs at the hearing."[90] Sgt. Musick's reference to his "limited attempts" to identify the officers is closer to the mark.[91] A large part of Sgt. Musick's investigation involved searches of the

---

[90]    *Id.* (emphasis added). *See also* Tr. 10/23 at 1113:24–1114:19.

[91]    Tr. 10/23 at 1115:16.

electronic UF-250 database, which contained only the addresses and birthdates —
not the names — of individuals stopped after July 2010 when the stop did not
result in a summons or arrest.[92]  Sgt. Musick conceded that he is "definitely not an
expert" at using the database.[93]  For example, he was only able to narrow down the
potential list of officers who might have stopped Jerome Grant in the summer of
2011 (discussed below) to a list of three hundred.  Yet this list included officers of
all ethnicities, while Grant had testified that one of the two officers was Asian.  On
cross-examination, Sgt. Musick explained that he had not searched for Asian
officers within the list of three hundred because Grant's description of the *other*
officer did not specify an ethnicity.[94]  This makes no more sense than refusing to
search a drawer for a pair of striped socks because one cannot remember which
color shoes they match:  there was no reason to make the search for the Asian
officer contingent on obtaining more information about his partner.  In the end,

---

[92]     *See* Chart by Sgt. Musick ("Musick Chart"), Defendants' Exhibit
("Def. Ex.") UU; Tr. 10/23 at 1123:23–1128:11.  Officers are required to complete
a UF-250 form, also known as a "Stop, Question and Frisk Report Worksheet,"
after each stop.  *See* Tr. 10/15 at 67:4–21, 69:24–70:6; Tr. 10/23 at 1110:9–11; UF-
250 Form, App. B to 7/27/12 Report of Plaintiffs' Expert Dr. Jeffrey Fagan
("Fagan Report"), Pl. Ex. 4.  UF-250s are discussed at greater length below.  *See
infra* Part V.B.1.a.  I have attached a copy of a blank UF-250 form as Appendix B
to this Opinion.

[93]     Tr. 10/23 at 1145:1, 1158:19–25.

[94]     *See id.* at 1153:4–1154:8.

34

Sgt. Musick was unable to locate a single UF-250 for any of the eleven stops to which plaintiffs testified.[95]

Because I find it extremely implausible that any plaintiff simply invented the stop or stops to which he or she testified, because defendants failed to make a sufficiently persuasive effort to identify the officers involved, and because the officers who did testify failed to undermine any plaintiff's credibility, I decline to draw speculative inferences in defendants' favor regarding the reasons that unidentified officers might have provided for their stops.

### a.    Charles Bradley's Stop

On May 3, 2011, after finishing his work for the day as a security guard, Charles Bradley, a black fifty-one year old resident of the Bronx, took the subway to visit his fiancée, Lisa Michelle Rappa, as they had arranged the evening before.[96]  Rappa lived in the Bronx at 1527 Taylor Avenue.[97]  Bradley formerly lived with Rappa and had keys to her apartment, but following a disagreement Bradley had returned his keys.[98]  1527 Taylor Avenue is a Clean Halls building.[99]

---

[95]    *See id.* at 1125–1143.

[96]    *See* Tr. 10/16 at 257:17–258:22, 259:10–19, 261:1–24, 272:6.

[97]    *See id.* at 258:23–24, 259:23.

[98]    *See* Tr. 10/15 at 258:23–260:21.

[99]    *See* Tr. 10/16 at 260:3–7.

35

When Bradley arrived at Rappa's apartment building, a young man who lived on the first floor and knew of Bradley's and Rappa's relationship let Bradley into the building.  Bradley then walked up the stairs to Rappa's apartment on the fifth floor and knocked.  Because Rappa is deaf in one ear, Bradley waited a minute or two.  When there was still no response, he returned downstairs and left the building.  Outside, he looked up toward Rappa's window.[100]

While Bradley was standing on the sidewalk, an unmarked green police van approached and an officer in the passenger seat — later identified as Officer Miguel Santiago — gestured for Bradley to come over.[101]  After Bradley approached the van, the officer got out and asked, "What are you doing here?"[102] Bradley explained he was there to see Rappa, and that he worked as a security guard.  Bradley testified that the officer responded to his attempts to explain his presence by suggesting Bradley was acting "like a fucking animal,"[103] searched Bradley's pockets,[104] then told Bradley to place his hands behind his back.  Once

---

[100]     *See id.* at 262:4–264:12.

[101]     *See id.* at 264:14–265:9; Tr. 10/22 at 1079:18–19.

[102]     Tr. 10/16 at 266:3.

[103]     *Id.* at 266:8.

[104]     Though plaintiffs have not focused their arguments on the legal standard for frisks, I note that a frisk requires an additional justification beyond the reasonable suspicion for the stop.  The Supreme Court held in *Terry*:

Bradley was handcuffed, the officer placed him in the van, where there were two other officers.  While the van drove away, the officers began to question Bradley: "When was the last time you saw a gun? When was the last time you got high? When was the last time you bought some drugs?"[105]

After twenty or thirty minutes in the van, the officers stopped at the station house.  Bradley was taken into a room, stripped, and told to wait.[106]  He was searched in "inappropriate areas."[107]  For the next two hours, he waited in a cell with other people who had been arrested.  He was then fingerprinted and given a

---

> [W]here a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot *and that the persons with whom he is dealing may be armed and presently dangerous*; . . . he is entitled for the protection of himself and others in the area to conduct a carefully *limited search of the outer clothing* of such persons in an attempt to discover weapons which might be used to assault him.

*Terry*, 392 U.S. at 30 (emphasis added).  If the officer who searched Bradley had no reason to conclude that Bradley posed a danger, the officer's frisk violated Bradley's rights under the Fourth Amendment.  *See also People v. Driscoll*, — N.Y.S.2d —, 2012 N.Y. Slip Op. 09097, 2012 WL 6699161, at *1 (3d Dep't Dec. 27, 2012) ("To conduct a protective pat frisk, an officer must have knowledge of some fact or circumstance that supports a reasonable suspicion that the suspect is armed or poses a threat to safety[.]" (quotation marks and citation omitted)).

[105]    Tr. 10/16 at 265:20–22, 266:1–267:17.

[106]    *See id.* at 267:16–268:1.

[107]    *Id.* at 268:5–6.  Bradley later stated that his experiences on May 3 made him feel "extremely violated, to say the least."  *Id.* at 275:8.

desk appearance ticket and a date to appear in court to answer the criminal charge

of trespassing.  Later, Bradley's defense attorney provided the Bronx DA's office

with a notarized letter from Rappa stating that Bradley had been visiting her.[108]

"[A]t that point in time," Bradley testified, "paperwork was submitted to me stating

that the People of New York declined to prosecute."[109]

Officer Santiago also testified at the hearing, explaining that he

worked two tours on May 3, 2011, the first from 4 a.m. to 12:35 p.m. and the

second from 1 p.m. to 9:30 p.m.  Bradley's arrest took place around 5:20 p.m.,

after Officer Santiago had been patrolling with his partner, Officer Landro Perez,

for a few hours without incident.[110]  Officer Santiago emphasized that 1527 Taylor

Avenue is in "a drug prone location" with "a lot of robberies, a lot of shootings" in

the area.[111]  It is a "high crime neighborhood."[112]

Officer Santiago's account of Bradley's arrest differed from Bradley's

in several respects.  Officer Santiago claimed that before stopping Bradley, he had

---

[108]     *See id.* at 268:9–25, 269:1, 12–13, 272:3–273:7; 7/7/11 Notarized
Letter from Rappa ("Rappa Letter"), Pl. Ex. 17.

[109]     Tr. 10/16 at 269:2–270:4.

[110]     *See* Tr. 10/22 at 1076:8–10, 1077:3–11, 1078:16–18, 1079:5–7.

[111]     *Id.* at 1081:5–6, 1082:24–25.

[112]     *Id.* at 1082:24.

observed Bradley at the end of a hallway inside the building "suspiciously walking back and forth" for two or three minutes and "disappearing."[113]  Officer Santiago claimed that he was able to see Bradley's suspicious behavior even though he was inside a police van parked across the street, twenty to thirty feet from the front door, separated from Bradley not only by the street but by the windows of the front door, a vestibule, the windows of an inner door, and the hallway.[114]

Officer Santiago testified that he approached Bradley after Bradley exited the building and said: "Excuse me, sir, could you come over here?"[115]  In response to Officer Santiago's questioning, Bradley could not tell him the name of his girlfriend or her apartment number, and could not produce any identification.[116]  After he arrested Bradley for criminal trespass, they drove five or ten minutes to the precinct.[117]  There was only one other officer in the van.[118]  Officer Santiago did not ask Bradley any questions along the way, and Bradley was not strip-searched

---

[113]   *Id.* at 1086:21–1087:1; Tr. 10/23 at 1097:8–9, 1101:13–15.

[114]   *See* Tr. 10/22 at 1087:2–11; Tr. 10/23 at 1101:20–25.

[115]   Tr. 10/22 at 1088:15–16.

[116]   *See id.* at 1088:11–1089:1; Tr. 10/23 at 1097:1–9.

[117]   *See* Tr. 10/23 at 1098:11–1099:1.

[118]   *See* Tr. 10/22 at 1080:23–25; Tr. 10/23 at 1098:19–1099:1.

upon arrival at the station.[119]

The paperwork Officer Santiago completed with regard to Bradley's stop and arrest contained numerous, self-serving errors.[120]  In direct contradiction to his testimony at the hearing, Officer Santiago made the following statements on the arrest fact sheet:  *first*, that he observed Bradley in the building for seven minutes; *second*, that he stopped Bradley inside the building; *third*, that he went to the apartment Bradley said he was visiting; and *fourth*, that the apartment was occupied.[121]  By all accounts, each of these statements was false.  Officer Santiago's credibility was further called into question by the fact that in 2002 or 2003 he lied within the scope of his police work by creating two improper summonses to help a friend.[122]  Finally, Officer Santiago failed to complete the UF-250 form he was required to fill out for Bradley's stop.[123]

---

[119]     *See* Tr. 10/23 at 1098:11–1099:1.

[120]     Officer Santiago admitted that by the time he completed the paperwork, he had worked fourteen or fifteen hours straight and was "a little tired." *Id.* at 1099:11–12.  *See also id.* at 1105:8–16.

[121]     *See* 5/3/11 Clean Halls Fact Sheet for Charles Bradley Arrest ("Bradley Fact Sheet"), Pl. Ex. 39.

[122]     *See* Tr. 10/23 at 1099:17–1100:2.  Officer Santiago testified that he was trying to help a landlord friend who was having problems with a tenant, "so I issued two improper summons, one in the bus stop and one in the fire hydrant, and the car was never there." *Id.* at 1099:24–1100:2.

[123]     *See id.* at 1110:9–11.

I find Bradley's account credible.  Bradley entered a Clean Halls building based on an invitation from a tenant, walked upstairs to the tenant's residence, found the tenant not home, then returned outside and waited on the sidewalk while considering what to do.  In response to Officer Santiago's questions, Bradley offered reasonable and unsuspicious answers.  Bradley's conduct provided no further basis for a stop.

### b.   Abdullah Turner's Stops

On the evening of March 26, 2011, Abdullah Turner, a black twenty-four year old, had plans to go to an engagement party in the Bronx with his close friend Anginette Trinidad.[124]  Both Turner and Trinidad testified at the hearing that Trinidad was carrying a sweater in a plastic bag.[125]  When the two had nearly arrived at the party, Trinidad told Turner she had to return the sweater to someone in the next building, 2020 Davidson Avenue, which is a Clean Halls building.[126]

While Trinidad went inside, Turner remained outside and called another close friend, Felisha Black, on his cell phone.  During the call, he paced in

---

[124]   *See* Tr. 10/17 at 472:14–15, 473:9–474:9.

[125]   *See id.* at 475:8–15; Tr. 10/18 at 622:25–623:4.

[126]   *See* Tr. 10/17 at 474:13–475:7, 481:23–25.

a circle on the sidewalk, trying to stay warm.[127]   It was "freezing cold" that night,

but Turner was wearing only a cardigan sweater and t-shirt with no coat or hat.[128]

　　　　After Turner had been pacing and talking on the phone for about five

minutes, someone "snatched the phone out of my hand."[129]   When Turner turned,

he saw three police officers:  one who was Hispanic and a little stocky; one who

was Indian, tall and slim; and a third officer that Turner did not "get a good look

at."[130]   One of the officers, Kieron Ramdeen, testified that he was only with one

other officer, Michael Pomerantz.[131]   Officer Ramdeen's testimony on this point

---

[127]    *See id.* at 475:21–476:25.

[128]    *Id.* at 495:5–18 (Turner's testimony).  Defendants suggest that it is
implausible that Turner did not go inside the building, because he knew that the
door was unlocked.  *See* Def. Findings ¶ 23 & n.11; Tr. 10/17 at 476:7–10.  But
Turner testified that he liked the cold and did not need a coat.  *See* Tr. 10/17 at
477:2–4.  *Accord id.* at 487:20–21, 502:5–19.  While Turner's winter-weather
clothing choices and apparent tolerance for the cold may be idiosyncratic, they do
not undermine his credibility.  There is also a facial inconsistency in defendants'
apparent attempt to suggest both that any reasonable person in Turner's
circumstances would have entered the building to warm up, and that if Turner did
so, he would have provided legal grounds for a *Terry* stop.  A reasonable person
would presumably want to avoid being stopped and frisked, and thus would prefer
standing in the cold to going inside, if doing so would create a reasonable
suspicion of criminal trespass.

[129]    Tr. 10/17 at 477:8.  I note that a reasonable person would not feel free
to leave when his personal property has been seized by the police.

[130]    *Id.* at 477:19–23.

[131]    *See* Tr. 10/22 at 1008:20, 1012:5–25.

was not credible, as Officer Pomerantz's own memobook stated that he was

patrolling on the night of March 26 with Officer Ramdeen and Premativo

Montanez, a Hispanic officer.[132]

       Turner testified that the Hispanic officer who took his phone began

questioning him about what he was doing and whether he lived at 2020 Davidson.

Turner explained that his friend was returning a sweater and they were on their

way to a party in the next building.  The officer asked for identification, and Turner

gave him his driver's license.  After the officer saw that Turner did not live on the

block, he asked again what Turner was doing at 2020 Davidson, and Turner

explained again.[133]  Then the officer asked:  "So you don't know anybody who

lives in this building?"[134]  When Turner said no, the officer asked him to stand

against the wall.[135]

       While Turner stood against the wall, the Hispanic officer entered 2020

Davidson with Turner's driver's license and cell phone still in his possession.

Officer Ramdeen, now alone with Turner, continued asking Turner the same

---

[132]    *See id.* at 1059:11–1061:6; Page from Memobook of Officer Michael
Pomerantz, Def. Ex. HHHH.

[133]    *See* Tr. 10/17 at 478:13–22, 479:8–11.

[134]    *Id.* at 479:11–12.

[135]    *See id.* at 479:12–13.

questions as before.  Eventually, Trinidad emerged from the building, no longer
carrying the plastic bag, and Turner pointed to her as proof of what he had been
saying.  Trinidad confirmed Turner's story while the other officers returned.  The
Hispanic officer asked for Trinidad's ID, and Trinidad gave it to him.[136]  Then the
officer asked her if she had "anything on her that she shouldn't have," and in
response, Trinidad said she had "a little pocketknife that her husband gave her for
protection and a bag of marijuana."[137]

      After confiscating these items, the Hispanic officer approached Turner
and pointed to a sign on 2020 Davidson and asked him if he knew what the sign
meant.  Turner said he did not.  The sign stated that 2020 Davidson was enrolled in
Operation Clean Halls.  The officer told Turner that he was trespassing and was
going to jail.  Turner asked how he could be trespassing if he was outside.  The
officer repeated that Turner was going to jail and placed him in handcuffs.[138]

      After being driven to the precinct in a paddy wagon, Turner spent
several hours waiting, was fingerprinted, and then was transferred to central
booking, where he spent several more hours.  It was not until the next day that a

---

[136]  *See id.* at 479:13–24, 480:12–24.

[137]  *Id.* at 481:1–3.

[138]  *See id.* at 481:7–25, 482:1–8.

judge released Turner.  He was then obligated to return to court eight to ten times

before the charges were dismissed.[139]  Turner testified that the events on March 26

made him feel "defenseless."[140]  Trinidad's testimony at the hearing supported

Turner's account of the stop.[141]

        Officer Ramdeen testified to a different version of events.  He testified

that he and Officer Pomerantz were driving past 2020 Davidson when he saw

Turner in the lobby.  Officer Pomerantz stopped the car and Officer Ramdeen

watched as Turner paced aimlessly in the lobby for two to three minutes,

occasionally looking up the stairs.  Aware that 2020 Davidson was a Clean Halls

building, Officer Ramdeen approached Turner, who then exited the lobby.  In

response to Officer Ramdeen's brief questioning, Turner volunteered that his

---

[139]    *See id.* at 482:21–483:10, 483:14–21.

[140]    *Id.* at 486:1.  Turner continued:

> It's like when you're a kid, when someone is bothering you or
> someone is like threatening you, you run to your parents for
> protection, and when you're an adult, you're supposed to run to
> the police.  But who are you supposed to run to when like the
> police are harassing you or like threatening you . . ., who are you
> supposed to run to then?

*Id.* at 486:3–8.

[141]    *See* Tr. 10/18 at 619:23–628:6.

friend was engaged in a drug deal.[142]  "I asked him what he was doing in the

building and, in sum and substance, he responded with, I am not going to lie,

Officer, I just came with my friend.  She went upstairs to buy weed."[143]  Officer

Ramdeen did not record this alleged confession in his arrest report.[144]

Officer Ramdeen then arrested Turner for trespassing, basing "the

charges on the fact that he had no lawful reason to be in the building and that he

knowingly was there to buy marijuana."[145]  Officer Ramdeen could not recall

having arrested Trinidad.  He conceded that neither he nor Officer Pomerantz took

any steps to investigate or arrest the drug dealer who, according to their version of

events, was operating that night a few stories above them at 2020 Davidson.[146]

---

[142]    *See* Tr. 10/22 at 1016:17–1017:14, 1020:11–1021:25.

[143]    *Id.* at 1021:21–24.

[144]    Officer Ramdeen's arrest report only states that Turner was inside a
Clean Halls building without permission or authority to be there.  *See id.* at
1038:19–1041:24; 3/26/11 Arrest Report of Plaintiff Abdullah Turner ("Turner
Arrest Report"), Def. Ex. ZZ.  The confession does appear in Officer Ramdeen's
supporting deposition, signed on the following day.  *See* 3/27/11 Officer Ramdeen
Supporting Deposition in *State v. Turner*, Def. Ex. CCC.  Like Officer Santiago
after Bradley's stop, Officer Ramdeen also failed to complete the required UF-250
form for his stop of Turner.  *See* Tr. 10/22 at 1024:2–7.  In fact, Officer Ramdeen
marked "NO" next to the field "Stop And Frisk" on Turner's arrest report.  *See*
Turner Arrest Report at 1.

[145]    Tr. 10/22 at 1022:20–22.  *See also id.* at 1025:14–1026:4.

[146]    *See id.* at 1026:21–22, 1064:13–1065:12.

I find Turner's testimony to be credible.  Turner stopped briefly at 2020 Davidson so that Trinidad could allegedly return a sweater.  While Trinidad went inside, Turner talked on his cell phone outside for a few minutes.  Officers Ramdeen, Pomerantz, and likely Montanez saw him standing outside the building in the cold, stopped him, and questioned him.  Turner's responses to the officers' questions were reasonable and unsuspicious.  Turner provided no other grounds for suspicion.  I did not find credible Officer Ramdeen's testimony concerning Turner's spontaneous confession.  Turner persuasively denied that he made the confession,[147] and the officers took no steps to investigate or stop the drug dealer who (according to Officer Ramdeen's testimony) was operating several floors above them.   I also did not find credible Officer Ramdeen's testimony concerning his observation of Turner's suspicious pacing inside the building before the officers approached.  Based on the totality of the evidence presented at the hearing, I do not believe that Turner entered the building.[148]

---

[147]     *See* Tr. 10/17 at 500:12–23.

[148]     I note, however, that even if Turner entered the building, paced in the lobby, looked up the stairs, and then exited the building to make his call, a stop would still have been unjustified.  This behavior is innocuous and would not, without something more, provide reasonable suspicion of criminal trespass, or of any other crime.  As in Bradley's and Roshea Johnson's cases, entering and exiting a Clean Halls building under ordinary circumstances does not establish reasonable suspicion.  *See infra* Part V.B.1.a.

Finally, Turner credibly testified to having been stopped on another night during December 2011 or January 2012 outside of his own building, 2249 Morris Avenue, which is also a Clean Halls building in the Bronx. As Turner was exiting the building, a police car pulled up. Turner's thirteen-year-old brother, a friend, and the friend's nephew were talking at the front of the courtyard. When Turner began to step out of the courtyard, a female officer got out of the car and asked whether they all lived in the building, and they all responded yes. Then the officer asked for Turner's identification, and he gave it to her.[149] Finally, the officer "told us that we can't stand in front of our building, so when they come back we would need to be gone."[150] Turner testified that he did not feel free to leave while the officer talked to him: "[S]he had my ID, and I don't know anyone . . . who ever just walked away from a cop in the middle of a conversation."[151] In this encounter as well, I find that Turner's behavior provided no grounds for suspicion of trespass or any other crime.

As to whether Turner's second stop was based on the suspicion of

---

[149]   *See* Tr. 10/17 at 486:9–490:25.

[150]   *Id.* at 491:4–5.

[151]   *Id.* at 491:6–8, 22–23.

*trespass*, the evidence is less clear.[152]  Nevertheless, because I found Turner's

testimony credible, because the officer's questions concerned the right of Turner

and the others to be on Clean Halls property, because there is no indication that the

officers suspected Turner of any other crime, and because the parties were unable

to locate a UF-250 or any other documentation showing otherwise, I find it more

likely than not that Turner's second stop was based on the suspicion of trespass.

### c.    J.G.'s Stop

J.G. is the son of plaintiff Jaenean Ligon and the brother of J.A.G. and

Jerome Grant.  The family lives in a Clean Halls building in the Bronx.[153]

J.G., who is black and seventeen years old, testified that the first time

he remembered being stopped around his apartment building was on an evening in

August 2011.  He had gone to a nearby store to buy ketchup for dinner.  On his

way back, he saw two plainclothes officers with badges in front of his building and

three uniformed officers across the street.  When J.G. reached his building, the

officers stopped him and began asking him questions, such as where he was

_____

[152]    Defendants' post-hearing brief does not challenge whether Turner's second stop was based on suspicion of trespass, but does challenge whether five of the other unrecorded stops described by plaintiffs were for trespass.  *See* Def. Findings ¶¶ 17 (Kieron Johnson), 19 (Jerome Grant), 20 (both of Letitia Ledan's stops), 21 (Roshea Johnson).  I address each of defendants' challenges below.

[153]    *See* Tr. 10/17 at 438:4–25.

49

coming from, where he was headed, and what he had in his bag.  After J.G.

answered that he had ketchup in the bag, one of the officers asked him to raise his

hands, then asked him what he had in his pockets.  The officer started to frisk him,

first shaking J.G.'s pockets, then putting a hand in J.G.'s left pocket,[154] then patting

J.G.'s arms down.  After the search, the officer asked for J.G.'s ID and took his

name down on a notepad.  Then the other officer looked in J.G.'s bag and

inspected the ketchup.  The officers asked for J.G.'s apartment number and rang

the bell.  Finally, after Ligon had come downstairs and confirmed that J.G. was her

son, the officers handed her the ketchup and let them go.[155]

      Ligon's testimony supported J.G.'s account.  Ligon testified that she

sent J.G. to the store for ketchup one evening when she was cooking chicken and

---

[154]    As I noted above, plaintiffs have not focused on the issue of frisks in the instant litigation.  Nevertheless, it is worth emphasizing that the officer's placement of his hand in J.G.'s pocket goes beyond "a carefully limited search of the outer clothing . . . in an attempt to discover weapons which might be used to assault him."  *Terry*, 392 U.S. at 30.  If the officer had no reasonable basis for believing J.G.'s pocket contained a dangerous weapon that J.G. might use to harm the officer, the officer's search of J.G.'s pocket violated J.G.'s rights under the Fourth Amendment.  *See Minnesota v. Dickerson*, 508 U.S. 366, 373 (1993) (reaffirming that *Terry* frisk "must be strictly 'limited to that which is necessary for the discovery of weapons which might be used to harm the officer or others nearby'" (quoting *Terry*, 392 U.S. at 26)).

[155]    *See* Tr. 10/17 at 437:17, 439:4–443:2.

french fries.  A few minutes after he left, she heard her bell ring.[156]  Jerome Grant answered the bell and an unfamiliar voice said:  "[C]an you please come down and identify your son."[157]  Hearing these words, Ligon thought J.G. was dead or hurt. She ran downstairs and collapsed on the steps when she saw J.G. standing, uninjured, beside the officers.  The plainclothes officer who was standing with J.G. approached Ligon, laughing, and handed her the ketchup.[158]

I find J.G.'s and Ligon's testimony credible.  J.G. provided no grounds for suspicion of trespass — or indeed of any other crime — as he approached his building.  He also provided no grounds for suspicion in his responses to the officers' questions.  J.G. provided no further basis for a stop, much less a frisk.  Because the officers did not ask J.G. whether he lived in the building, it is unclear whether J.G.'s stop was based on the suspicion of trespass. Nevertheless, because J.G. was only stopped as he approached a Clean Halls building, because the officers' questions indicate no suspicion of any other crime other than trespass, and because the parties have been unable to locate a UF-250 indicating otherwise, it remains more likely than not that J.G. was stopped on

---

[156]   *See id.* at 429:7–430:4.

[157]   *Id.* at 430:4–14.

[158]   *See id.* at 430:16–433:1.

suspicion of trespass — if his stop was indeed based on a particularized suspicion of any crime at all.

###    d.    Jerome Grant's Stop

Jerome Grant, J.G.'s older brother and Ligon's son, testified that his grandmother, Betty Ligon, lives at 274 Bonner Place in the Bronx.[159]  274 Bonner Place is a Clean Halls building.[160]

Grant, who is black and nineteen years old, testified that the first time the police stopped him at his grandmother's building was in July 2011.  He had been playing basketball with his little brother J.A.G., his cousin, and a friend.  In the evening, the group needed to pick up a key from Grant's grandmother's house, so they began walking toward it and sent J.A.G. to run ahead.  J.A.G. went inside the building without leaving the door open, so the others knocked loudly on the door.[161]  Grant's cousin was "a little upset" by being locked out.[162]

Two uniformed male police officers, one white and one Asian, approached with flashlights and asked if Grant, his cousin, and his friend lived in

---

[159]    *See id.* at 452:13–25.

[160]    *See* Photo of 274 Bonner Place, Pl. Ex. 37.

[161]    *See* Tr. 10/17 at 451:21, 453:6–19, 454:17–455:17, 464:19–466:5.

[162]    *Id.* at 464:11.

the building, and if they were trespassing.  Grant explained that they were visiting

their grandmother's apartment to get a key, and Grant's cousin asked if they were

doing anything wrong.[163]  The Asian officer responded, "I'm the one that's talking

here."[164]  When Grant's cousin said that he just wanted to know if there was a

problem, the Asian officer told him to "hush up" and there would not be any

problems.[165]  Then the officers made Grant, his cousin, and his friend stand with

their backs against a wall and take out their IDs.[166]  When only Grant had an ID,

the Asian officer told Grant's cousin and friend:  "I could take you in because you

don't have ID."[167]  The Asian officer then wrote down Grant's cousin's and

friend's names and birthdates in a notepad while the white officer did the same for

Grant.[168]

        Then the Asian officer returned Grant's ID and told the group to turn

around and place their hands against the wall.  The Asian officer asked Grant's

---

[163]     *See id.* at 455:19–20, 456:8–12.

[164]     *Id.* at 456:13.

[165]     *Id.* at 456:18–19.

[166]     *See id.* at 456:21–457:5.

[167]     *Id.* at 457:15.  I know of no law stating that failure to carry an ID, standing alone, provides probable cause for an arrest.

[168]     *See id.* at 457:18–21.

cousin whether he had any drugs or blades in his pockets, then grabbed his shoulders and patted him down to the ankles, stopping to remove all the contents from his pockets.[169]  The white officer frisked Grant's friend and Grant.  Finally, the Asian officer told the group to put their backs against the wall again, warned them to carry their IDs with them, and explained that the officers had wanted to make sure the group was not trespassing.  J.A.G. came outside shortly after the officers left.  Grant testified that he did not feel free to leave until the officers told him to go home.[170]

I find Grant's testimony largely credible, though it conflicted in certain minor details with his deposition testimony.[171]  Defendants argue that the officers approached based on the group knocking on the door, rather than on the suspicion of trespass.[172]  But I accept Grant's testimony that the John Doe defendant Asian officer mentioned trespassing as the basis for the stop.[173]

### e.    Roshea Johnson's Stop

---

[169]    Again, as in the cases of Bradley and J.G., the officer's conduct clearly exceeded the constitutional bounds of a frisk.

[170]    *See id.* at 458:3–459:21, 461:4–24, 462:3–5.

[171]    For example, Grant stated at the deposition that the Asian officer frisked all three members of the group.  *See id.* at 467:8–9.

[172]    *See* Def. Findings ¶ 19.

[173]    *See* Tr. 10/17 at 461:4–19.

Roshea Johnson is the brother of plaintiff Letitia Ledan.[174]  From 2001 through 2010, Johnson lived at River Park Towers, a complex of buildings in the Bronx.  Sometimes he lived with Ledan, and at other times with a friend.  River Park Towers is enrolled in Operation Clean Halls.[175]

On the morning of Father's Day 2010, Johnson, who is black and was then thirty-four years old, went to Ledan's apartment to change into clothes he had left there.  To enter River Park Towers, it is not necessary to pass through security or a closed gate, or to have a key.  Johnson walked into Ledan's building and took the elevator to her floor.  When he knocked at Ledan's door, there was no answer. He went back to the elevator and returned to the ground floor, planning to call Ledan on the payphone in front of a supermarket in the complex.[176]

As Johnson crossed the street to the payphone, a black van pulled up with police officers inside.  One officer asked him where he was coming from.[177]

---

[174]     *See* Tr. 10/16 at 394:2–395:2.  Roshea Johnson is unrelated to plaintiff Kieron Johnson.  *See id.* at 393:20–22.

[175]     *See id.* at 298:11–19, 394:2–395:2.

[176]     *See id.* at 394:3–399:7.

[177]     *See id.* at 399:21–400:13.  Defendants have not located a UF-250 connected to Roshea Johnson's stop, or identified the officers involved in the stop, despite Roshea Johnson's precise identification of the time and place of his stop and his detailed physical descriptions of the officers. *See* Musick Chart (incident 11); Tr. 10/16 at 401:20-402:3.

Johnson told the officer he was coming from his sister's house but she was not home.[178]  Then the officer "mentioned something about trespassing."[179]  Johnson tried to tell the officer that he could prove he was not trespassing, and that he had a letter in his pocket with his name and his sister's address on it.  The officer responded by handcuffing Johnson and placing him in the back of the van.[180]

The officers then drove the van to another part of the complex and questioned Johnson.[181]  One of the officers asked Johnson "where was the drugs or the guns at."[182]  Johnson said he "didn't know where the drugs or the gun was."[183]  The officers continued asking similar questions for a few minutes, then pulled out of the complex.[184]  During the drive, the officers "said you could make it easy on yourself if you tell us where the guns and the drug was, but I didn't know where no guns or drugs was."[185]  Finally, after about fifteen or twenty minutes, the officers

---

[178]     *See* Tr. 10/16 at 400:14–15.

[179]     *Id.* at 400:17.

[180]     *See id.* at 400:17–401:18.

[181]     *See id.* at 402:4–22.

[182]     *Id.* at 402:19–20.

[183]     *Id.* at 402:21–22.

[184]     *See id.* at 402:23–403:8.

[185]     *Id.* at 403:11–13.

pulled over at a location about a mile from River Park Towers, opened the door, and told Johnson to get out of the van.[186] "When I got out of the van, he said maybe you don't know nothing, and took the handcuffs off me and let me go."[187] Looking back, Johnson said that the encounter made him feel "angry and kind of helpless."[188]

I find Johnson's testimony credible.  Johnson provided no grounds for suspicion of trespass as he entered and exited Ledan's building.  He also provided no grounds for suspicion in his interactions with the officers.  Nor did Johnson's conduct provide any other basis for a stop.

### f.    Letitia Ledan's Stops

Letitia Ledan, Roshea Johnson's sister, testified that she has lived at River Park Towers for the past eleven years.  She chairs the maintenance and elevator committee in the tenants' association.  As noted above, River Park Towers is enrolled in Operation Clean Halls.[189]

Ledan, who is black, testified that she has been stopped six times in or

---

[186]   *See id.* at 403:15–20, 403:25–404:3.

[187]   *Id.* at 403:18–20.

[188]   Tr. 10/17 at 417:21–23.

[189]   *See* Tr. 10/16 at 297:2–298:19.

around her building.  Twice the stops occurred outdoors.  The first took place at some time in 2009, although she could not provide a more precise date.  Two white male officers stopped her in front of a supermarket in the River Park Towers complex as she was about to leave the complex.  They asked her whether she lived there and whether she had an ID, then took her ID, looked at it, handed it back to her, and said to have a nice day.  During the roughly three-minute encounter, she did not feel free to leave because the officers were standing in front of her and had her ID.[190]

Ledan's second outdoor stop occurred in the summer of 2011.  Ledan was returning home from work in the afternoon and saw four uniformed police officers standing with her husband and two of her friends in front of her building.  While one of the officers patted down one of Ledan's friends, another was patting down Ledan's husband and removing items from his pockets.  As Ledan approached her building, she asked what was going on.[191]  Then an officer approached her, and she asked, "[W]hy are you stopping us?"[192]  The officer told her to be quiet and asked whether she lived at the building, then asked for her ID,

---

[190]    *See id.* at 300:22–24, 301:1–14, 302:5–25, 317:18–25.

[191]    *See id.* at 306:16–308:8.

[192]    *Id.* at 308:8–10.

which she gave to him.[193]  After returning her ID and finishing the search of her husband and friends, the officers "just started walking away."[194]  As in 2009, Ledan did not feel free to leave during the encounter because the officer blocked the entrance to her building and had her ID.[195]

I find Ledan's testimony as to both encounters credible.  Plaintiffs have failed to establish, however, that Ledan's encounters constituted *Terry* stops. Despite Ledan's subjective feeling that she was not free to leave in the first encounter, Ledan's limited testimony tended to show that the officers approached and asked her questions politely and not in an aggressive, coercive, or threatening manner.  "[E]ven when officers have no basis for suspecting a particular individual, they may generally ask questions of that individual; [and] ask to examine the individual's identification . . . as long as the police do not convey a message that compliance with their requests is required."[196]  Ledan's testimony did

---

[193]     *See id.* at 308:10–19.

[194]     *Id.* at 308:19–309:4.

[195]     *See id.* at 328:22–330:4.

[196]     *Bostick*, 501 U.S. at 434–35 (collecting cases) (citations omitted). *Accord Delgado*, 466 U.S. at 216 ("[P]olice questioning, by itself, is unlikely to result in a Fourth Amendment violation . . . [u]nless the circumstances of the encounter are so intimidating as to demonstrate that a reasonable person would have believed he was not free to leave if he had not responded.").

not provide adequate evidence that the police conveyed a message that compliance
with their requests was required, and thus that she was not free to terminate the
encounter.

Similarly, Ledan's testimony concerning her second encounter with
the police suggested that it was consensual.  Without delving into the intricacies of
Fourth Amendment case law concerning consensual stops,[197] the Supreme Court
has made clear that "[l]aw enforcement officers do not violate the Fourth
Amendment's prohibition of unreasonable seizures merely by approaching
individuals on the street or in other public places and putting questions to them if
they are willing to listen."[198]  Ledan testified that in her second encounter, she
approached the police, initiated the encounter, and questioned the police before
being questioned by them.  Based on this testimony, I find that Ledan's second
encounter was most likely consensual.

---

[197]    Even when the Supreme Court has found consent for a search, it has
held that the "terminate the encounter" standard defines a *Terry* stop.  *See, e.g.*,
*Drayton*, 536 U.S. at 200–01 ("The proper inquiry 'is whether a reasonable person
would feel free to decline the officers' requests or otherwise terminate the
encounter.'" (quoting *Bostick*, 501 U.S. at 436)). *See also* LAFAVE, SEARCH &
SEIZURE § 9.4(a) ("[I]t does not appear . . . that the *Mendenhall-Royer* ['free to
leave'] test is intended to divide police-citizen encounters into their seizure and
nonseizure categories by reliance upon the amorphous concept of consent.").

[198]    *Drayton*, 536 U.S. at 200 (citing *Florida v. Royer*, 460 U.S. 491, 497
(1983) (plurality opinion)).

### g.   Fernando Moronta's Stop

Fernando Moronta, who is Latino, was thirty-six years old at the time of the hearing.  He lives in a Clean Halls building in the Bronx.  One day after work in the winter of 2008, Moronta went with his brother, Eladio Vasquez, to his brother's apartment building at 1453 Walton Avenue in the Bronx, which is also a Clean Halls building.[199]

When Moronta left the building at around 10:30 p.m., a police van pulled up and half a dozen uniformed officers exited and began questioning Moronta about where he was going and what he was doing in the building.  After Moronta explained that he had been at his brother's apartment, one of the officers asked if he had anything sharp in his pockets and then patted him down and searched his pockets.[200]  Then the officer asked if they could go upstairs to confirm Moronta's story, and Moronta gave his permission.  A white officer asked for Moronta's ID.[201]  On the way up in the elevator, a black officer told Moronta that he "better be telling the truth," because if Moronta's brother did not live in the

---

[199]   *See id.* at 340:24–341:4, 342:1–343:13, 343:14–344; Pl. Findings ¶ 43 ("Eladio").

[200]   Once again, as in the searches of Bradley, J.G., and Grant, the officer violated the Fourth Amendment by exceeding the constitutionally permissible scope of a frisk.

[201]   *See* Tr. 10/16 at 344:24–346:11.

building, Moronta would be arrested for trespassing.[202]

At the door, Moronta's brother identified Moronta, and after the white officer compared the name given to the name on Moronta's ID, "he looked at me and smirked and gave my ID back."[203]  On the way down the elevator, the officers explained that they had stopped Moronta because "the neighborhood is bad, got drugs and stuff like that."[204]  Moronta stated that he did not feel free to leave until he left his brother's building.[205]

I find Moronta's testimony credible.  Moronta provided no grounds for suspicion as he exited his brother's building, or in his responses to the officers' questions.  Moronta's conduct provided no other basis for a stop.

### h.    Kieron Johnson's Stop

Kieron Johnson, who is black, was twenty-one years old at the time of

---

[202]    *Id.* at 346:14–18.

[203]    *Id.* at 346:19–347:4.

[204]    *Id.* at 347:6–9.

[205]    *See id.* at 346:12–349:1.  Moronta's initial inability to remember whether the stop occurred in the winter of 2007 or of 2008 does not significantly undermine his credibility.  *See id.* at 350:12–24.  Defendants also note that plaintiffs' Complaint alleges that Moronta's stop occurred in 2010.  *See* Def. Findings ¶ 22 n.10; Compl. ¶ 129.  But Moronta testified that he had not looked at the Complaint closely enough to notice the error until three days before his hearing testimony, and that plaintiffs' counsel may have confused the stop to which he testified with an arrest for trespass in 2010.  *See* Tr. 10/16 at 350:22–352:18.

the hearing.  He lives in a Clean Halls building in the Bronx and testified to having been stopped in or near Clean Halls buildings seven or eight times, and to having seen others stopped about ten times.  His best friend, plaintiff Jovan Jefferson, lives across the street at 1546 Selwyn Avenue, another Clean Halls building.[206]

On a warm day in 2010, around noon, Jefferson invited Johnson over to play basketball.  Johnson went to Jefferson's building and waited outside, about six steps away from the door.[207]  After about two minutes, two uniformed officers "pulled up in a car and . . . jumped out and ran out and around me."[208]  One asked whether Johnson had been in the building.  After he replied that he had not, one of the officers asked for his ID while the other patted down his front pockets and reached into his back pockets, where he kept his wallet.[209]  The officer looked through his wallet, then the other officer returned his ID and told him he was free to go.  Until then, Johnson did not feel free to leave.[210]

---

[206]   *See* Tr. 10/16 at 377:11–379:22.

[207]   *See id.* at 380:1–381:11.

[208]   *Id.* at 381:12–23.

[209]   Yet again, as in the cases of Bradley, J.G., Grant, and Moronta, the officer who searched Johnson violated Johnson's Fourth Amendment rights by reaching into his pockets during a frisk without a reasonable basis in self-protection.

[210]   *See id.* at 382:6–383:5.  Johnson stated that after the incident, he felt "[e]mbarrassed and worried," because "there's usually people outside and I don't

I find Johnson's testimony credible, despite his inability to offer a more precise date for the stop.  Defendants argue that Johnson's stop was not for trespass, because he testified that at the time of the stop, he believed the officers were truancy officers.[211]  But defendants offer no persuasive evidence that the officers were, in fact, truancy officers.[212]  Even if the officers were truancy officers, defendants fail to show how this fact would undermine plaintiffs' claim that Johnson was stopped on suspicion of trespass.[213]  Presumably truancy officers are no less able to make trespass stops than any other kind of officer.  Moreover, Johnson's testimony that the officers asked him whether he had been inside the building suggests a trespass stop.[214]  Based on Johnson's testimony, I find that he provided no grounds for suspicion of trespass as he waited outside Jefferson's building, in his responses to the officers' questions, or in any other manner.

### i.      Jovan Jefferson's Stop

Jovan Jefferson, who is black, was twenty years old at the time of the hearing.  As noted above, he lives in a Clean Halls building in the Bronx.

---

like when they see me being stopped by officers." *See id.* at 384:7–10.

[211]     *See id.* at 385:4–13; Pl. Findings ¶ 17.

[212]     *See* Tr. 10/16 at 385:4–387:19, 389:8–391:5, 392:3–10.

[213]     *Cf. id.* at 387:21–23.

[214]     *See id.* at 382:6–10.

Jefferson testified that he had been stopped outside Clean Halls buildings about seven to eight times, and inside Clean Halls buildings about three to four times. Jefferson's friend Brandon Muriel lives at 1515 Selwyn Avenue, another Clean Halls building in the Bronx.[215]

Jefferson testified that his most recent stop outside a Clean Halls building occurred between April and June 2012. He and Muriel had been watching SportsCenter in Muriel's apartment when Muriel left for work. It was shortly after noon as the two of them stepped out of Muriel's building.[216] A passing police van stopped and three officers got out, including two that Jefferson recognized as officers named "Marquez" and "Rodriguez."[217] Jefferson testified that these officers had previously stopped him inside his building, and had arrested Kieron Johnson for trespass inside Jefferson's building at a time when Jefferson was with him. The officers had also arrested another friend of Jefferson's for trespass.[218] I

---

[215]    *See id.* at 359:17–361:14.

[216]    *See id.* at 361:15–362:16.

[217]    *Id.* at 362:18–363:15; Compl. ¶ 83. Officer Luis Rodriguez testified to being a truancy officer who patrolled Selwyn Avenue between April and June 2012. *See* Tr. 10/22 at 1067:1–18. Rodriguez testified that he recognized Jefferson but did not remember stopping him between April and June 2012. *See id.* at 1068:8–1069:5.

[218]    *See* Tr. 10/16 at 363:14–364:8.

find it more likely than not that Rodriguez participated in the stop that Jefferson described.

Rodriguez asked Jefferson and Muriel where they were coming from and why they were in the building.  The officers also asked Muriel for his ID.  Then Jefferson's mother drove by with his aunt.[219]  After his mother got out and approached the officers, Rodriguez stated that Jefferson was "free to go and that he was just talking to me."[220]  Jefferson testified that he did not feel free to leave before his mother approached.[221]

I find Jefferson's testimony largely credible, despite his failure during his deposition to remember the stop to which he testified at the hearing.[222]  Given the number of times Jefferson has apparently been stopped, it is understandable that he might forget one and then remember it later, just as it would be understandable if a police officer were unable to remember a relatively brief, unrecorded stop.  I find that neither Jefferson nor Muriel provided grounds for

---

[219]    *See id.* at 364:22–365:17.

[220]    *Id.* at 365:7–13.

[221]    *See id.* at 366:13–15.  He also stated that the stop made him feel the officers were biased "because I am being stopped all the time just because of the kind of neighborhood that I live in."  *Id.* at 366:16–22.

[222]    *See id.* at 370:11–372:3.

suspicion of trespass as they exited Muriel's building, as they responded to the

officers' questions, or in any other manner.

### 3.    Expert Testimony Regarding UF-250 Forms

Plaintiffs' expert witness, Dr. Jeffrey Fagan, is a criminologist with

expertise in statistics.[223]  Dr. Fagan performed a statistical analysis of data

contained on certain UF-250 forms completed by NYPD officers in the Bronx in

2011.[224]  As noted above, officers are required to complete a UF-250 form after

each stop.[225]  The front and back of the form contain various checkboxes and fields

in which officers indicate the nature of the stop and the circumstances that led to

the stop.[226]

Dr. Fagan ultimately concluded that the NYPD recorded 1,663 stops

outside a Clean Halls building in the Bronx in 2011 based only on a suspicion of

trespass, and without observing any indoor behavior.[227]  Of these stops, Dr. Fagan

---

[223]    *See Floyd v. City of New York*, 861 F. Supp. 2d 274, 279–80 (S.D.N.Y. 2012) (describing Dr. Fagan's qualifications).

[224]    *See* Fagan Report at 2.  Dr. Fagan extracted the data from the City of New York's Stop, Question, and Frisk Database.  *See id.*

[225]    *See id.* at 3; Tr. 10/15 at 69:24–70:1.  *See also infra* Part V.B.1.a (more detailed discussion of UF-250 forms).

[226]    *See infra* Appendix B ("App. B.").

[227]    *See* Fagan Report at 2–6 & nn.2–8 (analysis leading to original count of 1,857 stops); Apps. C–E to Fagan Report (exclusion of stops where indoor

concluded that 1,044 lacked any justification on the front or back of the UF-250 form that would have constituted reasonable suspicion of trespass.[228]  In other words, Dr. Fagan concluded that sixty-three percent of the recorded trespass stops outside Clean Halls buildings in the Bronx in 2011 where no indoor behavior was observed were not based on any articulated reasonable suspicion.[229]

Defendants offer a number of arguments against Dr. Fagan's conclusions.  *First*, they argue that it is impossible to conclude whether reasonable suspicion existed for a stop based on a UF-250 alone because "it is a conclusory form that does not capture all details, nuances and circumstances that may lead to a stop."[230]  Defendants argue that Dr. Fagan had an obligation to incorporate into his

behavior was observed); Tr. 10/15 at 73:5–77:7 (general search method), 114:23–115:2 (exclusion of alleged NYCHA stops), 117:20–119:20 (recapitulation of general search method); Table 14: Period of Observation of Proximity Stops, Bronx Trespass Stops, 2011 ("Period of Observation Table"), Pl. Ex. 98 (stop totals at various stages of analysis).

[228]    *See* Fagan Report at 15 tbl. 8; App. L to Fagan Report; Tr. 10/15 at 114:4–115:2.

[229]    *See* Tr. 10/15 at 115:1–2.

[230]    Def. Findings ¶ 3 n.1.  In *Arvizu*, the Supreme Court rejected the Ninth Circuit's attempt to clarify the reasonable suspicion standard by analyzing various stop factors in isolation as part of what the Supreme Court described as a "reasonable-suspicion calculus."  534 U.S. at 272.  The Supreme Court emphasized the importance of looking to the "'totality of the circumstances'" in reasonable suspicion analyses.  *See id.* at 273 (quoting *Cortez*, 449 U.S. at 417–18).  Dr. Fagan's report, though quantitative, attempts no such mechanistic analysis, because

analysis other sources of information, such as "911 calls or SPRINT Reports, memobooks, arrest and complaint reports, Trespass Crimes Fact Sheets, Owner's Affidavits and/or criminal court complaints."[231]   Defendants also criticize Dr. Fagan for having no expertise regarding police training on street stops and reasonable suspicion, and for having conducted no interviews with police personnel.[232]

If defendants believe that such research would have shown that reasonable suspicion existed for some or all of Dr. Fagan's 1,044 unlawful stops, defendants were free to conduct such research themselves and introduce evidence rebutting Dr. Fagan's conclusions regarding specific UF-250 forms.  Defendants

---

it does not claim to be the final word on whether reasonable suspicion existed for any individual stop in the UF-250 database.  *See* Fagan Report at 15 (identifying stops "where there *does not appear*" to be any combination of factors justifying a trespass stop (emphasis added)).  *Accord Floyd*, 861 F. Supp. 2d at 293 (noting that "(il)legality of a stop" cannot be "conclusively determined on the basis of paperwork alone," and clarifying that the UF-250 database "is necessarily an incomplete reflection of the totality of the circumstances leading to each stop").  Unlike a hearing on a single motion to suppress, this hearing aims to determine, based on necessarily limited data, whether the City and NYPD engaged in a widespread practice of constitutional violations.

[231]    Def. Findings ¶ 7.

[232]    *See id.* ¶ 4.

did not.[233]  In general, as I stated when evaluating Dr. Fagan's methods in *Floyd*,

the contents of UF-250s are admissible and probative.[234]  As defendants themselves

emphasize, officers are required to record all the reasons justifying a stop,[235] and

the UF-250 provides spaces for officers to record any reason.[236]  To the extent that

plaintiffs used the UF-250 database primarily to estimate the magnitude of the

problem at issue in this case, plaintiffs were under no legal obligation to

supplement "the extremely rich and informative material"[237] contained in the UF-

---

[233]    Similarly, defendants speculate that some of the buildings Dr. Fagan identified as Clean Halls buildings might not have been enrolled in Clean Halls on the date of the stop.  *See id.* ¶ 10.  Yet defendants fail to identify a single stop for which this was actually the case.

[234]    *See Floyd*, 861 F. Supp. 2d at 290–91.  Defendants' expert misquotes this earlier opinion as flatly holding that "it would be improper to declare certain stops 'unjustified' and others 'justified' on the basis of paperwork alone."  Report of Defendant[s'] Expert Dr. Dennis Smith in Response to Plaintiffs' Expert Dr. Jeffrey Fagan ("Smith Report"), Def. Ex. JJJJ, at 3 n.3 (quoting *Floyd*, 861 F. Supp. 2d at 291).  In fact, the quoted sentence continues:  "*without offering any qualifications*:  a perfectly lawful stop cannot be made unlawful because the arresting officer has done a poor job filling out the post-arrest paperwork; nor can an egregiously unlawful stop be cured by fabrication of the paperwork."  *Floyd*, 861 F. Supp. 2d at 291 (emphasis added).  Plaintiffs have presented Dr. Fagan's conclusions in the instant case with the appropriate qualifications.

[235]    *See* Def. Findings ¶ 4 ("NYPD training evidence . . . clearly identifies that its officers are instructed to include *all* circumstances leading to the stop on the worksheet[.]" (citing Tr. 10/15 at 86:12–87:2)); Tr. 10/19 at 849:13–19 (testimony of NYPD Chief James Shea).

[236]    *See* App. B.

[237]    *Floyd*, 861 F. Supp. 2d at 292.

250 database with other paperwork or testimony.

In any case, even if there are reasons to believe that Dr. Fagan's exclusive reliance on UF-250s led to inaccuracies, the inaccuracies generally favored defendants, not plaintiffs. UF-250s present a one-sided picture of a stop: they are completed not by neutral third parties, or with the cooperation of the stopped person, but by officers who have obvious incentives to justify the stops they have made.[238] More significantly, evidence from the hearing suggested that many stops take place for which no UF-250 form is ever generated. Sgt. Musick failed to identify a single UF-250 form for any of the eleven stops to which plaintiffs testified,[239] and in both of the stops where officers were clearly identified, the officers admitted that they had failed to complete a UF-250 for the stop.[240] Plaintiffs also introduced two reports by the Civilian Complaint Review Board ("CCRB") stating that there is a systemic problem with officers failing to complete

---

[238]    This conclusion receives anecdotal support from Officer Santiago's erroneous paperwork regarding Bradley's arrest, which tended to overstate rather than understate the justifications for the arrest. *See* Bradley Fact Sheet.

[239]    *See* Tr. 10/23 at 1125–1143.

[240]    *See* Tr. 10/22 at 1024:2–7 (Officer Ramdeen's failure to complete UF-250 for Turner's stop); Tr. 10/23 at 1110:3–18 (Officer Santiago's failure to complete UF-250 for Bradley's stop).

UF-250 forms after stops.[241]

In light of the above, I reject defendants' contention that the sole reliance on UF-250 forms as a statistical tool provides a categorically inadequate basis for determining the rough magnitude of unlawful stops in this case.  I also find that failures to fill out UF-250 forms likely led to a significant undercounting of both lawful and unlawful stops in Dr. Fagan's analysis.

*Second*, defendants attack Dr. Fagan's analysis based on his failure to take account of a field on the UF-250 labeled "Period of Observation Prior To Stop."[242]  Defendants correctly note that the location field that Dr. Fagan matched to Clean Halls addresses indicates not the location of the suspected trespass but the location of the stop.[243]  According to defendants' theory, Dr. Fagan's analysis overcounted the number of outdoor stops based on suspicion of trespass in Clean

---

241    *See* CCRB 2010 Annual Report, Pl. Ex. 78, at 13 (2010 report describing failure to fill out UF-250s as "major failure[]"); CCRB 2011 Annual Report, Pl. Ex. 79, at 14 (2011 Report describing same as "major categor[y] of failure").  I note that the NYPD Legal Bureau's PowerPoint presentation at Rodman's Neck may be read as suggesting, erroneously, that UF-250s need not be prepared when a stop results in arrest:  "If the investigation does not lead to an arrest the individual must be released immediately, and a UF-250 must be prepared."  NYPD Legal Bureau, Street Encounters PowerPoint Presentation ("Street Encounters Presentation"), Def. Ex. J, at 27.  *But see id.* at 33 (stating that a UF-250 must be prepared for every stop that is based on reasonable suspicion).

242    *See* Def. Findings ¶ 6; App. B.

243    *See* Tr. 10/15 at 45:14–47:4.

Halls buildings because officers may have stopped someone near a Clean Halls building on suspicion of trespass in a nearby building.[244]  As defendants conceded in their opening argument, however, the possibility of a discrepancy between the location of the suspected trespass and the location of the stop "cuts both ways."[245]  Just as Dr. Fagan's analysis might erroneously include stops that were in fact based on suspicion of trespass in a building near a Clean Halls building, so might his analysis erroneously exclude stops that were based on suspicion of trespass in a Clean Halls building but took place elsewhere.[246]  I am not persuaded that one effect would be larger than the other.

On the other hand, there is some validity to defendants' argument that Dr. Fagan's method might have failed to exclude stops based wholly or in part on observations of indoor behavior, despite Dr. Fagan's attempt to exclude these stops.[247]  Dr. Fagan assumed that whenever an officer checked "Outside" rather than "Inside" on a UF-250 and gave no indication elsewhere on the form of having

---

[244]   *See* Def. Findings ¶¶ 6, 10; Tr. 11/7 at 1309:9–1310:22.

[245]   Tr. 10/15 at 47:1–4.  *Accord* Fagan Report at 5–6 (noting underinclusive results of Dr. Fagan's "exact match" method).

[246]   I address below defendants' argument that the period of observation field could contribute to reasonable suspicion.

[247]   *See* Def. Findings ¶ 10.

observed indoor behavior,[248] the officer's suspicion was not based at all on an observation of indoor behavior.[249]   But it is easy to imagine an officer observing behavior inside a Clean Halls building, making a stop outside, checking the "Outside" box as a result of the stop location, describing the location of the outdoor stop in greater detail in the "Type of Location" field, and failing to indicate elsewhere on the form that all or part of the observed behavior took place inside.

Nonetheless, defendants have failed to show why it was necessary for Dr. Fagan to exclude all stops involving the observation of indoor behavior in the first place.   An outdoor stop based on the observation of *unsuspicious indoor behavior* may be just as unconstitutional, and just as potentially relevant to establishing a pattern of unlawful trespass stops outside Clean Halls buildings,[250] as

---

[248]   According to plaintiffs, the UF-250 database fields that could contain text suggesting an observation of indoor behavior included the field called "premname," as summarized in App. D to the Fagan Report, and the field called "detailSA," as summarized in App. E to the Fagan Report.

[249]   *See* Fagan Report at 3–4; Tr. 10/15 at 73:8–77:7, 128:1–130:16.

[250]   *See* Pl. Findings ¶ 69 (stating plaintiffs' claim as follows:  "[T]he defendants have a pattern and practice of unlawful stops on suspicion of trespassing outside TAP buildings in the Bronx.").   Some of the text strings in Fagan Report Appendices D and E that indicate indoor behavior also indicate reasonable suspicion for a trespass stop, such as "DRINKING IN REAR OF BUILDING," and "STAIRWELL DRINKING."   App. E to Fagan Report.   Many others, however, do not.   *See* App. D to Fagan Report (excluding stops with text

74

a stop based solely on the observation of *unsuspicious outdoor* behavior near a

TAP building, or a person exiting a TAP building.  Perhaps Dr. Fagan attempted to

exclude all stops involving the observation of indoor behavior because these stops

as a group tend to have a greater likelihood of being based on *reasonable*

suspicion, especially if the officer observed the person indoors for a long period of

time.  If so, the exclusion was a gesture of methodological conservatism,[251] and the

apparent unfeasibility of perfectly executing the exclusion should not be held

against plaintiffs.  While Dr. Fagan's methods may have failed to exclude some

stops that were preceded by an observation of indoor behavior, this failure, by

itself, is unlikely to have any significant impact on the validity of Dr. Fagan's

conclusions.[252]

   *Third*, defendants criticize Dr. Fagan for having departed from

---

strings such as "LOBBY," and "VESTIBULE"); App. E to Fagan Report (same
with text strings such as "INSIDE CLEAN HALLS," and "SUSPECT
OBSERVED INSIDE CLEAN HALL BUILDING").

[251] Dr. Fagan's testimony suggested that he attempted to exclude any stop
that was "not *purely* an outdoor stop."  *See* Tr. 10/15 at 74:3–5 (emphasis added).

[252] A similar argument applies to defendants' assertion that Dr. Fagan's
method failed to exclude some stops that took place outside a Clean Halls building
but within the legal limits of the property on which the building sits.  *See* Def.
Findings ¶ 10; Tr. 10/15 at 128:1–9.  An unconstitutional stop outside a Clean
Halls building but within the property line can support the existence of a pattern of
unconstitutional stops outside Clean Halls buildings just as well as an
unconstitutional stop a few steps outside the lot boundary.

methods he used to analyze UF-250 forms in *Davis* and *Floyd*.[253]  I decline to evaluate Dr. Fagan's simple methods in the instant case through the circuitous route proposed by defendants of analyzing Dr. Fagan's far more complicated methods in the other two cases, determining whether those methods were valid, comparing those methods to Dr. Fagan's methods in the instant case, analyzing whether Dr. Fagan's methods in the instant case are consistent with the methods in the other two cases, and then, if any inconsistency arises, rejecting Dr. Fagan's methods in the instant case on that basis.  Instead, I will simply evaluate the validity of Dr. Fagan's methods in the instant case on their own terms.

        Furthermore, it would be entirely understandable if the application of the method from *Floyd* to the instant case resulted in a lower count of unlawful stops than the method Dr. Fagan used here.  The explanation for such a discrepancy is apparent.  Dr. Fagan used more conservative assumptions throughout *Floyd* than in the instant case, and with valid reason.[254]  The universe of stops that *Floyd* analyzes for unconstitutionality is vastly larger than the universe

---

        [253]    *See* Def. Findings ¶ 4 (citing generally Dr. Fagan's analyses in *Floyd* and *Davis*).

        [254]    For example, Dr. Fagan assumed in *Floyd* and *Davis*, which also dealt with a far larger universe of stops, that Furtive Movements in combination with High Crime Area should be coded as constituting reasonable suspicion.  *See* Tr. 10/15 at 151:2–5.

analyzed for unconstitutionality as part of the instant motion — 2.8 million stops

versus 1,663.[255]  As a result, the plaintiffs in *Floyd* have less of a need for precision

than plaintiffs in the instant case.  That does not mean that plaintiffs' precision in

the instant case is spurious.  Dr. Fagan's credibility should hardly be questioned in

the instant case simply because, for whatever strategic or pragmatic reasons, he

chose cautious but more manageable methods in another case that might result in a

large number of unlawful stops being coded as lawful.  Once again, the relevant

question in evaluating Dr. Fagan's methods in the instant case is whether the

methods are valid here, not whether they are identical to the methods used in a

different case based on a different universe of stops.[256]

     *Fourth*, defendants persuasively note that Dr. Fagan's analysis,

---

[255]   *Compare Floyd*, 861 F. Supp. 2d at 278, *with* Period of Observation Table.

[256]   In addition, I note that the method in *Floyd* aims to identify stops for which no reasonable suspicion of *any* crime exists, whereas the method in the instant case aims to identify stops for which no reasonable suspicion of *trespass* exists.  Given a universe of forms recording stops based only on suspicion of trespass, there may be some forms containing data that could arguably constitute reasonable suspicion of some crime, but not of trespass.  The *Floyd* method will identify these stops as arguably lawful, while Dr. Fagan's method in the instant case will identify them as apparently unlawful.  As a result, Dr. Fagan's method in the instant case will result in a higher count of unlawful stops than his method in *Floyd*.  This does not imply bad faith or a contradiction in Dr. Fagan's methods, much less prove the invalidity of Dr. Fagan's method in the instant case.  *Floyd* and *Ligon* simply aim to assess different sets of stops.

standing alone, does not provide a convincing methodology for establishing a

causal nexus between the Clean Halls program and the stops that Dr. Fagan

analyzed.[257]   As Dr. Smith, stated in his report:

> Professor Fagan's methodology, by its very nature, cannot
> distinguish between whatever impact Clean Halls may have had
> on the pattern of *Terry* stops in the Bronx [and] the impact other
> factors . . . might have had on that same pattern. . . . [I]t would be
> invalid to conclude that Professor Fagan has demonstrated that the
> Clean Halls program itself, and its implementation, *caused* the
> outcomes Professor Fagan observes and the Plaintiffs challenge.[258]

In essence, Dr. Fagan selected a set of stops from the UF-250 database

based on several selection criteria — the stops had to be in the Bronx, on suspicion

of trespass only, at the location of a Clean Halls address, outside, and so on[259] —

and then determined how many of the stops in the set were unjustified.  This

approach cannot show whether stops in the set were more likely to be unjustified

than stops in the UF-250 database in general, or stops in some other relevant set.

Much less can this approach show that belonging to the set *causes* an increased

likelihood that a stop will be unjustified.  Just as Dr. Fagan analyzed the number

---

[257]   *See* Def. Findings ¶ 3 (citing Tr. 10/23 at 1172–77; Smith Report at 7–29).

[258]   Smith Report at 8 (emphasis added).

[259]   *See* Fagan Report at 8 tbl.1; Tr. 10/15 at 83:15–85:7, 124:25–126:17 (excluding stops at NYCHA addresses).

and percentage of trespass stops outside Clean Halls buildings that were

unjustified, one could analyze the quantity of unjustified trespass stops outside any

arbitrary category of building — such as green buildings, or buildings with odd-

numbered addresses.  If, hypothetically, the police were making a large number of

unjustified stops throughout New York City, the analysis would show that a large

number of stops outside odd-numbered buildings were unjustified.  It would

obviously be inappropriate to infer from this that the police had a customary

practice of making unlawful stops outside odd-numbered buildings, or to grant a

preliminary injunction requiring the police to conduct specific training regarding

stops outside odd-numbered buildings.[260]

Thus, defendants are correct that Dr. Fagan's analysis, standing alone,

cannot establish a causal nexus between Clean Halls buildings and unlawful

trespass stops.  But plaintiffs have already established a clear likelihood of proving

such a nexus based on other evidence.  ADA Rucker credibly testified to the police

_____

[260]     Plaintiffs imply in their Reply Memorandum of Law in Support of
Plaintiffs' Motion for Preliminary Injunction ("Reply Mem.") that it is not
necessary for plaintiffs to prove "that officers are stopping people *because* the
building is enrolled in the Clean Halls program."  Reply Mem. at 3.  But as the
analogy to the odd-numbered building hypothetical suggests, this cannot be
correct.  Plaintiffs' request for preliminary relief depends on there being a *specific*
problem involving stops outside Clean Halls buildings, a problem that can only be
partially solved by improving the *general* training regarding the law of stop and
frisk.

repeatedly making unjustified trespass stops and arrests outside Clean Halls buildings *because* they were Clean Halls buildings.[261]   One plaintiff testified that an officer explained an unlawful trespass stop based on the fact that it took place outside a Clean Halls building.[262]   As discussed below, an officer in the NYPD's Legal Bureau learned through focus groups with sergeants and lieutenants that they believed it was legal to approach and question, if not stop, anyone in a TAP building even without a reason for doing so.[263]   Finally, on 417 of the UF-250s in Dr. Fagan's original universe of 1,857 trespass stops outside Clean Halls buildings, officers handwrote phrases or words to the effect of "Clean Halls" or "Trespass Affidavit."[264]   The purpose of a UF-250 is to record the circumstances that led to an

---

[261]     *See supra* Part IV.A.1.

[262]     *See* Tr. 10/17 at 481:7–482:8 (Hispanic officer in Turner stop).  I also note — though the evidence does not relate directly to the *outdoor* stops at issue in this case — that Officer Santiago testified that even after receiving the NYPD's stop and frisk training at Rodman's Neck, he still believed there was legal justification to ask anyone in the lobby or hallways of a Clean Halls building for an ID, even in the absence of any suspicion, reasonable or otherwise.  *See* Tr. 10/23 at 1111:2–1113:10.  Officer Santiago attempted to qualify this rule by stating that the building needed to be in a high crime area in order to justify a request for ID.  *See id.* at 1111:9–22.  He then undermined this qualification by stating, categorically, that all Clean Halls buildings are in high crime areas.  *See id.* at 1111:24–1112:1.

[263]     *See* Tr. 10/18 at 648:18–649:16.

[264]     *See* Tr. 10/15 at 124:18–24.

officer's stop.[265]  The frequency with which officers took the time to note "Clean

Halls" on a form, even though there is no specific field or checkbox and no reason

for doing so,[266] suggests that many officers thought a building's enrollment in

Clean Halls contributed to the justification for the stop.

       *Fifth*, defendants challenge the methods and assumptions Dr. Fagan

followed in processing the information contained on UF-250 forms into

conclusions regarding the number of unlawful stops.[267]  Not surprisingly,

defendants argue that many of the forms Dr. Fagan identified as lacking an

articulation of reasonable suspicion in fact contained such an articulation.  Because

these arguments involve mixed questions of fact and law that depend on a fine-

grained analysis of what constitutes reasonable suspicion, I will address them in

my conclusions of law below.[268]  In any case, the facts regarding how Dr. Fagan

counted the number of unlawful stops are not in material dispute.

       Based on the testimony of plaintiffs and others, the decline to

prosecute forms, and the statistical analysis performed by Dr. Fagan and discussed

---

[265]    *See id.* at 123:17–20.

[266]    *See id.* at 124:14–17; Tr. 10/22 at 1058:24–1059:2, 1072:9–19; Tr. 10/23 at 1110:23–1111:1; App. B.

[267]    *See* Def. Findings ¶¶ 3, 6, 8–10.

[268]    *See infra* Part V.B.1.a.

in greater detail below, I find that plaintiffs have shown a clear likelihood of laying a sufficient factual foundation to prove that defendants have engaged in a widespread practice of making unlawful trespass stops outside TAP buildings in the Bronx.

### B.    Steps Taken by the NYPD in 2012

TAP began in the early 1990s in Manhattan.[269]  Despite the program's name, TAP was originally focused not on trespass but on narcotics sales taking place in the common areas of private buildings, such as lobbies, stairwells, and rooftops.[270]  An officer who testified regarding the origins of TAP stated that "[t]he more that we cracked down on drug sales on the street, the more that you saw drug dealers move indoors."[271]  Before TAP, officers had to deal informally with

---

[269]    *See* Tr. 10/17 at 519:8–520:16; Smith Report at 10–11; NYPD Legal Bureau, Trespass Affidavit Program: Legal Guidelines for Citizen Encounters in Trespass Affidavit Buildings ("1999 TAP Legal Guidelines"), Def. Ex. O, at 1. When TAP expanded to the Bronx, it was called "Clean Halls," though as of May 2012 the NYPD has begun referring uniformly to the program as TAP.  *See* Tr. 10/17 at 520:17–521:7.  In Queens, TAP was referred to, inexplicably, as "FTAP." *See id.*

[270]    *See* Tr. 10/17 at 519:23–520:16.  For the historical background of the War on Drugs, see WILLIAM J. STUNTZ, THE COLLAPSE OF AMERICAN CRIMINAL JUSTICE 23–26, 267–74 (2011); MICHELLE ALEXANDER, THE NEW JIM CROW 40–58 (2010).

[271]    Tr. 10/17 at 519:14–16.

landlords to get permission to enter private buildings in search of drug sales.[272]

TAP provided a formal process for building owners to permit officers to conduct

"vertical patrols" inside the buildings.[273]

Defendants were unable to produce a single written policy or

procedure governing any aspect of TAP between the program's origins in the early

1990s and the issuance of two orders in 2012, discussed below.[274] Nor did

defendants produce evidence that the NYPD conducted any training or created any

training materials specific to TAP before 2012.[275] Nor did the NYPD have an

---

[272]   *See id.* at 519:8–520:6.

[273]   *See id.* at 519:23–520:6.

[274]   *See id.* at 633:13–17.  In 1999, the NYPD's Legal Bureau created its
"Legal Guidelines for Citizen Encounters in Trespass Affidavit Buildings."  *See*
1999 TAP Legal Guidelines.  One passage of the fourteen-page document states:
"IT SHOULD BE UNDERSTOOD THAT WHEN AN OFFICER IS NOT IN THE
BUILDING (E.G., SITTING ACROSS THE STREET IN AN R.M.P.), MERELY
OBSERVING AN INDIVIDUAL ENTERING AND EXITING THE BUILDING,
OR SIMPLY EXITING THE BUILDING, IS NOT ENOUGH TO CONDUCT A
STOP."  *Id.* at 6; Tr. 10/18 at 684:2–4.  But Inspector Sweet testified that he did
not know of anyone to whom the document had been distributed.  *See* Tr. 10/18 at
654:5–7.  Defendants argue that a document from 2000 called Patrol Guide 212-
59, "Vertical Patrol" (P.G. 212-59), Def. Ex. FFFF, governed TAP before the 2012
Interim Orders.  *See* Def. Findings ¶ 26 & n.15 (citing P.G. 212-59).  But P.G. 212-
59 provides general guidelines for conducting vertical patrols and makes no
mention of TAP or Clean Halls.  *See* Tr. 10/18 at 679:20–25.

[275]   For the first TAP-specific training and the absence of prior training,
see the numerous citations to the record at Pl. Findings ¶ 48 & n.7.

accurate and complete count of buildings enrolled in TAP prior to a survey

conducted in the summer of 2012.[276]

### 1.   NYPD Recognition of a Problem in TAP

The improvements to TAP in 2012 had their roots in earlier years.

Inspector Kerry Sweet, the executive officer of the NYPD Legal Bureau, testified

that by early 2010, he had become involved in a group that was examining vertical

patrols and trespass issues in NYCHA buildings.[277]   Inspector Sweet received

approval to examine these issues in the TAP program as well.[278]   In the summer of

2010 through 2011, Inspector Sweet conducted focus groups with sergeants and

lieutenants involved with TAP, and then with prosecutors and various NYPD

officials.[279]   Inspector Sweet learned that "there really wasn't a lot of direction

about the administration of the program."[280]   During his deposition, Inspector

Sweet testified that he also learned of "some confusion" regarding TAP stops:

> [O]fficers believe their role might have been as doorman [or]

---

[276]   *See* Tr. 10/19 at 773:23–775:14.  The survey revealed that there were over eight thousand buildings enrolled in TAP, including over three thousand in the Bronx.  *See id.*

[277]   *See* Tr. 10/17 at 511:10–514:17.

[278]   *See id.* at 521:13–23.

[279]   *See id.* at 523:13–524:5, 528:11–13, 531:6–533:1.

[280]   *Id.* at 524:6–7.

custodian, rather than a strict application of *De Bour*. And once again, understanding that they needed that articulate reason to approach somebody and that if you were a doorman, you could approach everybody, but that is not the case. . . . [I]n TAP buildings, you have to have a reason to approach people.
. . .
I wasn't getting the sense necessarily that they were stopping people in their tracks, but they may have been asking everybody coming into a building, what are you doing here, what is your reason for being here. And that obviously isn't what we want them to do nor is it probably the right thing to do under the *De Bour* standard.[281]

Inspector Sweet testified that Katherine Lemire, special counsel to Police

Commissioner Raymond Kelly, attended meetings with Inspector Sweet where this

problem was discussed.[282]

## 2. Interim Orders 22 and 23 of 2012

After completing the focus groups in 2010 and 2011, Inspector Sweet

helped to draft two new regulations to govern the TAP program: Interim Orders

---

[281]   Tr. 10/18 at 648:18–649:16. I note that Inspector Sweet's testimony regarding what officers said at the focus groups appears to refer to the practice of stops without reasonable suspicion *inside* TAP buildings, and thus does not necessarily indicate that Inspector Sweet was aware of the problem of unlawful stops outside TAP buildings. At the hearing, Inspector Sweet also emphasized that his concern was with unlawful *approaches*, not unlawful *stops*. *See id.* at 649:20–650:7.

[282]   *See id.* at 650:18–651:17.

("IOs") 22 and 23, both published in May 2012.[283]  IO 23 of 2012 addresses

various administrative issues relating to TAP, including procedures for enrolling

buildings in the program.[284]  IO 22 of 2012 lays out procedures for the conduct of

vertical patrols *inside* TAP buildings, with an emphasis on trespass arrests.[285]  It

provides explicit guidance regarding when stops are lawful based on the suspicion

of trespass in a TAP building.  The second page of the Order begins with an

italicized warning:

> *A uniformed member of the service may approach and question*
> *persons if they* [sic] *have an objective credible reason to do so.*
> *However, a uniformed member may not stop (temporarily detain)*
> *a suspected trespasser unless the uniformed member <u>reasonably</u>*
> *<u>suspects</u> that the person is in the building without authorization.*[286]

The next page, in a separate section, repeats the first sentence of this note, and then

continues, again in italics:

> *When reasonable suspicion exists, a STOP, QUESTION AND*
> *FRISK REPORT WORKSHEET shall be prepared as per P.G.*
> *212-11, "Stop and Frisk."  Some factors which may contribute to*

---

283   *See* Tr. 10/17 at 534:6–536:1; Interim Order 22 of 2012 ("IO 22 of
2012"), Def. Ex. A; Interim Order 23 of 2012 ("IO 23 of 2012"), Def. Ex. B.  An
"Interim Order" is a revision to a patrol guide procedure and becomes the policy of
the NYPD upon publication.  *See* Tr. 10/17 at 522:2–13.

284   *See* IO 23 of 2012.

285   *See* IO 22 of 2012 at 1 (¶ 1, "SCOPE," and "PROCEDURE").

286   *Id.* at 2.

> *"reasonable suspicion" that a person is trespassing, in addition to those factors set forth in P.G. 212-11, "Stop and Frisk," are contradictory assertions made to justify presence in the building and/or assertions lacking credibility made to justify presence in the building.*[287]

The section continues by stating that a trespass arrest requires probable cause, and that refusal to answer questions is insufficient to establish probable cause.[288]

As plaintiffs correctly note, however, IO 22 of 2012 makes no reference to stops *outside* TAP buildings.[289]  It does not explicitly state that stops outside TAP buildings require reasonable suspicion, and that merely exiting a TAP building is insufficient to establish reasonable suspicion, even in a high crime area.[290]

At the hearing, defendants offered evidence of numerous steps that have been taken to support the implementation of IOs 22 and 23 of 2012.[291]  After

---

[287]    *Id.* at 3.

[288]    *See id.*

[289]    *See* Pl. Findings ¶ 54.

[290]    *See* IO 22 of 2012.

[291]    I give little weight to an August 20, 2012 memo from Chief of Patrol James P. Hall to all commanding officers.  *See* 8/20/12 Memo from Chief of Patrol to Commanding Officer, All Patrol Boroughs, Def. Ex. E.  The letter, distributed as the preliminary injunction hearing approached, contains a number of ambitious orders, such as that platoon commanders must personally critique all interior or exterior "street encounters" involving TAP buildings, including all stops.  *See id.* ¶ 3.  At the hearing, the executive officer of the Patrol Services Bureau testified

87

any trespass *arrest*, officers must now complete a "Trespass Crimes – Fact Sheet" documenting the facts that established probable cause.[292]   The Chief of Patrol distributed IOs 22 and 23 to 2012 to all commanding officers with a brief synopsis,[293] pursuant to a two-page plan to promote knowledge of criminal trespass offenses among uniformed servicemembers.[294]   Legal Bureau and other personnel offered instruction on IOs 22 and 23 of 2012 to training sergeants and special operations lieutenants,[295] who were then expected to pass along the information to "the rank and file" at training sessions during roll call.[296]   Legal Bureau and other

---

that he was unaware of any supervisors conducting critiques of stops inside or outside of TAP buildings.  *See* Tr. 10/19 at 759:6–15.

[292]   *See* Tr. 10/17 at 545:15–546:1, 559:24–560:7; Trespass Crimes – Fact Sheet, Def. Ex. H.  While the use of this fact sheet may be a welcome development, it will do nothing to clarify officers' confusion regarding the standards for making a *stop* outside a Clean Halls building.  There is also a new "Trespass Crimes – Owner's Affidavit" in support of the administrative goals of IO 23 of 2012.  *See* Tr. 10/17 at 526:21–528:7; Trespass Crimes – Owner's Affidavit, Def. Ex. G.

[293]   *See* 8/12/12 Memo from Chief of Patrol to Commanding Officers, All Patrol Boroughs, Def. Ex. C.

[294]   *See* 6/18/12 Memo from Chief of Patrol to Chief of Department ("Trespass Law Plan"), Def. Ex. D, ¶ 2.

[295]   *See id.* ¶ 3.

[296]   Tr. 10/19 at 789:19–790:5.

88

personnel provided separate instruction to borough and precinct commanders.[297]

Some of the training involved the use of a newly prepared video on "Stop,

Question, and Frisk,"[298] and an updated version of the Chief of Patrol Field

Training Guide.[299]

Many of these steps are peripheral to the concerns of this case.  The

video and the Training Guide, for example, deal with stop and frisk in general, and

make no specific reference to trespass stops outside TAP buildings.[300]  In addition,

as discussed below, some of the training materials contain inaccurate or misleading

information that could exacerbate rather than resolve the problem of

---

[297]     *See* Tr. 10/18 at 711:24–714:11.

[298]     *See, e.g.*, Tr. 10/22 at 996:2–4.

[299]     *See* Trespass Law Plan ¶ 6; July 2012 Chief of Patrol Field Training
Unit Program Guide ("Training Guide"), Def. Ex. N.  The Police Student's Guide,
which is hundreds of pages long, has also been revised to include several pages on
IO 22 of 2012.  *See* Police Student's Guide (excerpt) ("Police Student's Guide"),
Def. Ex. RRR, at 30–34; Tr. 10/22 at 915:7–919:17.

[300]     *See* Training Guide at 10–24; NYPD Stop Question & (Possibly)
Frisk Video Series, "Frisk," ("SQF Training Video No. 5"), Def. Ex. T; Script of
SQF Training Video No. 5, Def. Ex. U; Tr. 10/22 at 942:25–943:3 (nothing in film
deals specifically with TAP).  One page of the Training Guide, which was
distributed only to the supervisors of IMPACT officers, reiterates IO 22 of 2012 by
stating that reasonable suspicion is required for stops based on suspicion of
trespass in a TAP building.  *See* Training Guide at 65; Tr. 10/23 at 1252:1–3.  The
page makes no specific reference to stops outside TAP buildings, and could easily
be read, in context, as a discussion of stops during vertical patrols.  *See* Training
Guide at 65.

unconstitutional stops.[301]

### 3.   Absence of Steps Meaningfully Addressing Outdoor TAP Stops

During the hearing, defendants emphasized the training that officers receive throughout their careers regarding the laws governing stop and frisk *in general*.[302]  This training has recently been supplemented by a refresher course on stop and frisk at the Rodman's Neck training center in the Bronx.[303]  More than three thousand officers have attended the training course since its development in 2012.[304]

The root problem that led to unlawful trespass stops outside TAP buildings in the Bronx, however, based on ADA Rucker's testimony and the other evidence introduced at the hearing, is that officers perceived trespass stops in the proximity of TAP buildings as *exceptions* to the general rules governing stop and frisk.  Improving the training surrounding stop and frisk in general may do nothing to dispel the notion that there is an exception for stops outside TAP buildings.

IO 22 of 2012 makes clear that presence inside a TAP building is not

---

[301]   *See infra* Part V.B.1.b.

[302]   *See* Def. Findings ¶¶ 35–36.

[303]   *See* Tr. 10/17 at 571:25–572:23.

[304]   *See* Tr. 10/19 at 888:1–2; Tr. 10/22 at 955:8–13.

a sufficient basis for a stop, and that stops made during vertical patrols of TAP

buildings must be based on reasonable suspicion.  But IO 22 of 2012 and the

training introduced in support of it present themselves as guides to conducting

vertical patrols *inside* a TAP building, not guides for making trespass stops and

arrests *outside* TAP buildings.  The difference may seem insignificant when

viewed in the abstract.  In theory, officers should be able to infer from the rules in

IO 22 of 2012 how to perform lawful trespass stops outside TAP buildings.

       In practice, however, the evidence at the hearing suggests that NYPD

officers are trained to carry out their duties according to a set of standard operating

procedures.  The NYPD's training reduces the unpredictable, confusing challenges

that arise on patrol to a manageable set of standard situations and orderly

procedures for addressing them.[305]  If a recurring, problematic situation is not

---

[305]     IO 22 of 2012, for example, defines the standard scenario for a
vertical patrol in a TAP building, lays out various common problems that may arise
during such a patrol, and prescribes what to do and what not to do in response to
them, including specific questions to ask.  *See* IO 22 of 2012 at 2.  After receiving
training on IO 22 of 2012, including role-play simulations, *see* Tr. 10/19 at
836:7–840:13, an officer will have less need to improvise under pressure or base
his or her responses on inferences from general principles or analogies to other
scenarios.  In this sense, the NYPD's training follows the model of a traditional
Western military academy, which aims "to reduce the conduct of war to a set of
rules and a system of procedures — and thereby to make orderly and rational what
is essentially chaotic and instinctive."  JOHN KEEGAN, THE FACE OF BATTLE 18
(1976).  On the functioning of standard operating procedures in bureaucracies
generally, see GRAHAM ALLISON & PHILIP ZELIKOW, ESSENCE OF DECISION
143–96 (2d ed. 1999) .

included in the training, officers may categorize it in the wrong way and employ

inappropriate responses — such as stopping someone simply because he exited a

TAP building.  The evidence at the hearing, as summarized in the previous section,

strongly supports the conclusion that many officers took such actions before

2012.[306]  Yet none of the steps taken by the NYPD in 2012 were directly and

meaningfully focused on uprooting the misconceptions regarding trespass stops

outside TAP buildings that resulted in the constitutional violations in this case.

        In fact, based on the evidence at the hearing, the only piece of

instruction that has been provided to officers on a systematic basis and that

specifically targets the problem of outdoor trespass stops at TAP buildings is a

single bullet point included in a PowerPoint presentation offered by the Legal

Bureau as part of the Rodman's Neck training.[307]  The bullet point, which takes up

---

[306]     As plaintiffs stated in their summation:  "We have a 20-year program.
There is a culture around these stops.  So [corrective instruction] needs to happen
periodically . . . so that people get the message."  Tr. 11/7 at 1373:2–6.

[307]     *See* Street Encounters Presentation at 40; Tr. 10/17 at 572:24–573:6;
Tr. 10/18 at 663:13–664:1.  A former commanding officer of the New York City
Police Academy testified that the role-playing at Rodman's Neck sometimes
involves individuals standing outside of TAP buildings, but the individuals appear
to play the role of civilian bystanders and witnesses, not suspects.  *See* Tr. 10/19 at
815:11–14, 838:25–840:9.  Chief Hall testified that "we have made [it] clear" to
officers that "we do not want" them "stopping an individual outside of [a] Clean
Halls building simply because they are exiting a building, without more."  Tr.
11/23 at 1244: 6–12.  Chief Hall did not provide specifics as to how this was made
clear.  *See id.*

one third of a page of a forty-five-page presentation, states:

> Observation of an individual exiting a NYCHA/TAP Building, without more, is *not* an objective, credible reason to approach that individual.[308]

As common sense would suggest, and evidence at the hearing confirmed, attendees at the Rodman's Neck training do not always absorb the lesson contained in this bullet point, or even recall having seen it.  One officer who had recently attended the refresher course at Rodman's Neck testified that he did not remember any discussion of TAP,[309] and both he and another officer testified that they could not remember any training involving outdoor stops on suspicion of trespass.[310]

In light of the above, and in the absence of reliable statistics regarding stops in 2012, I find that defendants failed to introduce persuasive evidence regarding whether the improvements undertaken by the NYPD in 2012 have affected the magnitude of unlawful trespass stops outside TAP buildings in the Bronx.[311]

---

[308]    Street Encounters Presentation at 40.

[309]    *See* Tr. 10/22 at 1043:17–1044:13.

[310]    *See id.*; Tr. 10/23 at 1111:2–8.

[311]    Defendants introduced evidence of a dramatic reduction in declines to prosecute for trespass *arrests*, in general, in the Bronx in 2012.  *See, e.g.*, Tr. 10/18

## V.   DISCUSSION

### A.   Standing

As a preliminary matter, defendants argue that plaintiffs lack standing to seek injunctive relief.[312] I addressed this issue extensively in *Floyd*, and again in *Davis*, and the same analysis applies here.[313] *First*, "[c]oncrete injury is a prerequisite to standing and a 'plaintiff seeking injunctive or declaratory relief cannot rely on past injury to satisfy the injury requirement but must show a likelihood that he or she will be injured in the future.'"[314] *Second*, "'[t]he possibility of recurring injury ceases to be speculative when actual repeated incidents are documented.'"[315] *Third*, "'the presence of one party with standing is sufficient to satisfy Article III's case-or-controversy requirement.'"[316]

---

at 726:18–727:7; Tr. 10/23 at 1249:7–17.  But this obviously does not provide a reliable basis for inferring that unlawful trespass *stops* outside TAP buildings have declined.

[312]     *See* Def. Findings ¶ 47.

[313]     *See Davis*, 2012 WL 4813837, at *26; *Floyd*, 283 F.R.D. at 169.

[314]     *Floyd*, 283 F.R.D. at 169 (quoting *Deshawn v. Safir*, 156 F.3d 340, 344 (2d Cir. 1998)).

[315]     *Davis*, 2012 WL 4813837, at *26 n.225 (quoting *Nicacio v. United States Immigration & Naturalization Serv.*, 768 F.2d 1133, 1136 (9th Cir. 1985)).

[316]     *Id.* at *26 (quoting *Rumsfeld v. Forum for Academic & Institutional Rights*, 547 U.S. 47, 53 (2006)).

Abdullah Turner testified to two specific unlawful trespass stops outside TAP buildings in the Bronx, and J.G. and Jovan Jefferson both referred to having been stopped multiple times outside TAP buildings.[317]  The evidence suggests that both of Turner's stops were on suspicion of trespass.[318]  Furthermore, Turner has lived since 2008 in a TAP building,[319] where, based on the evidence presented at the hearing, he will likely be the target of future unlawful stops — if such stops continue to take place as they have in the past.[320]  This is sufficient to

---

[317]   *See supra* Part IV.A.2.b, c, i.  Jefferson testified to being stopped seven to eight times outside TAP buildings.  *See* Tr. 10/16 at 361:12–14.

[318]   *See supra* Part IV.A.2.b.

[319]   *See* Tr. 10/17 at 471:11–472:19, 486:9–487:1.

[320]   I also note, as I did in *Floyd*, that in light of the frequency of unlawful trespass stops outside TAP buildings in the Bronx, even those plaintiffs who have only been subjected to such a stop one time would likely have standing, provided that they continue to live in or visit TAP buildings.  "'[T]here is no per se rule requiring more than one past act, or any prior act, for that matter, as a basis for finding a likelihood of future injury.'"  *Floyd*, 283 F.R.D. at 170 n.106 (quoting *Roe v. City of New York*, 151 F. Supp. 2d 495, 503 (S.D.N.Y. 2001)).  *Accord Battle v. City of New York*, No. 11 Civ. 3599, 2012 WL 112242, at *3–4 (S.D.N.Y. Jan. 12, 2012) (concluding that plaintiffs, each of whom had only one alleged wrongful experience with NYPD officers under program involving searches of livery cars, had standing to pursue injunctive relief against NYPD, based on number of cars enrolled in the program and plaintiffs' reliance on such cars); *National Cong. for Puerto Rican Rights v. City of New York*, 75 F. Supp. 2d 154, 161–62 (S.D.N.Y. 1999) (concluding that frequency of NYPD stops and plaintiffs' belonging to groups distinctly affected by NYPD stop practices gave plaintiffs standing to seek injunctive relief).

95

confer standing on plaintiffs.[321]

### B.   Preliminary Injunctive Relief

Plaintiffs seek a variety of injunctive remedies that would require the NYPD to act in ways that depart from the status quo, including the development and implementation of new formal policies, new training procedures, and burdensome new supervisory and monitoring procedures.[322]  Because the preliminary injunctive relief sought by plaintiffs is thus mandatory rather than prohibitory, plaintiffs must show (1) that they are clearly or substantially likely to prove at trial that defendants are engaged in an ongoing custom of making trespass stops outside TAP buildings in the Bronx in the absence of reasonable suspicion, in violation of the Fourth Amendment; (2) that plaintiffs are likely to suffer irreparable harm in the absence of injunctive relief; (3) that the balance of equities tips in plaintiffs' favor; and (4) that an injunction is in the public interest.[323]

---

[321]   Of course, plaintiffs would not be likely to suffer injury in the future if the NYPD no longer had a custom of making unlawful trespass stops outside TAP buildings.  But while defendants have introduced evidence of certain changes in the NYPD's policies and training in 2012, defendants have not proven that the NYPD's custom of making unlawful trespass stops outside TAP buildings has ended.  *See supra* Part IV.B.3; *infra* Part V.B.1.b.

[322]   *See* Pl. Findings ¶¶ 72–75.  The remedies proposed in this Opinion, though not identical to those requested by plaintiffs, remain largely mandatory in nature.  *See infra* Part V.C.

[323]   *See supra* Part II.

The following sections address each of these factors in turn.

## 1.      Clear or Substantial Likelihood of Success on the Merits

Because plaintiffs do not assert that defendants have an explicit or formally approved policy of making trespass stops without reasonable suspicion outside TAP buildings in the Bronx, plaintiffs must show a clear or substantial likelihood of proving at trial that defendants have a custom or usage of making such stops.  Specifically, plaintiffs argue that defendants "have a pattern and practice" of making unlawful trespass stops outside TAP buildings, and that "the City of New York has been deliberately indifferent" to this practice "by failing to supervise and train."[324]

My analysis of plaintiffs' claim proceeds in two steps.  *First*, I analyze plaintiffs' deliberate indifference claim and conclude that plaintiffs have shown a clear likelihood of establishing that defendants' longstanding failure to train officers regarding the legal standards for trespass stops outside TAP buildings in the Bronx, despite actual or constructive notice that this omission was causing city employees to violate individuals' constitutional rights, has risen to the level of deliberate indifference.  Whether plaintiffs' deliberate indifference claim is

---

[324]      Pl. Findings ¶¶ 69–70.  Plaintiffs present the former as a "constructive acquiescence" claim, and the latter as a deliberate indifference claim based on failure to train.  *See id.*  Because constructive acquiescence is merely a way of proving deliberate indifference, I analyze the claims together.

analyzed in terms of the general standard in *Connick*, the three-part *Walker*
standard, or the constructive acquiescence standard, plaintiffs have shown a clear
likelihood of success on their *Monell* claim.  *Second*, I analyze whether defendants
have rebutted plaintiffs' evidence of deliberate indifference based on the steps
taken by the NYPD in 2012.  I conclude that these steps have not meaningfully
addressed the specific problem of unconstitutional trespass stops outside TAP
buildings in the Bronx.

### a.    Deliberate Indifference

Applying the law of *Terry* stops to my findings of fact, above,
plaintiffs offered more than enough evidence at the hearing to support the
conclusion that they have shown a clear likelihood of proving at trial that the
NYPD has a practice of making unlawful trespass stops outside of TAP buildings
in the Bronx:

### i.    ADA Rucker's Testimony

As described above, ADA Rucker credibly testified that NYPD
officers have treated proximity to a TAP building as a factor contributing to
reasonable suspicion, and have frequently made trespass stops outside TAP
buildings for no reason other than that the officer had seen someone enter and exit

or exit the building.[325]  These stops were made *because* the building was enrolled in TAP, and they were not based on any reasonable suspicion of trespass.[326]  ADA Rucker's testimony is corroborated by the accounts of stops and arrests in the twenty-six decline to prosecute forms, as well as by the hundreds of UF-250s on which officers wrote "Clean Halls" as a justification for a stop.[327]  As discussed below, Dr. Fagan's analysis of UF-250s provides further corroboration of ADA Rucker's testimony.[328]

### ii.    Plaintiffs' Stops

The conclusion that the NYPD has repeatedly made trespass stops outside TAP buildings without reasonable suspicion is further supported by the credible and mutually corroborating testimony of named plaintiffs regarding the circumstances leading to their encounters with police.[329]  *First*, with the exception of Ledan's two police encounters, each of plaintiffs' encounters with the police constituted *Terry* stops requiring reasonable suspicion.  As Ledan's first encounter illustrates, it is possible for an officer to approach a person outside a TAP building

---

[325]    *See supra* Part IV.A.1.

[326]    *See id.*

[327]    *See* Tr. 10/15 at 124:18–24; Fagan Report at 13.

[328]    *See infra* Part V.B.1.a.iii.

[329]    *See supra* Part IV.A.2.

and ask the person her name, where she is coming from, whether she lives in the building, and if not, whether she knows anyone in the building, all the while acting in such a way that a reasonable person would feel free to terminate the encounter and go about her business.  But the other plaintiffs' testimony showed that many trespass-related encounters outside TAP buildings involve aggressive, coercive, and threatening police behavior that would not leave a reasonable person feeling free to terminate the encounter.

Bradley was stopped when an officer in a van gestured for him to come over, he came over, and the officer asked "What are you doing here?"[330] Turner was stopped when three officers approached and one "snatched the phone out of [his] hand,"[331] abruptly and aggressively ending his call and taking control of his property, without any request for permission to do so.  The stop continued as the officer asked Turner what he was doing and whether he lived in the building beside which he was standing.[332]  Turner was stopped a second time when a police car pulled up in front of him as he and others were exiting a Clean Halls building,

---

[330]     Tr. 10/16 at 266:3.

[331]     Tr. 10/17 at 477:8.

[332]     *See id.* at 478:13–22, 479:8–11.

an officer got out, questioned the group, and requested Turner's identification.[333]

J.G. was stopped when five officers approached him outside his building, stopped him, and asked him where he was coming from, where he was headed, and what he had in his bag. He was surely stopped when the officers made him raise his hands, frisked him, and searched inside his pockets and his grocery bag.[334] Jerome Grant was stopped when two officers approached with flashlights, questioned him and his friends to determine whether they were trespassing, and in response to questions from those who were stopped, replied with strong words such as "I'm the one that's talking here,"[335] and "hush up."[336] Roshea Johnson was stopped when a black van pulled up in front of him with police officers inside and one of them began questioning him about trespassing.[337] He was certainly stopped — and arrested — a moment later when he was placed in handcuffs in the back of the van.[338]

No reasonable person would have felt free to leave in these plaintiffs'

---

[333]    *See id.* at 486:9–490:25.

[334]    *See id.* at 437:17, 439:4–443:2.

[335]    *Id.* at 456:13.

[336]    *Id.* at 456:18–19.

[337]    *See id.* at 399:21–400:17.

[338]    *See id.* at 400:17–401:18.

circumstances once an officer or officers approached, caused the plaintiff to stop through a command, gesture, accusatory introduction, or by taking possession of the person's property, and then began asking questions that were clearly intended to elicit incriminating responses regarding trespassing.

Any doubt that these plaintiffs were free to leave after the commencement of intrusive investigatory questioning is resolved by looking to the instances in the decline to prosecute forms when suspects attempted to terminate their encounters. In one encounter, "the defendant attempted to walk away[,] at which time [the officer] grabbed the defendant[']s arms."[339] After a struggle, the defendant was arrested.[340] In another encounter, "[t]he arresting officer stopped defendant and defendant clenched his fists on his sides and spread his feet apart and . . . stated . . . YOU'RE NOT GOING TO TOUCH ME. YOU'RE NOT GOING TO TOUCH ME. YOU'RE NOT PUTTING YOUR HANDS ON ME."[341] The arresting officer then handcuffed the defendant and placed him in a patrol vehicle.[342] Similarly, when various defendants simply refused to answer an

---

[339]   App. A ¶ 12.

[340]   *See id.*

[341]   *Id.* ¶ 20.

[342]   *See id.*

officer's questions, it became clear that they were not free to terminate the encounter in this way either.[343]  In one encounter, the arresting officer "approached the defendant and asked her where she was coming [from], what was she doing in the building[,] and what apartment number was she visiting.  Defendant responded in sum and substance: I WAS VISITING A FRIEND.  I AM NOT TELLING YOU THE APARTMENT NUMBER OR THE NAME."[344]  The defendant was then arrested for trespass.[345]

The responses of the police officers as summarized in the decline to prosecute forms do not tell a surprising story.  Indeed, they are what a reasonable person would have expected under the circumstances.  When a person considers walking away from an officer who has stopped her and begun asking accusatory questions, it is objectively reasonable for the stopped person to believe that the officer will attempt to prevent her from doing so.  Persons who are stopped by the police in circumstances like those described by the plaintiffs (other than Ledan)

---

[343]   *See, e.g., id.* ¶¶ 4, 15, 22, 25, 26.  In *Davis*, I held that "the Fifth Amendment prohibits police from arresting an individual for refusing to provide 'testimonial' evidence."  *Davis*, 2012 WL 4813837, at *14.  Whether refusal to provide testimonial evidence may contribute to reasonable suspicion of trespass is a distinct issue, and one not raised by the parties at this stage of the litigation.

[344]   App. A ¶ 4.

[345]   *See id.*

103

reasonably conclude that they are *not* free to terminate the encounter.  As a result, such stops are *Terry* stops under the Fourth Amendment,  and *DeBour* Level 3 stops under New York state law, and require that the officer have a "reasonable suspicion" that criminal activity may be afoot.

 *Second*, all but two of the eleven encounters to which plaintiffs testified appear to have been based on suspicion of trespass, but lacked the reasonable suspicion of trespass needed to support a *Terry* stop.  The two exceptions are Jerome Grant's stop and Letitia Ledan's second encounter.[346]

### iii. Decline to Prosecute Forms

 There remains the question of how widespread the practice of unlawful stops was.  Plaintiffs argue that the decline to prosecute forms independently support the finding of a widespread practice of unlawful stops outside of TAP buildings.[347]  Their rather complicated argument proceeds as

---

[346] In Grant's case, his cousin's or his friend's knocking loudly and perhaps angrily on the door of a Clean Halls building may have provided a minimal level of objective justification for suspecting that Grant and the others were attempting to enter unlawfully.  *See supra* Part IV.A.2.d.  As noted above, Ledan initiated her second encounter, which was most likely consensual and thus did not require reasonable suspicion.  Even if the stop had been nonconsensual, under the circumstances her interest in the detention of her husband and friends may have provided adequate grounds for brief questioning.  *See supra* Part IV.A.2.f.

[347] *See* Pl. Findings ¶ 17.

follows:  *First*, plaintiffs assume the City's expert was correct in reporting that

approximately thirteen percent of the trespass stops analyzed by Dr. Fagan resulted

in arrest.[348]  From this, plaintiffs infer a rough, general rule that thirteen percent of

trespass stops in the Bronx in 2011 resulted in arrest — or in other words, for every

recorded trespass *arrest*, there were roughly 7.7 trespass *stops*.[349]  *Second*, in three

randomly selected months in 2011, the Bronx DA's office produced at least

twenty-six decline to prosecute forms describing arrests that were apparently based

only on a person entering or exiting a TAP building.[350]  Because entry or exit from

a TAP building does not provide reasonable suspicion, there were at least twenty-

six arrests in the three sample months that were preceded by stops that were not

based on reasonable suspicion.  *Third*, if the twenty-six decline to prosecute forms

reflect only thirteen percent of the suspicionless trespass stops outside TAP

---

[348]     *See* Smith Report at 6.

[349]     *See* Pl. Findings ¶ 17.

[350]     *See supra* Part IV.A.1.  In the absence of more detailed evidence or
testimony regarding the initial police encounters described in the decline to
prosecute forms, I assume that the encounters were likely similar to those
described by plaintiffs, and thus that the intrusiveness of the encounters likely rose
to the level of a *Terry* stop at or shortly after the time that the officer or officers
initiated questioning.  *See generally* App. A.  I also note that in many of the
encounters described in the decline to prosecute forms, the defendant's behavior as
described in the form never gave rise to reasonable suspicion, even after the stop
began.  *See* App. A ¶¶ 2, 3, 8, 11, 12, 16, 17, 21, 24.

buildings in the three sample months in 2011, and if the sample months were representative of the year, then eight hundred trespass stops took place outside TAP buildings in the Bronx in 2011 without reasonable suspicion.[351]

Assuming as I do that the decline to prosecute forms contain largely accurate descriptions of stops, plaintiffs' reasoning is persuasive.  If anything, plaintiffs undercount the number of suspicionless stops suggested by the decline to prosecute forms.  Dr. Smith's thirteen percent figure is the arrest rate for *all* the trespass stops outside TAP buildings in Dr. Fagan's study, including both stops based on and stops lacking reasonable suspicion.[352]  Common sense would suggest, however, that the arrest rate for stops lacking reasonable suspicion — for example, stops based on nothing more than a person exiting a TAP building — should be significantly lower than the combined arrest rate for lawful and unlawful stops. The lower the arrest rate for unlawful stops, the higher the number of unlawful stops that would be required to generate twenty-six arrests based on such stops.  If the arrest rate for unlawful stops were five percent, for example, the existence of twenty-six arrests in three months based on unlawful stops would imply a yearly

---

[351]    I have altered plaintiffs' calculations to account for the two decline to prosecute forms containing revisions of other forms.  *See supra* Part IV.A.1.

[352]    *See* Smith Report at 6.  Dr. Fagan calculated arrest rates (or, as he called them, "hit rates") in *Floyd*, but does not appear to have done so in the instant case.  *Compare Floyd*, 861 F. Supp. 2d at 284–85, *with* Fagan Report.

total of more than two thousand (2,080) unlawful stops.

### iv.   Dr. Fagan's Analysis

Dr. Fagan's analysis of the UF-250 database provides further evidence that plaintiffs have a clear likelihood of being able to prove at trial that the NYPD's practice of unlawful stops was widespread.  In order to understand Dr. Fagan's claim that 1,044 trespass stops within his set apparently lacked reasonable suspicion, it is necessary to understand the basic features of a UF-250 form.[353]  I have included a copy of a blank UF-250 form as Appendix B to this Opinion.

The UF-250 form has two sides.[354]  On Side 1 there is a section labeled "What Were Circumstances Which Led To Stop? (MUST CHECK AT LEAST ONE BOX)."  Inside the section are several boxes that officers may check, such as "Fits Description" and "Actions Indicative of Acting As A Lookout."  There is also a checkbox for "Other Reasonable Suspicion Of Criminal Activity (Specify)" (the "Other" box) that officers can check and then supplement with a handwritten note.  On the back of the form, Side 2, there is a section labeled "Additional Circumstances/Factors: (Check All That Apply)."  Inside this section there are other checkboxes, such as "Report From Victim/Witness" and "Evasive,

---

[353]   *See* Fagan Report at 15 & tbl.8; App. L to Fagan Report ("Stop Factor List"), Pl. Ex. 64.

[354]   *See* App. B.

107

False Or Inconsistent Response To Officer's Questions."  As noted above, officers are required to record all the reasons justifying a stop.[355]

In an appendix to Dr. Fagan's report, he lists the combinations of factors from UF-250 forms that he counted as indicative of a stop apparently lacking reasonable suspicion of trespass.[356]  The list descends from the most common combinations of factors to the least common.[357]  On all of the forms that Dr. Fagan identified as apparently lacking reasonable suspicion, the officer had checked at most one of the listed "circumstances" on Side 1.[358]  In some cases the officer had also checked the "Other" box on Side 1 and handwritten a text string, which Dr. Fagan also analyzed.[359]

The most frequent combination of stop factors identified by Dr. Fagan as apparently inadequate were "Furtive Movements" (Side 1) and "Area Has High

---

[355]    *See* Def. Findings ¶ 4 ("NYPD training evidence . . . clearly identifies that its officers are instructed to include *all* circumstances leading to the stop on the worksheet[.]" (citing Tr. 10/15 at 86:12–87:2)); Tr. 10/19 at 849:13–19 (testimony of Chief Shea); Police Student's Guide at 20.

[356]    *See* Fagan Report at 15 & tbl.8; Stop Factor List.

[357]    *See* Stop Factor List at 1.  The final four pages of the six page list contain the many allegedly inadequate combinations that appeared on only one UF-250.  *See id.* at 3–6.

[358]    *See* Fagan Report at 11–15.

[359]    *See id.*

Incidence Of Reported Offense Of Type Under Investigation" (Side 2), referred to in Dr. Fagan's shorthand as the "High Crime Area" box.[360]  On ninety-one forms, these two factors were the only recorded basis for the stop.[361]

Of the 1,044 trespass stops that Dr. Fagan identified as apparently unlawful, 503 were based on the ten most frequent combinations of stop factors.[362] In each of these ten combinations, which offer a manageable illustration of Dr. Fagan's assumptions, the officer filling out the form recorded only the following basis for the trespass stop.  *First*, on Side 1, the officer offered one of the following three factors:

1) "Furtive Movements."

2) "Other Reasonable Suspicion Of Criminal Activity (Specify)" (the "Other" box), and a text string referring to "Clean Halls," "Trespass," or both as the sole notation.[363]

---

[360]    *See* Stop Factor List at 1.

[361]    *See id.*

[362]    *See id.*

[363]    *See* Fagan Report at 13 (explaining "Clean Halls/Trespass" category); "detailSA Stop Factor Analysis" ("'Other' Text Strings"), App. F to Fagan Report at 5–6 (listing the text strings in this category, including "CLEAN HALLS," "CLEAN HALLS BLDG," "CRIM TRES," and "CLEAN HALLS PROGRAM-CRIM TRES").

3) The "Other" box and words indicating the suspect was observed exiting the building.[364]

*Second*, on Side 2, under "Additional Circumstances/Factors," the officer either checked no box, or offered one of the following five justifications:

1) High Crime Area.

2) "Time Of Day, Day Of Week, Season Corresponding To Reports Of Criminal Activity" (the "Time of Day" box).

3) Both High Crime Area and Time of Day.

4) "Proximity To Crime Location" (the "Proximity to Scene" box).

5) "Changing Direction At Sight Of Officer/Flight" (the "Change Direction" box).

Standing alone, Dr. Fagan's categorizations leave a great deal of room for skepticism. The Supreme Court has "recognized that nervous, evasive behavior is a pertinent factor in determining reasonable suspicion."[365] It is possible to

---

[364] *See* "Other" Text Strings at 7–8 (listing text strings in the "Observed Exit" category, including many variations on the phrase "EXITING CLEAN HALLS BUILDING").

[365] *Wardlow*, 528 U.S. at 124 (citing numerous cases). On the other hand, "furtive behavior absent additional indicia of suspicion generally does not suffice to establish reasonable suspicion." *United States v. Bellamy*, 592 F. Supp. 2d 308, 318–19 (E.D.N.Y. 2009) (collecting cases). In *Bellamy*, the court held that the following stop factors did not give rise to reasonable suspicion that Bellamy was trespassing in a building:

imagine scenarios in which an officer observing behavior that would probably give rise to reasonable suspicion might reasonably record that behavior by checking nothing more than "Furtive Movements."  For example, an officer might observe a person standing nervously outside a TAP building, pretending to walk away whenever others approach, then returning after they are gone, and finally entering the building without a key, nervously looking both ways before opening the door. I also note that in each of the twenty stops where the officer checked "Change Direction" on Side 2, the officer also checked "Furtive Movement" on Side 1.[366]  If these forms were based on an officer seeing someone engage in the behavior described above, and then run away at the sight of the officer, the officer almost certainly had reasonable suspicion of trespass.[367]

---

> (1) the officers' knowledge that the . . . building was located in a high-crime, drug-prone neighborhood; (2) the officers' knowledge that the . . . building had experienced problems with drug trafficking and trespassing; (3) the officers' understanding that the building had participated in FTAP; (4) Bellamy's presence in the [building's] vestibule; (5) the presence of the supposed "crack addict" outside of the . . . building; and (6) Bellamy's furtive gestures.

*Id.* at 317.

[366]    *See* Stop Factor List.

[367]    *See Floyd*, 861 F. Supp. 2d at 298 (discussing *Wardlow*, which "held that a defendant's 'presence in an area of heavy narcotics trafficking' and 'unprovoked flight upon noticing the police' were together sufficient to raise

111

On the other hand, there are good reasons to doubt that most, or even many, of the forms marked with the combinations listed above were in fact based on such suspicious behavior. *First*, many of the 503 forms in the top ten on Dr. Fagan's list contain stop factor combinations providing no basis whatsoever for reasonable suspicion. 205 of these forms simply indicate that the person was stopped outside a Clean Halls building, or for criminal trespass, neither of which explains why the officer's suspicion was *reasonable*; or that the person was observed exiting, which also contributes nothing to reasonable suspicion; and that the stop took place in a high crime area and/or at a suspicious time of day, neither of which can establish reasonable suspicion in the absence of some additional contributing factor.[368] Thus, at a bare minimum, over two hundred of the five hundred stops at the top of Dr. Fagan's list provide no basis for a finding of suspicious behavior.

*Second*, Dr. Fagan reported that in his original universe of stops, officers had checked the Other box on nearly forty percent of the UF-250 forms.[369]

_____

reasonable suspicion and justify a stop" (quoting *Wardlow*, 528 U.S. at 124)).

[368]    "Reasonable articulable suspicion does not exist merely on the basis of [High Crime Area and Time of Day]: many people live in high crime areas and many crimes occur at night; simply being in a high crime area at night is not suspicious behavior." *Floyd*, 861 F. Supp. 2d at 298 (citations omitted).

[369]    *See* Fagan Report at 11.

Officers were clearly willing and able to describe suspicious behavior when they observed it.[370]  In fact, officers frequently took the time to write notes that do not contribute to reasonable suspicion.[371]  Given the evident eagerness of officers to check the Other box and write notes — even when they had no basis for doing so — it is doubtful that many officers observed the kind of highly suspicious behavior hypothesized above and then merely checked the Furtive Movements box.[372]

   *Third*, as Dr. Fagan notes, when police officers are in an area where they are primed to look for signs that "crime is afoot," they may be more likely to perceive a gesture as an indicator of criminality.[373]  Recent psychological research

---

[370] *See, e.g.*, "Other" Text Strings at 7 ("Observed Entry" text strings including, for example, "RAN INTO BLDG").  The NYPD Legal Bureau's PowerPoint presentation at Rodman's Neck contains a number of examples of concise, easily written descriptions of furtive behavior that could give rise to reasonable suspicion.  *See* Street Encounters Presentation at 22–23.

[371] *See id.* (listing text strings accompanying checked Other boxes).

[372] In addition, many behaviors that would, like the behaviors hypothesized above, lead to a suspicion of trespass would presumably also provide grounds to check "Actions Indicative [o]f 'Casing' Victim Or Location" or "Actions Indicative of Acting As A Lookout" on Side 1.  *See* App. B.

[373] *See* Fagan Report at 11 n.12 (citing Robert J. Sampson & Steven W. Raudenbush, *Seeing Disorder: Neighborhood Stigma and the Social Construction of "Broken Windows"*, 67 SOC. PSYCHOL. Q. 319 (2004); Geoffrey P. Alpert, John M. MacDonald, & Roger G. Dunham, *Police Suspicion and Discretionary Decision Making During Citizen Stops*, 43 CRIMINOLOGY 407 (2005)).

has provided evidence of such cognitive distortions.[374]  Thus the category of Furtive Movements may be inherently prone to overuse on UF-250s.  Given the nature of their work on patrol, officers may have a systematic tendency to see and report furtive movements where none *objectively* exist.[375]

Dr. Fagan raised further doubts in *Floyd* regarding the general validity of assuming reasonable suspicion based on Furtive Movements.[376]  Dr. Fagan's report in *Floyd* showed that "the *arrest rates* in stops where the high crime area or furtive movement boxes are checked off is actually *below* average."[377]  Officers may have a tendency to check these boxes when they are unable to articulate any other basis for a stop — perhaps because the suspicion leading to the stop was, in fact, not reasonable.

Defendants attack the accuracy of Dr. Fagan's categorization scheme

---

[374]    *See id.*  Indeed, this is an area in which further training may be highly beneficial.

[375]    *See Bayless*, 201 F.3d at 133 ("Reasonable suspicion is an *objective* standard; hence, the subjective intentions or motives of the officer making the stop are irrelevant." (emphasis added)).

[376]    *See Floyd*, 861 F. Supp. 2d at 284–85; Fagan Report at 11 n.12 (citing Dr. Fagan's report in *Floyd*).

[377]    *Floyd*, 861 F. Supp. 2d at 285 (emphasis added).

in various ways.[378]  *First*, defendants criticize Dr. Fagan for neglecting to factor

into his analysis a field on Side 1 of the UF-250 form labeled "Period Of

Observation Prior To Stop."[379]  Though defendants' reasoning is not explicit, I take

it they assume that a long enough period of observation, combined with some of

the stop factor combinations in Dr. Fagan's list of unlawful stops, might justify

removing a stop from the list.[380]  *Second*, defendants' expert noted a few dozen

text strings accompanying the Other box that Dr. Fagan included in his count of

unlawful stops but that defendants argue could justify a *Terry* stop.[381]  For

example, Dr. Fagan categorized "RAN INTO BLDG" as an instance of an

observed entry into a TAP building, and thus not a basis for a stop.[382]  *Third*,

---

[378]    *See* Def. Findings ¶¶ 6 ("Period of Observation"), 8 (metacategories
for "Other" text strings), 9 ("Furtive Movements," "Ongoing Investigation").

[379]    *See id.* ¶ 6; App. B.

[380]    *See* Def. Findings ¶ 6.  According to the UF-250 database, in sixty-
five percent of the trespass stops outside TAP buildings in the Bronx in 2011, the
Period of Observation was less than one minute, and in eighty-four percent of
those stops, the period of observation was less than two minutes.  *See* Period of
Observation Table.  Only five of the 1,044 unlawful stops identified by Dr. Fagan
involved periods of observation of greater than ten minutes.  *See* Table 15:
Distribution of Period of Observation, Pl. Ex. 99.

[381]    *See* Def. Findings ¶ 8; Smith Report at 34–39.  Neither Dr. Smith nor
defendants offer a total of the number of stops contested by Dr. Smith in this way.
Plaintiffs state that Dr. Smith identified thirty-six stops with contestable text
strings out of Dr. Fagan's 1,044.  *See* Pl. Findings ¶ 12.

[382]    *See* Smith Report at 34–35.

defendants argue that Dr. Fagan's list of unlawful stops should not have included the forty-one stops in which an officer marked Furtive Movement on Side 1 and a box on Side 2 labeled "Ongoing Investigations, e.g., Robbery Pattern" (the "Ongoing Investigations" box).[383]

Rather than addressing each of these claims individually, it is enough to note that even if the one hundred forty-three stops involving observation periods over two minutes, the thirty-six stops with contestable text strings, and the forty-one stops with both Furtive Movements and Ongoing Investigations marked were excluded from Dr. Fagan's grand total of 1,044 unlawful stops, the total would still show that out of the 1,663 stops in Dr. Fagan's revised set of trespass stops outside TAP buildings in the Bronx in 2011, over eight hundred (824) were unconstitutional. That is, even if defendants' arguments on these points are accepted — and I am not convinced that they should be — Dr. Fagan's report would still show that on hundreds of occasions in the Bronx in 2011, people were stopped without basis outside of TAP buildings, in violation of their rights under the U.S. Constitution, and required to answer questions from an officer with the power to arrest them if they answered incorrectly.

The essential fact, sufficiently established by Dr. Fagan's analysis

---

[383]    *See* Def. Findings ¶ 9; App. B.

when viewed in combination with the other evidence discussed above, is that a very large number of constitutional violations took place outside TAP buildings in the Bronx in 2011.  Whether the percentage of trespass stops that were unconstitutional was thirty or sixty, and whether one assumes that officers failed to fill out UF-250s ten, twenty, or fifty percent of the time, plaintiffs have succeeded in showing a clear likelihood that they will be able to prove that the City of New York and its agents displayed deliberate indifference toward the violation of the constitutional rights of hundreds and more likely thousands of individuals prior to 2012.

### v.    Notice to Defendants

By 2011 city policymakers were on actual notice of a practice of unconstitutional trespass stops by city employees outside TAP buildings in the Bronx.[384]  As early as 1999, the NYPD Legal Bureau was aware that it was unlawful to stop someone simply for entering and exiting a TAP building.[385]  By July 2010, as Inspector Sweet testified, the NYPD was on actual notice that officers were unlawfully approaching people entering or inside TAP buildings to

---

[384]    *See supra* Part IV.B.1.

[385]    *See* 1999 TAP Legal Guidelines at 6; Tr. 10/18 at 684:2–4.

question them about their presence.[386]  The special counsel to Commissioner Kelly attended meetings where the problem was discussed.[387]  In February 2011, a number of NYPD officials received letters from ADA Rucker on behalf of the Bronx DA's office clarifying the unconstitutionality of stopping people merely for entering or exiting a TAP building.[388]  Throughout this period, the NYPD received copies of decline to prosecute forms describing arrests in which officers apparently stopped people for no reason other than their proximity to a TAP building.[389]

### vi.   Legal Analysis

Deliberate indifference is "a stringent standard of fault,"[390] especially when it is based on a failure to train.[391]  Nevertheless, "deliberate indifference may be inferred where 'the need for more or better supervision to protect against constitutional violations was obvious,' but the policymaker 'fail[ed] to make

---

[386]   *See* Tr. 10/18 at 648:18–649:16.

[387]   *See id.* at 650:18–651:17.

[388]   *See id.* at 659:20–660:17.

[389]   *See* Tr. 10/16 at 256:8–13.

[390]   *Connick*, 131 S.Ct. at 1360.

[391]   *See id.* at 1359 (citing *Tuttle*, 471 U.S. at 822–23).

118

meaningful efforts to address the risk of harm to plaintiffs[.]'"[392]

Based on the conclusions above, plaintiffs have shown a clear likelihood of proving deliberate indifference under any of the prevailing ways of framing that standard. Stated in terms of *Connick*'s general standard for failure-to-train claims, plaintiffs have shown a clear likelihood of proving that city policymakers were on actual notice by 2011, and constructive notice prior to then, that the failure to train NYPD officers regarding the legal standard for trespass stops outside TAP buildings in the Bronx was causing city employees to violate the constitutional rights of a large number of individuals.[393] Stated in terms of the three-part *Walker* test for deliberate indifference through failure to train, plaintiffs have shown a clear likelihood of proving (1) city policymakers knew to a moral certainty that NYPD officers, who regularly patrol in and around TAP buildings in the Bronx, would confront the question of when it was legally permissible to stop people outside those buildings; (2) the decline to prosecute forms, ADA Rucker's letters, and the hundreds of UF-250 forms that failed to articulate reasonable suspicion for trespass stops outside TAP buildings provided an extensive record of NYPD officers mishandling these stops; and (3) when NYPD officers made the

---

[392]    *Cash*, 654 F.3d at 334 (quoting *Reynolds*, 506 F.3d at 192; *Vann*, 72 F.3d at 1049).

[393]    *See Connick*, 131 S.Ct. at 1359.

wrong choice in these stops, the deprivation of constitutional rights frequently resulted.[394]  Thus, plaintiffs have shown a clear likelihood of proving that city policymakers should have known that their inadequate training and supervision regarding trespass stops outside TAP buildings in the Bronx was "'so likely to result in the violation of constitutional rights,'" that their failure to train constituted deliberate indifference.[395]  Stated in terms of the constructive acquiescence standard, plaintiffs have shown a clear likelihood of proving that there was "a sufficiently widespread practice among police officers" of unlawful trespass stops outside TAP buildings "to support reasonably the conclusion that such abuse was the custom of the officers," and that "supervisory personnel must have been aware of it but took no adequate corrective or preventive measures."[396]

In fact, plaintiffs presented some evidence suggesting that the practice of making stops outside TAP buildings without regard for reasonable suspicion might have been "so persistent and widespread as to practically have the force of law."[397]  In addition to the sheer magnitude of apparently unlawful stops, ADA

---

[394]   *See Walker*, 974 F.2d at 297–98.

[395]   *Id.* at 298 (quoting *Canton*, 489 U.S. at 390).

[396]   *Jones*, 691 F.3d at 82.

[397]   *Connick*, 131 S.Ct. at 1359.

Rucker offered testimony suggesting that prior to her legal research into the standards governing stops outside TAP buildings, she had been explicitly advising officers that it was permissible to stop a person simply because he had exited a TAP building, so long as the officer had observed the person in the vestibule first.[398]  Even defendants seemed to recognize that the similarities among the stops described in this case support the conclusion that officers' behaviors were the result of uniform training.[399]

> **b.    Failure to Rebut Deliberate Indifference Claim Based on Steps Taken by NYPD in 2012**

Defendants spent a great deal of time at the hearing introducing evidence concerning steps the NYPD took in 2012 to improve TAP and provide training regarding stop and frisk practices.[400]  Yet in spite of receiving actual notice of NYPD officers carrying out widespread constitutional violations outside TAP buildings, and in spite of already being engaged in changes to the TAP program and the training related to stop and frisk more generally, the NYPD has failed to take meaningful action to address the *specific* and narrow problem at issue in this

---

[398]    *See* Tr. 10/15 at 176:14–23.

[399]    *See* Def. Findings ¶ 29 n.16 ("Defendants contend that any similarity in the interactions [between officers and plaintiffs] demonstrates that officers are being uniformly trained.").

[400]    *See supra* Part IV.B.

case:  the problem of unconstitutional trespass stops *outside* TAP buildings in the Bronx.  To date, as noted above, the only piece of instruction that has been provided to officers on a systematic basis and that specifically targets the problem at issue in this case is a single bullet point in a single slide show during a single part of the Rodman's Neck training.[401]  This has been the NYPD's most meaningful specific response to the problem that caused Charles Bradley's unlawful stop and arrest, Abdullah Turner's unlawful stop and arrest, the unlawful stop of J.G. that led Jaenean Ligon to fear for her son's life, Roshea Johnson's stop and interrogation in an unmarked NYPD van, all the other indignities that the other plaintiffs were obliged to suffer, and the hundreds of other unlawful stops, recorded and unrecorded, whose precise details this Court will never know.

The Rodman's Neck bullet point is plainly insufficient to rebut plaintiffs' showing of a clear likelihood of success on the merits of their deliberate indifference claim.  Nor did defendants provide reliable statistics regarding stops in 2012 that might have rebutted plaintiffs' claim.  Defendants have provided no evidence that the NYPD has ceased its practice of making unlawful trespass stops outside TAP buildings in the Bronx.

The evidence introduced by defendants of broader reforms to TAP

---

[401]     *See* Street Encounters Presentation at 40; Tr. 10/17 at 572:24–573:6; Tr. 10/18 at 663:13–664:1.

and stop and frisk undertaken by the NYPD in 2012 also does not rebut plaintiffs'
case that city policymakers have displayed deliberate indifference to an ongoing
practice of constitutional violations by city employees based on unlawful stops
outside TAP buildings.  To the contrary, many of the training materials introduced
by defendants may serve to further entrench the problem of these unconstitutional
stops.  In some cases, defendants' introduction of training materials not only failed
to rebut plaintiffs' case, but made plaintiffs' case stronger.

Most strikingly, within the last year the NYPD has produced a video
on stop and frisk that has now been shown in every precinct.[402]  Chief Shea
testified that "it would be fair to say that every single member of a patrol borough
has probably" seen the video by now.[403]  The video, whose script was also entered
into evidence, begins by briefly summarizing the four levels of police encounters
recognized by New York state courts.  Then the video provides the following
description of what constitutes a stop requiring reasonable suspicion, that is, a
*Terry* stop:

Your authority to conduct a Stop Question and Frisk

---

[402]    *See* Tr. 10/19 at 900:21–904:20; Tr. 10/22 at 942:13–24; SQF
Training Video No. 5; Script of SQF Training Video No. 5.

[403]    *See* Tr. 10/22 at 22–24.  Chief Shea also testified that the information
in the video is "consistent with the training that recruit officers receive at the
academy" regarding reasonable suspicion.  *See* Tr. 10/19 at 904:16–20.

encounter is limited to public places within the City of New York.
. . . A forcible stop can take many different forms. It can be
constructive in nature, such as using verbal commands or blocking
a subject's path. Or it could be an actual stop, such as grabbing or
holding the subject.

      The courts will look to an officer's actions in making this
determination. They consider: if the officer's gun was drawn; if
the person was physically prevented from moving; the number
and tone of verbal commands; the content of the commands; the
number of officers present; and the location of the encounter.

      Usually just verbal commands, such as STOP, POLICE!!!,
will not constitute a seizure. However, a verbal command, *plus
other actions* may be considered a seizure — other actions, such
as: using physical force to subdue a suspect; physically blocking
a suspect's path; grabbing a suspect by the arm, shirt or coat;
pointing a gun at a suspect; using an ASP or baton to contain a
suspect; or placing a suspect against a wall or on the ground.[404]

This misstates the law. It is incorrect in its specific claim that if an officer yelled

"STOP, POLICE!!!" and the person stopped, the result would not "[u]sually"

constitute a *Terry* stop.[405] Indeed, it is difficult to imagine many contexts in which

---

[404]    Script of SQF Training Video No. 5 at 58–59 (formatting altered),
beginning at roughly 6:35 in SQF Training Video No. 5.

[405]    Perhaps the video reflects a misunderstanding of the Supreme Court's
ruling in *Hodari D.*, 499 U.S. at 626–28. *Cf.* Def. Findings ¶ 42 n.19 (citing
*Hodari D.*). In *Hodari D.*, the Court explained that the word "seizure" "does not
remotely apply . . . to the prospect of a policeman yelling 'Stop, in the name of the
law!' at a fleeing form that continues to flee. That is no seizure." *Id.* at 626. The
Court's point was that there is no seizure unless the individual is in fact *seized*, in
the sense of being *stopped*, either by physical force, or by submission to the
assertion of the officer's authority — *not* that a *Terry* stop requires a display of
authority beyond shouted commands. *See Swindle*, 407 F.3d at 572 (interpreting
*Hodari D.*).

124

an officer shouting this command, followed by the person stopping, would *not* constitute a *Terry* stop.  As noted above, the test for a *Terry* stop is whether "a reasonable person would feel free 'to disregard the police and go about his business.'"[406]  If the "reasonable person" of Fourth Amendment law would feel free to disregard an officer yelling "STOP, POLICE!!!" and go about his business, then this "reasonable person" bears little or no resemblance to the many reasonable people who have been or will be affected by the NYPD's stop and frisk practices.

The video is also incorrect in its more general suggestion that an officer must deploy something resembling physical force or the threat of such force in order for an encounter to constitute a stop.  It is true that *Terry* stops are sometimes referred to as "forcible stops."[407]  But the test for a *Terry* stop, again, is not the use of force:  it is whether a "reasonable person" would feel free "'to disregard the police and go about his business.'"[408]  The Second Circuit has held, for example, that a stop took place where an officer twice ordered a person to "hold on a second," and after the second order the person stopped.[409]  The Second Circuit

---

[406]   *Bostick*, 501 U.S. at 434 (quoting *Hodari D.*, 499 U.S. at 628).

[407]   *See, e.g.*, *Alabama v. White*, 496 U.S. 325, 328 (1990) (referring to *Terry* stop as "forcible stop").

[408]   *Bostick*, 501 U.S. at 434 (quoting *Hodari D.*, 499 U.S. at 628).

[409]   *Simmons*, 560 F.3d at 101, 105–06.

125

also held that a stop occurred where an officer pointing a spotlight at a person said, "What, are you stupid?  Come here.  I want to talk to you," and then told the person to show his hands.[410]  In *Davis*, the City of New York conceded, and I held, that a person was stopped when he encountered an officer in a stairway, the officer asked if he lived in the building, the officer asked for his ID, and then the officer asked him to step out of the stairwell and into the lobby.[411]  I also held in *Davis* that a person was stopped "when she attempted to walk to the elevator, was told to 'come back' by [an officer], and stopped walking," because the officer's "order to 'come back' was an order to stop and [she] obeyed the order."[412]

The Second Circuit held more than twenty years ago, in a case that remains good law, that the following factors are indicative of a "seizure," which can mean either an arrest or a *Terry* stop:

> the threatening presence of several officers; the display of a weapon; the physical touching of the person by the officer; language or tone indicating that compliance with the officer was compulsory; prolonged retention of a person's personal effects, such as airplane tickets or identification; and a request by the

---

[410]   *Brown v. City of Oneonta, N.Y.*, 221 F.3d 329, 340 (2d Cir. 2000).  On the other hand, the court held that where a person encountered two officers in his dorm lobby, and the officers asked him to show them his hands, he was not seized. *See id.* at 341.

[411]   *See Davis*, 2012 WL 4813837, at *5–6.

[412]   *Id.* at *14.

officer to accompany him to the police station or a police room.[413]
Because the yelled command "STOP, POLICE!!!" contains both language and a
tone indicating that compliance is compulsory, the NYPD's video is incorrect to
suggest that other actions would usually be required for an encounter to constitute
a *Terry* stop. Indeed, some of the "other actions" described by the NYPD's video
— "using physical force to subdue a suspect; physically blocking a suspect's path;
grabbing a suspect by the arm, shirt or coat; pointing a gun at a suspect; using an
ASP or baton to contain a suspect; or placing a suspect against a wall or on the
ground"[414] — go significantly beyond the level of coercion suggested by the
Second Circuit's list of factors that define a *Terry* stop. While any evaluation of
whether a *Terry* stop has taken place requires consideration of the totality of the
circumstances, it is clear that the NYPD's video conflicts with the Second Circuit's
guidance: there is a certain range of conduct that a viewer of the video would
identify as insufficiently coercive to constitute a *Terry* stop, while a reader of the
Second Circuit's list would identify the same conduct as falling squarely within the
parameters of a *Terry* stop.

By raising the *Terry* bar above where it was set by the Second Circuit,

---

[413]    *United States v. Glover*, 957 F.2d 1004, 1008 (2d Cir. 1992) (quoting
*Lee*, 916 F.2d at 819).

[414]    Script of SQF Training Video No. 5 at 58–59.

127

the NYPD trains its officers that they do not need reasonable suspicion to engage in conduct that the Second Circuit would identify as sufficiently coercive to qualify as a *Terry* stop.  In other words, the NYPD's video, which was produced in 2012, which has now been seen by nearly every officer in the patrol bureau, and which defendants continue to present as a sign of their lack of deliberate indifference,[415] trains officers that it is acceptable to engage in conduct that amounts to a *Terry* stop without reasonable suspicion.

The Chief of Patrol Field Training Unit Program Guide, which is distributed to supervisors in Operation IMPACT,[416] also reflects the tendency of NYPD training materials to exaggerate how intrusive a police encounter must be in order to constitute a *Terry* stop.  The Guide states that with something less than reasonable suspicion,[417] an officer may approach a person and engage in "pointed, invasive, and accusatory" questioning that is "intended to elicit an incriminating response," and even "ask for permission" to search the person.[418]  While "[t]he

---

[415]    *See* Def. Findings ¶ 42.

[416]    *See* Tr. 10/19 at 744:2–6.

[417]    Using the language of *De Bour* Level 2, not Level 3, the Training Guide requires a "founded suspicion that criminal activity is afoot" in order to approach and engage in an encounter of this kind.  *See* Training Guide at 17.

[418]    *Id.* (emphases omitted).  The Guide clarifies that the officer "may not touch the person, display a weapon, or act in a threatening manner," but notes that

Fourth Amendment does not proscribe all contact between the police and citizens,"[419] it is difficult to imagine many circumstances in which a reasonable person being aggressively interrogated by the police regarding suspected criminal activity could feel free "'to disregard the police and go about his business.'"[420] The more realistic outcome would be for the person to assume that if he refused to answer, walked away, gave the wrong answers, or made a false move, serious consequences would follow.[421] As Abdullah Turner testified, "I don't know anyone . . . who ever just walked away from a cop in the middle of a conversation."[422] Given the high stakes of any encounter in which an officer interrogates someone regarding his suspected criminal activity, it is fanciful to say that a reasonable person would as a rule feel free in the midst of such an

---

"[i]f a confronted citizen walks away without answering, the officer may follow to continue questioning." *See id.* at 17–18.

[419]    *Delgado*, 466 U.S. at 215.

[420]    *Bostick*, 501 U.S. at 434 (quoting *Hodari D.*, 499 U.S. at 628).

[421]    Indeed, based on the accounts of stops in the decline to prosecute forms, this appears to be an accurate expectation. *See* App. A ¶¶ 12, 20, discussed below. Moreover, it would not be surprising to learn that based on the experiences of their families, friends, and neighbors, the residents of these buildings fully appreciate the consequences that will follow if they attempt to walk away from the police during questioning.

[422]    Tr. 10/17 at 491:22–23.

interrogation to "'terminate the encounter'"[423] at will.

A lesson on TAP that was added to the Guide in 2012 similarly reflects a model of policing in which the investigative questioning of suspects routinely *precedes* rather than *follows* reasonable suspicion:

> A uniformed member of the service <u>may not</u> stop (temporarily detain) a suspected trespasser unless the uniformed member reasonably suspects that the person is in the building without authority. . . . Some factors which may contribute to "reasonable suspicion" that a person is trespassing . . . are contradictory assertions made to justify presence in the building and/or assertions lacking credibility made to justify presence in the building.[424]

---

[423]   *Drayton*, 536 U.S. at 202 (quoting *Bostick*, 501 U.S. at 436).

[424]   Training Guide at 65; Tr. 10/19 at 743:6–7.  I recognize that many of the NYPD's training materials purport to derive from *De Bour*, as defendants have emphasized.  *See, e.g.*, Def. Findings ¶ 42 & n.19.  Because plaintiffs have brought their case under the Fourth Amendment, and not New York law, Pl. Findings ¶¶ 64–71, it would lie beyond the scope of this Opinion to make general statements regarding the precise relations between the law of *De Bour* and the case law interpreting the Fourth Amendment.  I note, however, that in theory, *De Bour* should provide *greater* protection than the Fourth Amendment by restricting police action even in encounters whose level of invasiveness falls below the minimum threshold for Fourth Amendment scrutiny.  *See, e.g.*, *De Bour*, 40 N.Y.2d at 381 (prohibiting any investigative encounter, even at Level 1, if it is based on "intent to harrass" or "mere whim, caprice, or idle curiosity").

Some commentators have expressed skepticism regarding the practical virtues of *De Bour*'s multi-level analysis.  LaFave questions whether *De Bour*'s more sophisticated articulation of *Terry*'s balancing approach is advantageous, or is likely to result in "such confusion and uncertainty that neither police nor courts can ascertain with any degree of confidence precisely what it takes to meet any of these standards."  LAFAVE, SEARCH & SEIZURE § 9.4(e).  *Accord* Emily J. Sack, *Police Approaches and Inquiries on the Streets of New York: The Aftermath of*

Instead of reasonable suspicion providing a basis for investigative questioning, the NYPD's training materials suggest that the standard scenario is for investigative questioning to lead to reasonable suspicion. The NYPD Legal Bureau's PowerPoint presentation at Rodman's Neck similarly suggests that even when an officer lacks reasonable suspicion for a stop, the officer may not only approach and ask accusatory questions, but during the encounter may "place [his] hand on [his] holstered firearm" or "draw and conceal" his weapon, all without escalating the encounter to a *Terry* stop.[425]

What is most troubling about these materials is not the suggestion that

---

*People v. De Bour*, 66 N.Y.U. L. REV. 512, 520, 548–53 (1991) (arguing that "the courts routinely conflate the *De Bour* standards and use inappropriately low levels of suspicion to justify police intrusions," and that "the multitiered structure of the *De Bour* model allows inadequately justified low-level intrusions to escalate quickly into inappropriate forcible stops and arrests"). *See also* Anthony G. Amsterdam, *Perspectives on the Fourth Amendment*, 58 MINN. L. REV. 349, 394 (1974) (a "sliding scale approach" to the Fourth Amendment may "produce more slide than scale").

The NYPD's training materials may illustrate the risk created by the multi-level doctrine of *De Bour*. The mere existence of *De Bour* Level 2, and the inevitable difficulty of clearly distinguishing an encounter on the more intrusive end of Level 2 from an encounter on the less intrusive end of Level 3, creates problems of administrability. In practice, the possibility of classifying a stop as Level 2 or even Level 1 may lead police to perform a large number of stops — in the ordinary sense of the word, but inevitably often in the *Terry* sense as well — without the minimal foundation in reasonable suspicion required by the U.S. Constitution.

[425]     Street Encounters Presentation at 16, 19.

131

investigative questioning might under certain circumstances lawfully precede

reasonable suspicion, but that it should do so as a matter of course, routinely, as the

rule rather than the exception.  If the difference between a *Terry* stop and a less

intrusive encounter hinges on indefinite factors such as the demeanor and

positioning of the officers; and if it is safe to assume that officers routinely display

their authority and power through aggressive behavior, as many of the officers did

in their encounters with plaintiffs in the instant case; then a training program that

invites officers to approach large numbers of people and question them without

reasonable suspicion will inevitably result in frequent *Terry* stops that lack

reasonable suspicion, effectively guaranteeing the commission of widespread

constitutional violations.  The evidence of numerous unlawful stops at the hearing

strengthens the conclusion that the NYPD's inaccurate training has taught officers

the following lesson:  stop and question first, develop reasonable suspicion later.[426]

  The NYPD's training failures may also help to explain why no UF-

250s were located for any of the plaintiffs in the instant case.  Based on training

---

[426]  I note that the NYPD's stop practices also appear to conflict with the
considered judgment of the New York State Legislature, which enacted New
York's stop and frisk law.  This law states that without a warrant, "a police officer
may stop a person . . . when he reasonably suspects that such person is committing,
has committed, or is about to commit" a crime, "and may demand of him his name,
address and an explanation of his conduct."  CPL § 140.50.  In other words, the
New York State Legislature envisioned reasonable suspicion preceding the request
for a name, address, and purpose.

materials like those above, the officers who stopped plaintiffs may very well have perceived themselves as not engaged in *Terry* stops at all, but in something less intrusive.  The NYPD Legal Bureau's PowerPoint presentation at Rodman's Neck continues to encourage this belief, and the constitutional violations that will naturally follow from it, by redefining the standards for stops and arrests.  Thus, the final slide on arrests states:  "If you are at probable cause, you have made an arrest."[427]  This is not correct.  If you have arrested someone, you have made an arrest; whether or not you had probable cause only determines whether the arrest was constitutional.  Similarly, the presentation states:  "When an individual is stopped *based upon Reasonable Suspicion* a UF-250 must be prepared."[428]  IO 22 of 2012 offers a similar message:  "*When reasonable suspicion exists, a STOP, QUESTION AND FRISK REPORT WORKSHEET shall be prepared . . . .*"  Both of these statements are incorrect.  Whether a stop constitutes a *Terry* stop and thus requires the completion of a UF-250 form does not depend on whether the stop is based on reasonable suspicion, but on whether a reasonable person would have felt free to terminate the encounter.[429]

---

[427]    Street Encounters Presentation at 37 (capitalization altered).

[428]    *Id.* at 33 (emphasis altered).

[429]    *See Drayton*, 536 U.S. at 202.

In response to criticisms directed at the NYPD's training materials, defendants have argued that the materials reflect New York state law, and in particular *De Bour* and its progeny.[430]   Defendants assert that "New York Law applies" in the instant case.[431]   But practices that violate the Fourth Amendment cannot be saved by proving that they comply with state law.[432]   To the extent that *De Bour* suggests a police officer, without reasonable suspicion, may lawfully stop and question an individual in such a way that a reasonable person would not feel free to terminate the encounter, that suggestion would be incorrect.

## 2.   Irreparable Harm

In addition to showing a clear likelihood of success on the merits, plaintiffs have the burden of showing that they are "likely to suffer irreparable harm in the absence of preliminary relief."[433]   Plaintiffs have moved for class

---

[430]   *See, e.g.*, Def. Findings ¶ 42 & n.19.

[431]   *Id.*

[432]   As I noted in the Introduction, the Supreme Court held in *Sibron* that "New York is, of course, free to develop its own law of search and seizure to meet the needs of local law enforcement.  . . .  It may not, however, authorize police conduct which trenches upon Fourth Amendment rights, regardless of the labels which it attaches to such conduct."  392 U.S. at 60–61.  *Sibron* makes clear that any conflict between the Fourth Amendment and New York state law must be resolved in favor of the Fourth Amendment.

[433]   *Winter*, 555 U.S. at 20.

134

certification in connection with their motion for a preliminary injunction.

Plaintiffs' putative class is "comprised of individuals who have been or are at risk

of being subjected to the New York City Police Department's practice of stopping

individuals outside of buildings enrolled in Operation Clean Halls in the Bronx on

suspicion of trespassing inside those buildings."[434]

While I have not yet ruled on plaintiffs' motion, "[i]t is well

established that '[c]ertain circumstances give rise to the need for prompt injunctive

relief for a named plaintiff or on behalf of a class' and that the 'court may

conditionally certify the class or otherwise award a broad preliminary injunction,

without a formal class ruling, under its general equity powers.'"[435]  Based on the

conclusions in the preceding section, the putative class in this case is threatened

with imminent violations of their constitutional rights in the absence of preliminary

relief.[436]  The frequency of unconstitutional trespass stops outside Clean Halls

buildings reflected in the decline to prosecute forms and Dr. Fagan's report

---

[434]   Class Mem. at 1.

[435]   *Strouchler v. Shah*, — F. Supp. 2d —, 2012 WL 3838159, at *8 (S.D.N.Y. Sept. 4, 2012) (quoting ALBA CONTE & HERBERT NEWBERG, NEWBERG ON CLASS ACTIONS § 9:45 (4th ed. 2002)).

[436]   *See id.* at *6 ("In order to merit preliminary relief, the threat of irreparable harm must be imminent." (citing *Rodriguez v. DeBuono*, 175 F.3d 227, 235 (2d Cir. 1999)).

establishes that members of plaintiffs' putative class will likely be subject to such stops between now and the completion of trial if this Court does not act.  Because "[t]he violation of a constitutional right . . . constitutes irreparable harm for the purpose of a preliminary injunction,"[437]  plaintiffs have carried their burden of showing likely irreparable harm on behalf of the putative class.

### 3.   Balance of Equities

In order to qualify for a preliminary injunction, plaintiffs must show "that the balance of equities tips in [their] favor."[438]  Given that a preliminary injunction is "'an extraordinary remedy never awarded as of right,'"[439] it would be inappropriate to award such an injunction if doing so would result in an arrangement less fair to the parties than the status quo, such as an arrangement in which the hardship imposed on one party outweighed the benefit to the other. "[T]he Court should 'balanc[e] . . . the equities to reach an appropriate result protective of the interests of both parties.'"[440]

---

[437]   *Ligon*, 2012 WL 3597066, at *1 (citing *Johnson v. Miles*, 355 F. App'x 444, 446 (2d Cir. 2009)).

[438]   *Winter*, 555 U.S. at 20.

[439]   *UBS Fin. Servs.*, 660 F.3d at 648 (quoting *Winter*, 555 U.S. at 24).

[440]   *Sterling Drug, Inc. v. Bayer AG*, 14 F.3d 733, 747 (2d Cir. 1994) (quoting *Soltex Polymer Corp. v. Fortex Indus., Inc.*, 832 F.2d 1325, 1330 (2d Cir. 1987)) (emphasis omitted).

I do not take lightly the burden on defendants of altering NYPD policies and training procedures.  It is partly out of concern for defendants' hardships that I have rejected some of plaintiffs' proposed remedies.[441] Nevertheless, the burden on putative class members of continued unconstitutional stops goes far beyond administrative inconvenience.  As I stated in *Floyd*:

> The right to physical liberty has long been at the core of our nation's commitment to respecting the autonomy and dignity of each person:  "No right is held more sacred, or is more carefully guarded, by the common law, than the right of every individual to the possession and control of his own person, free from all restraint or interference of others, unless by clear and unquestionable authority of law."[442]

Eliminating the threat that the kinds of stops described by plaintiffs might occur at any moment, without legal justification, in the vicinity of one's home and the homes of one's friends and family, is itself an important interest deserving of judicial protection.

Equally important are the potential consequences of an unlawful stop. The stakes of "field interrogation"[443] by the police have dramatically risen since *Terry* was decided in 1968.  The use of incarceration has increased, sentences have

---

[441]   *See* Pl. Findings ¶¶ 73–75.

[442]   *Floyd*, 283 F.R.D. at 158–59 (quoting *Union Pac. R. Co. v. Botsford*, 141 U.S. 250, 251 (1891)).

[443]   *Terry*, 392 U.S. at 12, 14.

grown, the threat of lengthy incarceration has created new incentives to plead guilty, and the collateral consequences of a conviction — on employment, housing, access to government programs, and even the right to vote or serve on a jury — have become more common and more severe.  If an unjustified stop happens to lead to an unjustified arrest for trespassing, as it did in Charles Bradley's case, not every overburdened public defender will have the wherewithal to obtain a notarized letter from the defendant's host explaining that the defendant was invited, as Bronx Defender Cara Suvall did on behalf of Bradley.[444]  When considering the relative hardships faced by the parties, it is important to consider the potentially dire and long-lasting consequences that can follow from unconstitutional stops.[445]

---

[444]     *See* Tr. 10/16 at 269:2–9; Rappa Letter.

[445]     Though it is unnecessary to reach the issue in this Opinion, I note that the appropriate form of Fourth Amendment analysis may differ depending on the quantity and nature of stops being scrutinized, and the remedies available.  Not only are the consequences of stops different today than they were in 1968, but the frequency of stops is far higher as well.  *See Floyd*, 283 F.R.D. at 159 (over 2.8 million stops by NYPD between 2004 and 2009).  As the stops have increased in frequency, they have also become more standardized and predictable.  In *Terry*, the Supreme Court emphasized "the myriad daily situations in which policemen and citizens confront each other on the street."  *Terry*, 392 U.S. at 12.  "No judicial opinion can comprehend the protean variety of the street encounter, and we can only judge the facts of the case before us."  *Id.* at 15.  In the instant case, by contrast, the contested police encounters are strikingly uniform.  The stops in the decline to prosecute forms echo the stops of plaintiffs, which in turn echo aspects of the training materials introduced at the hearing.  *See, e.g.*, IO 22 of 2012 at 2

Weighing the equities in light of the totality of the circumstances, the administrative burdens that defendants will face in revising the NYPD's policies and training materials are real, but are outweighed by plaintiffs' interest in not being subjected to unconstitutional stops outside their homes and the homes of their family and friends.

### 4.   Public Interest

Any preliminary injunction must be "in the public interest."[446]   Courts

---

(¶ 11).  *Terry* envisions street stops as uniquely tailored to unforeseen circumstances.  The stops in the instant case are more like the products of fixed, repeatable processes.  The NYPD training materials that teach these processes can be scrutinized in ways that an individual officer's discretionary act cannot.  Because of this, a different constitutional analysis may be appropriate.

In addition, the constitutional framework for the *ex post* evaluation of highly individualized, discretionary stops, where exclusion is the only remedy, may not be appropriate to the *ex ante* evaluation of routinized, highly scripted, largely predictable stops, where the remedy can involve changes in training.  Ultimately, "the central inquiry under the Fourth Amendment" is "the reasonableness in all the circumstances of the particular governmental invasion of a citizen's personal security."  *Terry*, 392 U.S. at 19.  An invasion of privacy that is reasonable when it occurs on an *ad hoc* basis and is weighed in the context of the exclusionary rule may not be reasonable when it occurs as a matter of programmatic policy on a far larger scale.

*Terry* itself seems to invite scrutiny of stops falling below the intrusiveness of *Terry* stops, provided that the remedies applied are less severe than the exclusion of evidence.  "[O]f course, our approval of legitimate and restrained investigative conduct undertaken on the basis of ample factual justification should in no way discourage the employment of other remedies than the exclusionary rule to curtail abuses for which that sanction may prove inappropriate."  *Terry*, 392 U.S. at 15.

[446]      *Winter*, 555 U.S. at 20.

139

have no special institutional competence in determining what the public interest is, and the parties presented little evidence at the hearing directly addressing this issue.  Nevertheless, the public interests at issue in plaintiffs' motion are familiar from a long line of cases concerning "the power of the police to 'stop and frisk' . . . suspicious persons."[447]  In these cases, there is a recurring conflict between liberty and dignity on the one hand, and safety on the other.[448]

Because any member of the public could conceivably find herself outside a TAP building in the Bronx, the public at large has a liberty and dignity interest in bringing an end to the practice of unconstitutional stops at issue in this case.  Even if the constitutional violations described by plaintiffs were confined to the members of a discrete community, the public has a clear interest in protecting the constitutional rights of all its members.  At the same time, enforcing constitutional restrictions on the NYPD's ability to stop and potentially frisk people outside TAP buildings could conceivably inhibit the NYPD's ability to provide security to the residents of those buildings and their communities.

In light of these considerations, and taking account of all the evidence presented at the hearing, I find that the public interest lies with the enforcement of

---

[447]   *Terry*, 392 U.S. at 10.

[448]   *See Davis*, 2012 WL 4813837, at *1.

the Constitution.  It is "'clear and plain'"[449] that the public interest in liberty and

dignity under the Fourth Amendment trumps whatever modicum of added safety

might theoretically be gained from the NYPD making unconstitutional trespass

stops outside TAP buildings in the Bronx.  I am not ordering the abolition or even

a reduction of TAP, which appears to be a valuable way of using the NYPD's

resources to enhance the security in voluntarily enrolled private buildings.[450]  My

ruling today is directed squarely at a category of stops lacking reasonable

suspicion.  Precisely because these stops lack rational justification, they are

presumably of less value to public safety than would be the stops of individuals

who displayed objectively suspicious behavior.

### C.    Appropriate Scope of Injunctive Relief

Injunctive relief "'should be narrowly tailored to fit specific legal

violations.'"[451]  In addition, "great[] caution is appropriate where a federal court is

asked to interfere by means of injunctive relief with a state's executive functions, a

---

[449]    *Reynolds*, 506 F.3d at 198 (quoting *Rizzo v. Goode*, 423 U.S. 362, 378
(1976)).

[450]    *See, e.g.*, Tr. 10/18 at 593:15–594:3 (testimony of landlord to the
advantages of enrollment in Operation Clean Halls).

[451]    *Patsy's Ital. Res., Inc. v. Banas*, 658 F.3d 254, 272 (2d Cir. 2011)
(quoting *Patsy's Brand, Inc. v. I.O.B. Realty, Inc.*, 317 F.3d 209, 220 (2d Cir.
2003)).  *Accord City of New York v. Mickalis Pawn Shop, LLC*, 645 F.3d 114,
143–44 (2d Cir. 2011) (summarizing limitations on scope of injunctive relief).

141

sphere in which states typically are afforded latitude."[452]  Prudence counsels in favor of the exercise of restraint and caution when the important interests of policing and safety may conflict with the equally important interests of protecting the constitutional rights of all those who are or may be affected by police practices in New York City.[453]  Nevertheless, where the levers of municipal democracy have failed, leaving in place practices that violate constitutional rights, courts have a duty to intervene.  As I stated in *Floyd*, safeguarding the liberties guaranteed under the Fourth Amendment "is quintessentially the role of the judicial branch."[454]

In light of these considerations, as well as the findings of fact and conclusions of law detailed above, I impose the following preliminary relief:

### 1.    Immediate Relief

---

[452]    *Reynolds*, 506 F.3d at 198.

[453]    Some recent scholarship has argued that the NYPD's stop and frisk program may be partly responsible for the decline in crime in New York City in recent decades.  *See* FRANKLIN E. ZIMRING, THE CITY THAT BECAME SAFE: NEW YORK'S LESSONS FOR URBAN CRIME AND ITS CONTROL (2011).  The issue in this case, however, is not whether trespass stops outside TAP buildings in the Bronx are effective at reducing crime, but whether they are constitutional.  No matter how effective a police practice may be, if it violates the Fourth Amendment, the Constitution requires the government to find other means of achieving its goals.  For example, while preventive detention might be an effective law enforcement tool, police departments are not allowed to employ it, because doing so would violate the Constitution.

[454]    *Floyd*, 283 F.R.D. at 159.

The NYPD is ordered immediately to cease performing trespass stops

outside TAP buildings in the Bronx without reasonable suspicion of trespass, in

accordance with the law as set forth and clarified in this Opinion.[455]  To

summarize:  as the Fourth Amendment has been interpreted by the U.S. Supreme

Court and the Second Circuit, an encounter between a police officer and a civilian

constitutes a *Terry* stop whenever a reasonable person would not feel free to

"'terminate the encounter.'"[456]  The stops in this case illustrate that the threat or use

of force is not a necessary or even typical element of *Terry* stops.  Encounters

involving nothing more than commands or accusatory questioning can and

routinely do rise to the level of *Terry* stops, provided that the commands and

questioning would lead a reasonable person to conclude he was not free to

---

[455]     Defendants appear to believe that an order prohibiting stops outside
TAP buildings that lack reasonable suspicion is "a simple command that the
defendant obey the law," and thus is not legally cognizable.  *See* Def. Findings ¶ 54
n.21 (quoting *S.C. Johnson, Inc. v. Clorox Co.*, 241 F.3d 232, 240 (2d Cir. 2001)
(interpreting Rule 65(d)).  But as I stated prior to the preliminary injunction
hearing, "the City misapprehends the purpose of Rule 65."  *Ligon*, 2012 WL
3597066, at *3–4.  Cases like *S.C. Johnson* do not prohibit courts from ordering
parties to obey the law, but rather require that such orders be *specific* and *clear*.
*See S.C. Johnson*, 241 F.3d at 240.  "[A]n injunction must 'be specific and definite
enough to apprise those within its scope of the conduct that is being proscribed.'"
*Id.* at 240–41.  The immediate relief ordered here is specific, clear, and necessary
to correct the misconceptions of NYPD officers that led to the violations of
constitutional rights at issue in this case.

[456]     *Drayton*, 536 U.S. at 202 (quoting *Bostick*, 501 U.S. at 436).

143

terminate the encounter.

In order for an officer to have "reasonable suspicion" that an individual is engaged in criminal trespass, the officer must be able to articulate facts providing "a minimal level of objective justification for making the stop,"[457] which means "something more than an inchoate and unparticularized suspicion or hunch.'"[458]  In particular, an individual observed exiting or entering and exiting a TAP building does not establish reasonable suspicion of trespass, even if the building is located in a high crime area, and regardless of the time of day.  For the reasons described above, "furtive movement" is a problematic basis for a trespass stop, especially when it is offered as a stand-alone justification.  If an officer is unable to articulate *anything* more specific than that a person displayed "furtive movement," including anything *about* the person's furtive movement that suggested trespass, then the statement that a person displayed "furtive movement" is nothing more than an unparticularized suspicion or hunch, and does not constitute reasonable suspicion.

2.    **Proposed Additional Relief**

In addition to the immediate relief ordered above, I *propose* to enter

---

[457]    *Wardlow*, 528 U.S. at 123.

[458]    *White*, 496 U.S. at 329 (quoting *Sokolow*, 490 U.S. at 7) (certain quotation marks omitted).

the preliminary relief described under the following subheadings.  I present this

relief as a proposal for two reasons.  *First*, the parties in *Ligon* had little

opportunity to argue and present evidence at the preliminary injunction hearing

concerning the appropriate scope of relief.  *Second*, the preliminary relief I propose

is similar though not identical to the relief sought by plaintiffs in the *Floyd* action,

where I have already certified a city-wide class of plaintiffs alleging that they have

or will be victims of unconstitutional stops.  *Floyd* is scheduled for trial on March

11, 2013.  As part of the proof in that case, plaintiffs intend to present evidence

regarding the remedies they seek.

Because of the rapidly approaching trial date in *Floyd* and the

inefficiency of hearing separate arguments regarding the closely related remedies

at issue in *Ligon* and *Floyd*, I am ordering the consolidation of the remedies

hearing in the instant case with the remedies portion of the *Floyd* trial.  Thus, the

relief proposed under the subheadings below will not take effect until the parties in

this case have had the opportunity to participate in a hearing at which they may

present evidence or argument as to whether the proposed relief is insufficient or

too burdensome or otherwise inappropriate, as well as regarding the appropriate

timeline for relief.  This remedy hearing will be held in conjunction with the *Floyd*

trial, following the phase of the trial dealing with proof of liability.[459]  Plaintiffs'

counsel in *Ligon* and *Floyd* must coordinate their presentations with respect to

appropriate remedies.[460]  Submissions by counsel in *Ligon* related solely to

remedies must be filed no later than February 22, 2013, and may not exceed

twenty-five pages per side.

### a.    Policies and Procedures

The NYPD is ordered to develop and adopt a formal written policy

specifying the limited circumstances in which it is legally permissible to stop a

person outside a TAP building on a suspicion of trespass.  The policy must reflect

the fact that trespass stops outside TAP buildings are governed not only by New

York state law, but by the Fourth Amendment.  Guidance in drafting this policy

should be drawn from the legal discussion found in this Opinion.

---

[459]    I emphasize that this ruling should in no way be taken to indicate that I have already concluded that plaintiffs will prevail in *Floyd*.  The evidence presented by both sides in *Floyd* will be judged on its own merits.  While the Applicable Law section of this Opinion — *see supra* Part III — certainly applies to issues raised in *Floyd*, the Findings of Fact section does not.  As I have noted throughout this Opinion, this case relates *solely* to trespass stops outside of TAP buildings in the Bronx.  It is only because of the unavoidable overlap between the steps that are necessary to address plaintiffs' harms in the instant case, and the steps that *would be* necessary to address plaintiffs' harms in *Floyd* if plaintiffs prevailed there, that I am ordering the consolidation of the remedies presentations.

[460]    In the interests of efficiency, counsel in *Floyd* and *Ligon* are also permitted, but not required, to invite the participation of counsel in *Davis* in the presentation on appropriate remedies.

A draft of the written policy governing trespass stops outside TAP buildings shall be provided to the Court (or a monitor appointed by the Court) for approval prior to distribution, with a copy to plaintiffs' counsel.

**b.      Supervision**

*First*, the City is ordered to take all necessary steps to ensure that UF-250s are completed for *every* trespass stop outside a TAP building in the Bronx. Again, a "stop" in the relevant sense is defined as any police encounter in which a reasonable person would not feel free to terminate the encounter.

*Second*, the City is ordered to implement a system of review modeled on the one ordered by Chief Hall in paragraph 3 of Exhibit E.  Supervisory personnel in each Bronx precinct must review, on a quarterly basis, each UF-250 completed for a trespass stop outside a TAP building in the Bronx.  To the extent that such review reveals nonconformity with the formal written policy described above, the City will take specific steps to retrain the officer.  The results of these reviews and any retraining will be periodically reported to the relevant precinct commander, a designated member of the Bronx Borough Command, a designated member of the Chief of Patrol's Office, and plaintiffs' counsel.  Copies of all reviewed UF-250s shall be provided to plaintiffs' counsel.

**c.      Training**

The City is ordered to revise the NYPD's training materials and training programs to conform with the law as set forth in this Opinion. The instruction must be sufficient to uproot the longstanding misconceptions that have afflicted TAP in the Bronx. It must include, but need not be limited to, the following reforms: (1) The formal written policy governing trespass stops outside TAP buildings, described above, must be distributed to each Bronx NYPD member, and then redistributed two additional times at six-month intervals. (2) The stop and frisk refresher course at Rodman's Neck must be altered to incorporate instruction specifically targeting the problem of unconstitutional trespass stops *outside* TAP buildings. Whether the instruction includes additional slides, role-playing, or exams, it must be sufficient to convey to all officers who attend the course that reasonable suspicion of trespass is required before making a trespass stop outside a TAP building. Training regarding these stops must also be provided to new recruits and to officers who have already attended the Rodman's Neck refresher course and are not scheduled to do so again. (3) Chapter 16 of the Chief of Patrol Field Training Guide must be revised to reflect the formal written policy governing trespass stops outside TAP buildings described above. (4) SQF Training Video No. 5 must be revised to conform with the law as set forth in this Opinion. I recognize that this step, like some of the others above, will involve

alterations to training materials used outside the Bronx and outside the context of

TAP.  But such steps are necessary to correct the longstanding misconceptions that

led to the violations of plaintiffs' constitutional rights described in this Opinion.

Drafts of the written or scripted training materials described above

shall be provided to the Court (or a monitor appointed by the Court) for approval

prior to use, with a copy to plaintiffs' counsel.

### d.    Attorneys' Fees

Reasonable attorneys' fees and costs will be rewarded as appropriate,

on application.

In closing, I stress that my conclusions in this Opinion are based on

the limited evidence presented at the preliminary injunction hearing.  It could be

the case that the development and implementation of IOs 22 and 23 of 2012, as

well as the changes to NYPD training in 2012, have resolved the problem of

unconstitutional trespass stops outside TAP buildings in the Bronx.  Because these

changes were so recent, however, and so late in the two-decade history of TAP,

they were insufficient to rebut plaintiffs' evidence at the hearing of defendants'

deliberate indifference to a practice of unconstitutional stops.  At any time that

defendants develop persuasive evidence, supported by reliable statistics, that

unconstitutional trespass stops are no longer taking place outside TAP buildings in

the Bronx, defendants may move for the dissolution of this preliminary injunction and the proposed relief.

## VI.   CONCLUSION

For the reasons explained above, plaintiffs' motion is granted, although the full extent of the relief has not yet been determined.[461] No action is required by the Clerk of the Court, because plaintiffs' motion has already been closed.

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:        February 14, 2013
              New York, New York

---

[461]     Subsequent to the publication of the original version of this Opinion on January 8, 2013, I stayed the immediately ordered relief granted above. *See Ligon v. City of New York*, No. 12 Civ. 2274, 2013 WL 227654 (S.D.N.Y. Jan. 22, 2013). The publication of this Amended Opinion does not have the effect of lifting the stay.

**APPENDIX A**

Excerpts from Decline to Prosecute Affidavits:

1.      The Arresting Officer observed the defendant exit the lobby of . . . a Clean Halls Apartment Building, and asked defendant, why were you in the building? Defendant stated in sum and substance:  VISITING A FRIEND.  The Arresting Officer then observed defendant to have a white powdery substance on his nose . . . however, the amount was too small to field test or recover.

       The Arresting Officer arrested Defendant and charged him with violating New York State Penal Law section 140.15 (Criminal Trespass).  However, the Arresting Officer failed to ask defendant [redacted] you know anyone in the building; if so, what is the person's name and apartment number.

2.      [T]he defendants were observed exiting a clean halls building.  The defendants stated that they were there to visit a tenant . . . .  After being arrested a tenant from the building did corroborate the defendant's statements and the tenant stated that both defendants were in the building as his guests.

3.      The Arresting Officer . . . observed defendant exiting the lobby of . . . a Clean Halls Apartment Building.  The Arresting Officer . . . approached the defendant and asked the defendant do you live in the building and defendant stated in sum and substance: NO.  The Arresting Officer further asked the defendant what apartment did you come from and defendant stated in sum and substance: I MET WITH [redacted] IN THE LOBBY.  The Arresting Officer further asked defendant what apartment does [redacted] live in and defendant stated in sum and substance: I DON'T KNOW THE APARTMENT NUMBER.  [Another officer then went inside the building and asked two people exiting if they knew anyone by the name of the defendant's host.  When they said no, the defendant was arrested for trespass.]

4.      . . . Arresting Officer observed defendant enter and exit a Clean Halls Building.  Arresting Officer approached the defendant and asked her where she was coming [from], what was she doing in the building and what apartment number was she visiting.  Defendant responded in sum and substance: I WAS VISITING A FRIEND.  I AM NOT TELLING YOU THE APARTMENT NUMBER OR THE NAME.  [The defendant was then arrested for trespass.]

5.      Defendants entered . . . a clean halls building, and exited.  Defendant was stopped outside of the location.  When the arresting officer questioned the defendant, defendant stated, in sum and substance, I'M JUST CHILLING.  Defendant did not admit that he was in the location.  [The defendant was then arrested for trespass.]

6.      [A]rresting officer . . . observed the defendant enter and exit the lobby of . . . a Clean Halls Apartment Building, asked defendant does he live there and defendant did not respond.  The arresting officer then asked the defendant if he knows anyone in the apartment and defendant did not respond.  Arresting officer then asked defendant what was he doing in the building and defendant stated in sum and substance I WASN'T THERE TO BUY DRUGS.  [The defendant was then arrested for trespass.]

7.      Arresting Officer observed the defendant enter and exit the lobby of . . . a Clean Halls Apartment building, and asked defendant do you live in the building, do you know anyone in the building, what are you doing in the building, to which defendant stated in sum and substance:  NO, NO, I WAS INSIDE FOR A COUPLE OF MINUTES MAKING A PHONE CALL.  [The defendant was then arrested for trespass.]

8.      Arresting Officer . . . observed both defendants exit the lobby of . . . a Clean Halls Apartment Building and asked defendants what was their purpose inside of said building and defendant [redacted] stated in sum and substance: I WAS VISITING MY COUSIN [redacted] IN [redacted] but defendant [redacted] remained silent.  [Another officer] entered the building to investigate further, however, the arresting officer was unable to articulate how [the other officer] disproved [the speaking defendant's] claim.  [Both defendants were arrested for trespass.]

9.      Police Officer . . . observed the defendant exiting the lobby of . . . a Clean Halls Apartment Building and asked defendant whether he lived in the building and defendant stated in sum and substance: NO.  [The officer] then asked the defendant, were you visiting anyone in the building, and defendant stated in sum and substance: YES.  [The officer] then asked the defendant for the name of the person he was visiting and the apartment number and defendant stated in sum and substance: I DON'T KNOW.  [The defendant was then arrested for trespass.]

10.     Arresting Officer observed the defendant enter and exit the lobby of . . . a Clean Halls Building, and radioed defendant's description.  Arresting Officer's partner asked defendant why did you go into the building, do you know anyone in the building, to which defendant stated in sum and substance: I CAME OUT OF A FRIEND[']S APARTMENT.  I WAS INSIDE FOR ABOUT AN HOUR.  [The defendant was then arrested for trespass.]

11.     [T]he arresting officer observed the defendant enter into [a Clean Halls building] and exit after approximately five (5) minutes. . . .
        . . . The defendant was not observed in an area of the building that is not open to the public such as the hallways, lobby and stairwells.  [The defendant was arrested for trespass.]

12.     [A police officer] observed the defendant enter a Clean Halls Building and exit moments later. . . . [W]hen the defendant exited the building, [the officer] asked the defendant if he lived in the building, to which the defendant stated in sum and substance, NO. . . . [The officer] did not ask the defendant if he was a guest of a tenant in the building. . . . [T]he defendant attempted to walk away at which time [the officer] grabbed the defendant[']s arms, and the defendant pulled away.  [A struggle ensued, and the defendant was then arrested in part for trespass.]

13.     [T]he defendants entered a Clean Halls building, stayed there approximately five minutes, and then left.  The arresting officer stopped the defendants and asked them where they were coming from.  The defendants replied, in sum and substance, WE'RE COMING FROM . . . WE'RE COMING FROM . . ., and could not provide a name or apartment number.  The officer placed both defendants under arrest and searched them.

14.     The Arresting Officer observed the defendant exit the lobby of . . . a Clean Halls Apartment Building, approached defendant and asked, Do you live in the building?, defendant stated in sum and substance: NO.  The Arresting Officer then asked the defendant, Do you know anyone in the building?, defendant stated in sum and substance: YES, A FRIEND.  The Arresting Officer then asked the defendant, What's your friend's name?  What apartment does your friend live in?, defendant stated in sum and substance:  I DON'T KNOW HIS NAME.  HE'S IN [redacted].  The Arresting Officer went to [redacted] however, the apartment was unoccupied, and as a result, the Arresting Officer was unable to locate anyone who

could verify defendant's claim.  [The defendant was then arrested for trespass.]

15.    The Arresting Officer observed the defendant exit the lobby of . . . a Clean Halls Apartment Building and [another officer] approached defendant on the sidewalk and asked defendant, Do you live in the building?, and defendant stated in sum and substance: NO.  [The officer] asked defendant, What was your reason for being in the building?, and defendant stated in sum and substance:  LOOKING FOR A GIRL.  [The officer] then asked the defendant, What's the name of the girl?, and defendant refused to provide an answer to the aforementioned question. [The defendant was then arrested for trespass.]

16.    Arresting Officer observed the defendant enter and exit the lobby of . . . a clean halls Building.  [The defendant was then arrested for trespass.]  However, arresting Officer could not obtain a clean halls affidavit.

17.    [I]n front of . . . a Clean Halls building, [the arresting officer] observed defendant and several unapprehended individuals exit the lobby . . . .  [The officer] approached defendant and asked defendant if he knew anyone in above-mentioned location and defendant stated in sum and substance: NO.  I'M JUST LOOKING FOR MY FRIEND [redacted].  NO [redacted] DOESN'T LIVE HERE.  [The defendant was then arrested for trespass.]

18.    [D]efendant was observed entering and exiting the lobby of [a Clean Halls building].
       Arresting officer asked defendant what he was doing in the building and defendant stated in sum and substance I WAS IN THE BUILDING LOOKING FOR WORK.  Arresting officer asked defendant what kind of work he was looking for and defendant stated in sum and substance I WAS LOOKING FOR MY FRIEND [redacted].  Arresting officer asked defendant where his friend lived and defendant stated in sum and substance I DON'T KNOW WHERE HE LIVES. [The defendant was then arrested for trespass.]

19.    Arresting officer observed defendant enter . . . a clean halls building and observed defendant exit said building.  Arresting officer approached and asked defendant, what were you doing in the building and defendant stated in sum and substance:  I WAS THERE TO VISIT A FRIEND.  I DON'T KNOW WHAT APARTMENT THEY LIVE IN.  [The officer then searched the defendant, found crack-cocaine and a pipe, and arrested defendant in part for trespass.]

20.     The arresting officer . . . observed defendant exiting the lobby of . . . a Clean Halls Apartment Building.  The arresting officer stopped defendant and defendant clenched his fists on his sides and spread his feet apart and . . . stated in sum and substance YOU'RE NOT GOING TO TOUCH ME.  YOU'RE NOT GOING TO TOUCH ME.  YOU'RE NOT PUTTING YOUR HANDS ON ME.  [The arresting officer then handcuffed defendant and placed him in the patrol vehicle.]

21.     [D]efendant was observed entering the above location, a Clean Halls Apartment building, and was also observed exiting said location minutes later. Arresting police officer . . . asked defendant if he lived in the building and defendant stated in sum and substance, I'M NOT THERE, I'M IN [redacted].  [The defendant was then arrested for trespass.]

22.     Arresting Officer observed the defendant exit the lobby of . . . a Clean Halls Apartment Building.  Arresting officer approached defendant and asked him, do you live in the building, do you know anyone in the building, what apartment does your friend live [in], what is his name[,] to which defendant stated in sum and substance:  . . . NO I DON'T, YES I'M VISITING MY FRIEND ON THE [redacted] FLOOR, NO I'M NOT GOING TO GIVE YOU MY FRIEND'S NAME.  [The officer then patted down the defendant and arrested him in part for trespass.]

23.     Arresting officer observed defendant enter . . . a clean halls building and observed defendant exit said building.  Arresting officer approached and asked defendant, what were you doing in the building and do you know anyone in the building and defendant stated in sum and substance:  NO, I DON'T KNOW ANYONE AND I WENT TO BUY DRUGS.  [The defendant was then arrested in part for trespass.]

24.     The Arresting Officer states that . . . he observed defendant exiting . . . a Clean Halls Apartment Building.  The Arresting Officer approached defendant and asked defendant if he lives in the building and defendant stated in sum and substance: NO.  The Arresting Officer further asked the defendant where are you coming from and defendant stated in sum and substance:  I'M COMING FROM THE [redacted] FLOOR.  The Arresting Officer asked the defendant what apartment are you coming from and defendant stated in sum and substance:  I DON'T KNOW THE APARTMENT NUMBER BUT I'LL SHOW IT TO YOU. [The officer went with the defendant to the apartment.  No one answered the door.

The defendant was arrested for trespass.]

25.     Arresting Officer observed the defendant enter and exit the lobby of . . . a Clean Halls Building.  Arresting Officer told defendant that he observed him enter said building along with separately apprehended [redacted] . . . and separately apprehended stated in sum and substance WE WERE IN THE BUILDING. Arresting Officer then asked separately apprehended and defendant what apartment they were visiting, and neither defendant nor separately apprehended provided a response.  [The defendant was then arrested for trespass.]

         . . . [T]he Arresting Officer did not observe defendant to go beyond the public vestibule of said building, nor did defendant admit to being inside of said building, beyond the public vestibule.

26.     The arresting officer states that . . . inside of . . . a Clean Halls Building, she observed defendant and separately apprehended [redacted] enter the lobby of said location and exit shortly thereafter.  Arresting officer stopped defendant and asked him if he lived in the building and defendant stated in sum and substance I DON'T LIVE IN THE BUILDING.  Arresting officer asked defendant what he was doing in the building and defendant stated in sum and substance I WAS WAITING FOR A FRIEND.  Arresting officer asked defendant for the name of the person he was waiting for and defendant did not reply.  Arresting officer asked defendant for his identification and defendant was unable to produce one at which time arresting officer attempted to handcuff defendant and defendant ran.

# APPENDIX B
Blank UF-250 Form



STOP, QUESTION AND FRISK REPORT WORKSHEET
PD344-151A (Rev. 11-02)

(COMPLETE ALL CAPTIONS)

Pct.Serial No.

Date | Pct. Of Occ.

Time Of Stop | Period Of Observation Prior To Stop | Radio Run/Sprint #

Address/Intersection Or Cross Streets Of Stop

□ Inside  □ Transit  |  Type Of Location
□ Outside  □ Housing  |  Describe:

Specify Which Felony/P.L. Misdemeanor Suspected | Duration Of Stop

**What Were Circumstances Which Led To Stop?**
(MUST CHECK AT LEAST ONE BOX)

□ Carrying Objects In Plain View Used In Commission of Crime e.g., Slim Jim/Pry Bar, etc.
□ Fits Description.
□ Actions Indicative Of "Casing" Victim Or Location.
□ Actions Indicative of Acting As A Lookout.
□ Suspicious Bulge/Object (Describe)
□ Other Reasonable Suspicion Of Criminal Activity (Specify)

□ Actions Indicative Of Engaging In Drug Transaction.
□ Furtive Movements.
□ Actions Indicative Of Engaging In Violent Crimes.
□ Wearing Clothes/Disguises Commonly Used In Commission Of Crime.

Name Of Person Stopped | Nickname/ Street Name | Date Of Birth

Address | Apt. No. | Tel. No.

Identification:  □ Verbal  □ Photo I.D.  □ Refused  □ Other (Specify)

Sex:□ Male  Race:□ White  □ Black  □ White Hispanic  □ Black Hispanic
□ Female  □ Asian/Pacific Islander  □ American Indian/Alaskan Native

Age | Height | Weight | Hair | Eyes | Build

Other (Scars, Tattoos, Etc.)

Did Officer Explain If No, Explain:
Reason For Stop
□ Yes  □ No

Were Other Persons Stopped/  □ Yes If Yes, List Pct. Serial Nos.
Questioned/Frisked?  □ No

If Physical Force Was Used, Indicate Type:
□ Hands On Suspect
□ Suspect On Ground
□ Pointing Firearm At Suspect
□ Handcuffing Suspect
□ Suspect Against Wall/Car
□ Drawing Firearm
□ Baton
□ Pepper Spray
□ Other (Describe)

Was Suspect Arrested? | Offense | Arrest No.
□ Yes  □ No

Was Summons Issued? | Offense | Summons No.
□ Yes  □ No

Officer In Uniform? | If No, How Identified? □ Shield  □ I.D. Card
□ Yes  □ No  □ Verbal

Was Person Frisked? □ Yes □ No  IF YES, MUST CHECK AT LEAST ONE BOX
□ Inappropriate Attire - Possibly Concealing Weapon
□ Verbal Threats Of Violence By Suspect
□ Knowledge Of Suspects Prior Criminal
□ Violent Behavior/Use Of Force/Use Of Weapon
□ Other Reasonable Suspicion of Weapons (Specify)

□ Actions Indicative Of Engaging In Violent Crimes
□ Furtive Movements

□ Refusal To Comply With Officer's Direction(s)
□ Leading To Reasonable Fear For Safety
□ Violent Crime Suspected
□ Suspicious Bulge/Object (Describe)

Was Person Searched? □ Yes □ No  IF YES, MUST CHECK AT LEAST ONE BOX □ Hard Object  □ Admission Of Weapons Possession
□ Outline Of Weapon  □ Other Reasonable Suspicion of Weapons (Specify)

Was Weapon Found? □ Yes  □ No  If Yes, Describe: □ Pistol/Revolver  □ Rifle/Shotgun  □ Assault Weapon  □ Knife/Cutting Instrument
□ Machine Gun  □ Other (Describe)

Was Other Contraband Found? □ Yes  □ No If Yes, Describe Contraband And Location
Demeanor Of Person After Being Stopped
Remarks Made By Person Stopped

Additional Circumstances/Factors:  (Check All That Apply)
□ Report From Victim/Witness
□ Area Has High Incidence Of Reported Offense Of Type Under Investigation
□ Time Of Day, Day Of Week, Season Corresponding To Reports Of Criminal Activity
□ Suspect Is Associating With Persons Known For Their Criminal Activity
□ Proximity To Crime Location
□ Other (Describe)

□ Evasive, False Or Inconsistent Response To Officer's Questions
□ Changing Direction At Sight Of Officer/Flight
□ Ongoing Investigations, e.g., Robbery Pattern
□ Sights And Sounds Of Criminal Activity, e.g., Bloodstains, Ringing Alarms

Pct. Serial No. | Additional Reports Prepared: Complaint Rpt.No. | Juvenile Rpt. No. | Aided Rpt. No. | Other Rpt. (Specify)

REPORTED BY: Rank, Name (Last, First, M.I.)
Print | Tax#
Signature | Command

REVIEWED BY: Rank, Name (Last, First, M.I.)
Print | Tax#
Signature | Command

157

**- Appearances -**

**For Plaintiffs:**

Christopher Dunn, Esq.
Alexis Karteron, Esq.
Taylor Pendergrass, Esq.
Daniel Mullkoff, Esq.
New York Civil Liberties Union
125 Broad Street, 19th floor
New York, NY 10004
(212) 607-3300

J. McGregor Smyth, Jr., Esq.
Mariana Kovel, Esq.
The Bronx Defenders
860 Courtlandt Avenue
Bronx, NY 10451
(718) 508-3421

Juan Cartagena, Esq.
Foster Maer, Esq.
Roberto Concepcion, Jr., Esq.
LatinoJustice PRLDEF
99 Hudson Street, 14th Floor
New York, NY 10013
(212) 219-3360

John A. Nathanson, Esq.
Tiana Peterson, Esq.
Mayer Grashin, Esq.
Shearman & Sterling LLP
599 Lexington Avenue
New York, NY 10022
(212) 848-5222

**For Defendants:**

Heidi Grossman
Mark Zuckerman
Joseph Marutollo
Brenda Cooke
Richard Weingarten
Assistant Corporation Counsel
New York City Law Department
100 Church Street
New York, NY 10007
(212) 788-1300

# EXHIBIT C

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT
− − − − − − − − − − − − − − − − − − − − − − − − − − − X

DAVID FLOYD, et al.,

                   Plaintiffs-Appellees,

        -against-

THE CITY OF NEW YORK,

             Defendants-Appellants.

− − − − − − − − − − − − − − − − − − − − − − − − − X

**Docket No. 13-3088**

**MEMORANDUM OF LAW IN SUPPORT OF MOTION**

### Background of the Litigation

This is a class action filed pursuant to 42 U.S.C. § 1983 and the Fourth and Fourteenth Amendments. Plaintiffs-appellees are a class of persons who allege that defendants-appellants the City of New York ("the City") and its Police Department ("NYPD"), have engaged in a pattern or practice of stopping, questioning, and/or frisking them without reasonable suspicion as defined in *Terry v. Ohio,* 392 U.S. 1 (1968) and its progeny. The plaintiff class also includes a subclass of blacks and Latinos whose stops were purportedly based on their race or national origin. *See Floyd v. City of New York*, 283 F.R.D. 153, 160 (S.D.N.Y. 2012) (certifying class).

After a nine-week trial, the District Court for the Southern District of New York (Scheindlin, U.S.D.J.) found the City liable for a pattern and practice of violating the plaintiffs' Fourth and Fourteenth Amendment rights. In a 198-page opinion, the Court found that the City engaged in a widespread pattern or practice

of conducting stops and frisks without reasonable suspicion, and operated under a policy of "indirect racial profiling" in violation of the Equal Protection Clause.

The City appeals from the District Court's Remedial Order, entered August 12, 2013, annexed hereto as Exhibit A (the "Injunction" or "Remedial Order"). The appeal also brings up for review the supporting decision imposing liability on the City, also entered August 12, 2013, annexed hereto as Exhibit B.[1]

## Terms of the Injunction

In the Remedial Order, the Court delineated specified measures to address NYPD policies and practices deemed unconstitutional in the liability decision. The Court appointed Peter L. Zimroth as Court Monitor to oversee these reforms to City stop-and-frisk policies, including amended training, supervision, monitoring, and discipline. The Injunction requires both short-term "Immediate Reforms," to be developed and implemented "as soon as practicable," as well as "Joint Process Reforms," which involve a longer process (Exh. A, at 12).

1. **Immediate Reforms**. Details of the Immediate Reforms are to be devised by the Monitor in conjunction with the parties, and implemented upon the Court's approval. Although some details are left to be worked out, the following reforms must be implemented "as soon as practicable:"

---

[1] This Court has jurisdiction over this interlocutory appeal from the Injunction under 28 U.S.C. § 1292(a)(1). The liability ruling, which purports to provide the legal basis for the Injunction, is also properly before this Court, because it is "necessary to ensure meaningful review of" and "inextricably intertwined with" the appealable order. *Lamar Adver. of Penn., LLC v. Town of Orchard Park*, 356 F.3d 365, 371 (2d Cir. 2004); *Merritt v. Shuttle, Inc*., 187 F.3d 263, 268-269 (2d Cir. 1999). By letter dated August 27, 2013, the City sought an order staying the remedial order in the District Court (ECF #372). The District Court has not yet decided the motion. Plaintiffs submitted an opposition dated September 6, 2013 (ECF #385), and the City's reply is due on September 12, 2013.

(a)   The NYPD must transmit a FINEST message summarizing the standards set forth in the Court's decision "in simple and clear terms," and order all NYPD personnel to comply with those standards "immediately."  Exh. A, at 25.

(b)   The NYPD must institute a pilot program for the use of body-worn cameras, which shall be worn for one year by all officers in one precinct per borough where the greatest number of stops occurred in 2012.  Exh. A, at 25-28.

(c)   The NYPD must amend its method of documenting stop-and-frisk activity, especially its "UF-250" form.   These amendments shall include the addition of narratives, as well as a "tear-off" section that is to be provided to the subject at the end of any stop.  Exh. A, at 18-23.

(d)   The NYPD must revise its policies regarding both stop-and-frisk and racial profiling to accord with the District Court's interpretation of federal and state law.   Training, supervision, monitoring, and discipline must be similarly amended.  Exh. A, at 14-17; 23-25.

**2.  <u>Joint Remedial Process Reforms</u>**.   The Injunction also sets forth a Joint Remedial Process for developing supplemental reforms, which will take place after the Immediate Reforms are implemented.   This process contemplates community input, to be overseen by a Facilitator in conjunction with the Monitor.[2] Along with the parties, a wide array of individuals and entities will be granted a say in the reform process, including, *inter alia*, members of the communities where stops most often take place; representatives of religious, advocacy, and grassroots

---

[2]   In a subsequent order, the District Court appointed Nicholas Turner to serve as facilitator.

organizations; representatives of other police organizations; District Attorneys' offices; local elected officials; community leaders; the Civil Rights Division of the DOJ, Communities United for Police Reform; and the Black, Latino, and Asian Caucus of the City Council. Exh. A, at 28-32.

## ARGUMENT

For the reasons set forth below, the City seeks an order expediting briefing, argument, and review of this appeal. The City stands ready to perfect its appeal in 61 days, by November 12, 2013.[3] The City seeks an order directing appellees to file their answering brief by January 13, 2014, with the City's reply submission to be due on January 28, 2014. Finally, the City requests that this appeal be heard in tandem with its pending appeal in *Ligon v. City of New York* (Docket No. 13-3123).[4]

Expedited review is warranted. First, the District Court's orders lend credence to the notion that the NYPD unfairly targets minorities for stops and frisks, undermining its ability to carry out its mission effectively. As this Court has observed:

> The effectiveness of a city's police department depends importantly on the respect and trust of the community and on the perception in the community that it enforces the law fairly, even-handedly, and without bias. If the police department treats a segment of the population of any race, religion, gender, national origin,

---

[3]  Day 60 falls on Veteran's Day, a "legal holiday" as set forth in FRAP 26(a)(6).

[4]  Plaintiffs do not consent to the requested due date for their appellees' brief, nor do they consent to expedited argument or consideration of the appeal, and intend to submit an opposition to that portion of the motion by September 17, 2013. Plaintiffs have, however, consented to the two appeals being heard in tandem.

or sexual preference, etc., with contempt, so that the particular minority comes to regard the police as oppressor rather than protector, respect for law enforcement is eroded and the ability of the police to do its work in that community is impaired. Members of the minority will be less likely to report crimes, to offer testimony as witnesses, and to rely on the police for their protection. When the police make arrests in that community, its members are likely to assume that the arrests are a product of bias, rather than well-founded, protective law enforcement. And the department's ability to recruit and train personnel from that community will be damaged.

*Locurto v. Giuliani,* 447 F.3d 159, 178-179 (2d Cir. 2006), quoting *Pappas v. Giuliani*, 290 F.3d 143, 147 (2d Cir. 2002). Public perception of the NYPD has been clouded by the District Court's condemnatory ruling and the immense attention paid to it, compromising confidence in the integrity of law enforcement. At the least, it is of paramount importance that the City be granted a prompt opportunity to dispute the validity of that ruling, which we believe is based on a faulty statistical model and a misapprehension of governing law.

Second, the District Court's decision has strong potential for disruption in law enforcement, as it throws considerable doubt on whether officers may continue to rely upon the traditional building blocks of reasonable suspicion under *Terry v. Ohio* and its progeny. Although the District Court purported to recognize the validity of "stop, question and frisk," its 198-page liability opinion limits police-citizen interactions to an unprecedented degree, without setting clear guideposts for what factors now allow a brief investigatory stop, or justify a circumscribed pat-down for weapons.

For example, the Court ruled that categories such as "high-crime areas," "furtive movements," and "suspicious bulges," which are used on UF-250 forms to document a *Terry* stop, are so "vague" and "subjective" as to indicate an "apparently unjustified" stop (Exh. B, at 8). Yet courts, like police officers, have articulated reasonable suspicion in such terms for decades. *See, e.g., Illinois v. Wardlow*, 528 U.S. 119, 124 (2000) ("high crime area" and "nervous, evasive behavior," along with flight, constituted reasonable suspicion); *Florida v. Rodriguez*, 469 U.S. 1, 6 (1984) ("furtive" and "strange" behavior at sight of officers contributed to reasonable suspicion of drug smuggling); *Pennsylvania v. Mimms,* 434 U.S. 106, 111-12 (1977) (bulge in jacket pocket during routine traffic stop supported frisk); *United States v. Williams*, 2013 U.S. App. LEXIS 11140 (2d Cir. 2013) ("suspicious behavior" in high-crime area supported stop; bulge in subject's jacket supported frisk); *People v. Perry*, 133 A.D.2d 380, 382 (2d Dept. 1987) (bulge in subject's sweatshirt pouch supported pat-down).

On the whole, the District Court failed to heed the Supreme Court's oft-repeated admonition that Fourth Amendment issues cannot be reduced to neat legal rules, but must be based in every instance on the totality of the circumstances inherent to each case. *E.g., Florida v. Harris*, 133 S. Ct. 1050, 1055-56 (2013); *Ohio v. Robinette,* 519 U.S. 33, 39 (1996); *Florida v. Jimeno*, 500 U.S. 248, 250 (1991). Moreover, having based its ruling on statistical data derived exclusively from checkboxes on a single piece of police paperwork, the Court effectively eliminated the City's reliance on factors that cannot easily be reduced to broad

categorizations.   As a prime example, deductions arising from "specialized training" and "experience" require a far more searching inquiry than the District Court performed.  *United States v. Arvizu*, 534 U.S. 266, 273 (2002); *see United States v. Singh*, 415 F.3d 288, 295 (2d Cir. 2005).  Veteran officers who have gained such specialized knowledge will now be at a loss to understand how they may apply it in detecting and deterring crime, if at all.

The foregoing is further complicated by the fact that the Court previously ruled that a reasonable person would not feel free to leave whenever a police officer approaches and asks questions in an accusatory tone (*see* Exhibit A, at 15, citing *Ligon* Decision).  That ruling, too, seems to conflict with this Court's precedent.  *See United States v. Wiggan*, 2013 U.S. App. LEXIS 14616, 10-11 (2d Cir. 2013) (subject was not "stopped" when officer questioned him in "a commanding tone" and asked him to step outside).

The Court also took issue with the way that two police officers defined the term "furtive movements," which included "changing direction," being "very fidgety," "going in and out of his pocket," "going in and out of a location," "looking back and forth constantly," "looking over their shoulder," "adjusting their hip or their belt," "moving in and out of a car too quickly," "turning a part of their body away from you," "getting a little nervous, maybe shaking," "stuttering," and "all of a sudden becoming very nervous, very aware." (Exh. B, at 11-12).  These are the very kinds of conduct that jurists have characterized as "furtive" or "suspicious."  *E.g., Rodriguez*, 469 U.S. at 3, 6; *United States v. Sokolow*, 490 U.S.

1, 5 (1989); *Wiggan*, 2013 U.S. App. LEXIS 14616, 2-3; *United States v. Thomas*, 184 Fed. Appx. 91, 91-92 (2d Cir. 2006); *United States v. Patton*, 705 F.3d 734, 736 (7th Cir. 2013); *United States v. Mouscardy,* 722 F.3d 68 (1st Cir. 2013); *United States v. Robinson*, 664 F.3d 701, 704 (8th Cir. 2011); *People v. Lozado,* 90 A.D.3d 582, 583 (1st Dept. 2011), *lv. denied*, 18 N.Y.3d 925 (2012).

Additionally, the District Court seems to have ruled that, where the NYPD deploys its resources with attention to suspect descriptions including race, an officer who stops a member of a minority group has engaged in "indirect racial profiling," which violates the Equal Protection Clause *even if the stop is supported by reasonable suspicion* (Exh. B, at 82-85; Exh. A, at 4).  Contrastingly, this Court has found the absence of an actionable claim under the Equal Protection Clause unless investigatory stops are based "*solely* upon race, without more."  *Brown v. City of Oneonta*, 221 F.3d 329, 338 (2d Cir. 2000) (emphasis added, citation and internal punctuation omitted).  The NYPD routinely uses real-time CompStat data to target crime patterns in particular areas, which often contain general suspect descriptions that include racial information.  But officers are trained to consider other indicia of criminality in determining whether to make a stop.  As a result of the District Court's ruling, however, every officer who sees a black or Hispanic suspect acting suspiciously must confront the real possibility of being charged with intentional race discrimination if he takes proactive steps to detect or deter crime.

In short, the City firmly believes that the District Court erred in applying the balancing test required under the Fourth Amendment (*e.g., Hiibel v.*

*Sixth Judicial Dist. Court*, 542 U.S. 177, 187-188 [2004]), affording too little weight to the compelling governmental interest in protecting its citizenry from crime. *United States v. Salerno*, 481 U.S. 739, 749 (1987). The District Court even went so far as to declare, *sua sponte*, that N.Y. Crim. Proc. Law § 140.50(3), New York's "frisk" statute, violates federal law (Exh. B, at 24, n. 74). The City also believes that the Court's Fourteenth Amendment analysis assigns invidious racial motivation to the legitimate deployment of limited police resources. *See generally City of Oneonta*, 221 F.3d at 337-38. However, if the District Court's analysis is correct, this Court should make a definitive statement to that effect as soon as possible, or refine it so that the City may benefit from its reasoned guidance in reforming its policing practices. Moreover, plaintiffs should share an interest in obtaining an appellate decision as soon as possible, as the District Court's decision is currently binding only on the NYPD. This Court's holding will, of course, have a far wider reach.

Finally, the parties agree that this appeal should be heard and argued in tandem with the City's pending appeal in *Ligon*. The NYPD's stop-and-frisk policies are directly at issue in both cases, and the Injunction was issued under both captions. The grant of this relief would best serve the interests of judicial economy, and would avoid the possibility of inconsistent rulings.

# CONCLUSION

For the foregoing reasons, the Court should grant the relief requested

herein.

Respectfully submitted,

MICHAEL A. CARDOZO
Corporation Counsel of the City of
  New York

By: _____
      DEBORAH A. BRENNER
      Senior Counsel

Docket No. 13-3123-cv

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

JAENEANE LIGON et al.

v.

CITY OF NEW YORK

**MOTION TO EXPEDITE  BRIEFING AND
CONSIDERATION OF THE APPEAL**

***MICHAEL A. CARDOZO***
*Corporation Counsel of the City of New York*
*Attorney for Defendant-Appellant*
*100 Church Street*
*New York, N.Y.  10007*
*Of Counsel:  Deborah A. Brenner*
*Tel:  (212) 356-0826 or 0827*